No. 20-16802

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

STATE OF CALIFORNIA, et al.,

Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## EXCERPTS OF RECORD

———————————

JEFFREY BOSSERT CLARK
*Acting Assistant Attorney General*

DAVID L. ANDERSON
*United States Attorney*

ALISA B. KLEIN
AMANDA L. MUNDELL
*Attorneys, Appellate Staff*
*Civil Division, Room 7236*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3469*

# TABLE OF CONTENTS

**Page**

Judgment (Dkt. 66, July 20, 2020) ........................................................................ 3

Order (Dkt. 65, July 20, 2020) ............................................................................. 4

Defendants' Consent to Proceed Before a Magistrate Judge
(Dkt. 31, March 11, 2020) ........................................................................ 19

Amended Complaint (Dkt. 25, Feb. 26, 2020) ................................................. 20

Plaintiffs' Consent to Proceed Before a Magistrate Judge
(Dkt. 20, Feb. 13, 2020) ........................................................................... 96

Complaint (Dkt. 1, Jan. 30, 2020) ...................................................................... 97

Notice of Appeal (Dkt. 67, Sept. 17, 2020) ..................................................... 174

Docket Sheet ........................................................................................................ 176

CERTIFICATE OF SERVICE

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         NORTHERN DISTRICT OF CALIFORNIA

10                              San Francisco Division

11   STATE OF CALIFORNIA, et al.,              Case No. 20-cv-00682-LB

12             Plaintiffs,

13        v.                                    **JUDGMENT**

14   U.S. DEPT. OF HEALTH AND HUMAN
     SERVICES, et al.,
15
              Defendants.
16

17       On July 20, 2020, the court granted the plaintiffs' motion for summary judgment and denied

18   the defendants' cross-motion for summary judgment. Pursuant to Federal Rule of Civil Procedure

19   58, the court hereby enters judgment in favor of the plaintiffs and against the defendants. The

20   court directs the Clerk of Court to close the file in this matter.

21

22       **IT IS SO ORDERED.**

23       Dated: July 20, 2020

24                                              _____

25                                              LAUREL BEELER
                                                United States Magistrate Judge
26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | Case No. 20-cv-00682-LB |
| Plaintiffs, | **ORDER GRANTING THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING THE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| U.S. DEPT. OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| Defendants. | Re: ECF Nos. 36 & 43 |

**INTRODUCTION**

Section 1303(b)(2)(B) of the Affordable Care Act ("ACA") requires health-insurance issuers to collect separate payments from policy holders ("enrollees" in the insurance plans) for premiums for abortion services and for non-abortion services. 42 U.S.C. § 18023(b)(2)(B). The Department of Health and Human Services ("HHS") issued a rule in 2015 that allowed issuers to satisfy the separate-payment requirement by sending a single bill that itemized the premium for abortion services, sending a separate bill for the premium for abortion services, or sending a notice at enrollment specifying the separate charge. 80 Fed. Reg. 10,750, 10,840 (Feb. 27, 2015) (codified at 45 C.F.R. § 156.280). In 2019, HHS replaced the 2015 rule with a new rule that required issuers to send enrollees two separate bills, and enrollees to make two separate payments, to reflect the split between abortion and non-abortion premiums. 84 Fed. Reg. 71,674, 71,684 (Dec. 27, 2019)

**4**

(codified at 45 C.F.R. pt. 155, 156). In this lawsuit, six states and the District of Columbia sued HHS to invalidate the rule and moved for summary judgment on the following grounds: (1) the rule is arbitrary and capricious under the Administrative Procedures Act ("APA") because HHS did not give a reasoned explanation for the policy change, ignored high costs that accompanied it, ignored the evidence about the harms, and imposed measures with no rational connection to its objective; (2) the rule is contrary to several sections of the ACA; (3) HHS exceeded its statutory authority when it promulgated the rule; (4) HHS failed to follow APA procedures; and (5) the rule violates the Tenth Amendment.[1] HHS moved for summary judgment on the grounds that the new rule does not violate the ACA, the APA, or the Tenth Amendment, and it did not exceed its authority by promulgating the rule.[2]

The court grants the plaintiffs' summary-judgment motion, and denies HHS's summary-judgment motion, on the ground that the rule is arbitrary and capricious.

## STATEMENT

### 1. The ACA

The ACA created state health-insurance exchanges to allow customers to buy private insurance plans, and it provided federal subsidies to lower the cost of coverage to eligible enrollees. 42 U.S.C. §§ 1396w-3(b)(1)(B)–(C); *King v. Burwell*, 135 S. Ct. 2480, 2485–87 (2015). Federal law generally prohibits the use of federal funds for abortion services (except for rape, incest, or pregnancy that endangers the mother's life) through the Hyde Amendment, which is enacted annually in the annual appropriations bills for HHS and certain other agencies. 42 C.F.R. §§ 441.200, 441.202, 441.203; *see Harris v. McRae*, 448 U.S. 297, 300-04 (1980). To ensure compliance with the Hyde Amendment, section 1303 of the ACA prohibits health-insurance issuers from using federal subsidies to pay for non-Hyde abortion services. 42 U.S.C. § 18023(b)(2)(A). If a health plan covers abortion services, then the issuer must collect from each

---

[1] Compl. – ECF No. 1; Pls. Mot. – ECF No. 36 at 24–48. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Defs. Cross-Mot. – ECF No. 43.

United States District Court
Northern District of California

United States District Court
Northern District of California

enrollee ("without regard to the enrollee's age, sex, or family status) a separate payment for" (1) the portion of the premium for the non-Hyde abortion services equal to the actuarial value of that coverage (and that is at least $1 per month) and (2) the portion of the premium for services other than abortion services. *Id.* § 18023(b)(2)(B). The separate payments must be deposited into "separate allocation accounts." *Id.* The segregated funds can be used only for their separate purposes, meaning, payments for abortion services are used only for abortion services and payments for other services are used only for other services. *Id.* § 18023(b)(2)(C). Under the ACA, state health-insurance commissioners ensure that health plans comply with the segregation requirements. *Id.* § 18023(b)(2)(E)(i).

The ACA also has notice procedures. It requires issuers to send enrollees notice of the plan's inclusion of abortion coverage "only as part of the summary of benefits and coverage explanation, at the time of enrollment, of such coverage." *Id.* § 18023(b)(3)(A). The notice also "shall provide information only with respect to the total amount of the combined payments for [non-Hyde abortions] . . . and other services covered by the plan." *Id.* § 18023(b)(3)(B).

## 2. The 2015 Rule

In 2015, the Government Accountability Office ("GAO") identified inconsistencies by 18 issuers in 10 states with health plans that offered abortion services: two issuers who did not collect the statutory $1, four issuers who did not include the required notices, and other issuers who did not collect payments by sending a bill itemizing the separate payments or sending separate bills for the two premiums.[3] In response, in 2015, HHS proposed and finalized a rule establishing that issuers could satisfy section 1303 in several ways: (1) sending an enrollee a single monthly bill that separately itemized the premium amount for non-Hyde abortion services; (2) sending a separate monthly bill for non-Hyde abortion services; or (3) sending an enrollee a notice at or soon after enrollment that the monthly invoice or bill will include a separate charge for the non-Hyde abortion services and specifying the charge. 45 C.F.R. § 156.280. The rule allowed enrollees to

---

[3] Pls. Mot. – ECF No. 36 at 13–14. HHS did not dispute this account.

make one payment (a "single transaction") for the segregated services. *Id.* The issuer then

deposited the separate payments into the two segregated accounts. *Id.*

In October 2017, the Centers for Medicare & Medicaid Services' Center for Consumer

Information and Insurance Oversight issued a bulletin confirming that these alternatives comply

with section 1303's segregated funding requirements.[4]

### 3. The New Rule

In November 2018, the agency proposed the new rule that the plaintiffs challenge in this

lawsuit: a rule that requires (1) issuers to send two separate bills each month for the premium for

non-Hyde abortion services and the premium for other services and (2) enrollees to pay the two bills in

separate transactions. 83 Fed. Reg. 56,015, 56,030–031 (Nov. 9, 2018). HHS said that its proposed

rule "would better align the regulatory requirements for QHP [(qualified health plan)] issuer

billing of enrollee premiums with the separate payment requirement in section 1303 of the

[ACA]." *Id.* at 56,022. HHS received nearly 75,000 public comments to its proposed rule.[5] Some

supported the rule, but a majority did not.[6]

For example, state exchanges said that the proposal could result in significant consumer

confusion and loss of insurance coverage.[7] Even with consumer outreach and education

---

[4] Centers for Medicare and Medicaid Services, *CMS Bulletin Addressing Enforcement of Section 1303 of the Patient Protection and Affordable Care Act* (Oct. 06, 2017), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Section-1303-Bulletin-10-6-2017-FINAL-508.pdf.

[5] Pls. Mot. – ECF No. 36 at 15; Defs. Mot. – ECF No. 43 (HHS does not dispute this characterization); Administrative Record ("AR") – ECF No. 38. AR citations refer to the numbers at the upper left of the AR pages.

[6] Pls. Mot – ECF No. 36 at 15.

[7] AR 078652 (Covered California); AR 81027 (New York State of Health); AR 81099–81100 (Connect for Health Colorado); AR 81070 (Connecticut's Access Health CT); AR 80936–37 (District of Columbia Health Benefit Exchange Authority); AR 76518 (Silver State Health Insurance Exchange).

United States District Court
Northern District of California

**7**

campaigns, the exchanges predicted that most policy holders would not understand the purpose of the two bills or why they had to send separate payments.[8]

Other stakeholders described confusion that would cause consumers to not complete their initial enrollment. After enrolling, consumers must make their first month's premium payment — known as a "binder" payment — in full, and if they do not, there is no coverage. Because the proposed rule required two payments (at least $1 and a separate payment for the balance of the premium), some consumers would miss the full payment and thus would not initiate coverage.[9]

Physicians and professional medical associations echoed the concerns that policy holders who failed to pay the abortion-related premium would be left without coverage, resulting in a disproportionate impact on vulnerable communities.[10] Consumer-advocacy groups explained that the current process aligned with industry practice and was endorsed by the National Association of Insurance Commissioners.[11] Bundled coverage — such as life-and-disability insurance or home-and-car insurance — is commonplace because it allows policy holders to pay for multiple policies in one transaction with the same instrument.[12] Sending two bills also harms consumers, who might suspect that a bill for a nominal amount is a "scam" or otherwise ignore the bill.[13]

Issuers identified operational burdens, including Blue Shield of California's identification of up to $7 million in annual costs, costs to medium-sized health plans (of about 70,000 enrollees) of

---

[8] AR 76518 (Silver State Health Insurance Exchange).

[9] AR 81071 (Connecticut's Access Health CT); AR 78737 (Multistate Attorney Generals); AR 80263–65 (Blue Cross Blue Shield Association); AR 81302 (National Family Planning & Reproductive Health Association); AR 78720–21 (Vermont Legal Aid); AR 81310–11 (The American College of Obstetricians and Gynecologists).

[10] *See* AR 80953 (American Academy of Family Physicians, American Academy of Pediatrics, American College of Obstetricians and Gynecologists, American College of Physicians, American Medical Association, and the American Psychiatric Association group comment).

[11] AR 072862 (California Department of Insurance); AR 80207 (American Health Insurance Plans); AR 81218 (Center on Budget and Policy Priorities); AR 79777 (Planned Parenthood); AR 80489 (California Pan-Ethnic Health Network); AR 81334–35 (Western Center on Law & Poverty).

[12] AR 80207 (American Health Insurance Plans); AR 81335 (Western Center for Law and Poverty); AR 76527 (State of Oregon, Department of Consumer and Business Services).

[13] AR 79778 (Planned Parenthood Federation of America); AR 80263–64 (Blue Cross Blue Shield Association); AR 78736–37 (Multistate Attorney Generals).

United States District Court
Northern District of California

significant costs, and the cost and time to implement revised billing systems (12 to 18 months to revamp the systems and up to two years to implement the systems).[14]

State entities identified the increased regulatory and fiscal burdens from the proposed rule, such as significant administrative costs and the need to invest in increased call-center training and consumer assistance to handle the expected increase in consumer queries, complaints, and terminations resulting from non-payments.[15] They said that the "loss of coverage will also decrease the size of the risk pool and increase the cost of uncompensated care, which will drive medical costs and health insurance rates higher, further limiting access to coverage"[16] and that "the proposed [rule] would create substantial new regulatory burdens for both QHP issuers and consumers, without increasing program integrity."[17]

In December 2019, HHS published the final rule requiring issuers to send, and enrollees to pay separately, separate bills each month for the premium for non-Hyde abortion services and the premium for other services. 84 Fed. Reg. at 71,710–711 (Dec. 27, 2019) (codified at 45 C.F.R. pt. 155–56). Issuers could no longer send a single monthly bill that includes costs for abortion coverage and non-abortion healthcare coverage, even if the bill itemized the separate premium payment for abortion services, and they could not notify enrollees as part of the summary of

---

[14] AR 81321–22 (Blue Shield of California) (raising significant operational burdens, potentially up to $7 million in annual costs); *see also* AR 80207–08 (American Health Insurance Plans) (initial costs could run as high as $7.5 million per issuer with compliance costs going as high as $10.8 million); AR 81166 (Association of Community Affiliated Plan) (discussing that for medium-sized health plans, of about 70,000 enrollees, CMS underestimated the costs on issuers by 2,666 times for the first year alone);; AR 80264 (Blue Cross Blue Shield Association's billing systems); AR 80212 (American Health Insurance Plans' billing systems).

[15] AR 78734 (Multistate Attorney Generals); AR 76527 (State of Oregon, Department of Consumer and Business Services); AR 81040–43 (State of Washington); AR 80490 (California Pan-Ethnic Health Network); AR 79394 (National Women's Law Center); AR 76518 (Silver State Health Insurance Exchange); AR 78652–53 (Covered California); AR 81070–71 (Access Health CT); AR 80936–37 (District of Columbia Health Benefit Exchange Authority); AR 81029 (New York State of Health); AR 81101 (Connect for Health Colorado ) ( "mid-year implementation" posed additional significant administrative complexities).

[16] AR 76527 (State of Oregon, Department of Consumer and Business Services); *see* AR 78752 (Multistate Attorney Generals) (the rule will interfere with gains in enrollment rates and the insurance risk pool); AR 81028 (New York State of Health) (the rule will "reverse recent reductions in uncompensated care").

[17] AR 80211 (America's Health Insurance Plans).

**9**

benefits and coverage at the time of enrollment. *Id.* Instead, the issuers must send two monthly bills, either in an envelope with separate bills or electronically via two separate emails, to each enrollee. *Id.* Issuers also must instruct enrollees to pay each bill separately, either by two checks or two electronic transactions. *Id.* It required implementation of the new rule in six months, or by June 27, 2020, which is in the middle of the plan year, when most insurers are calculating and negotiating charges for the next plan year. *Id.* at 71,711.[18]

HHS explained the reasons for the new two-bills/two-payments rule:

> As explained in the proposed rule, HHS now believes that some of the methods for billing and collection of the separate payment for coverage of non-Hyde abortion services described as permissible in the preamble to the 2016 Payment Notice do not adequately reflect Congress's intent. We believe Congress intended that QHP issuers collect two distinct (that is, ''separate'') payments, one for the coverage of non-Hyde abortion services, and one for coverage of all other services covered under the policy, rather than simply itemizing these two components in a single bill, or notifying the enrollee that the monthly invoice or bill will include a separate charge for these services.

*Id.* at 71,684.

HHS recognized that it underestimated the costs of implementation in HHS's earlier cost-benefit analysis (resulting in $4.1 million in higher contracting costs for each insurer for system changes and overtime payments for personnel for over 2.9 million hours of extra work and total costs of $385 million for all issuers). *Id.* at 71,697. It recognized the additional annual costs of $1.07 million per issuer annually (about $100.2 million for all issuers). *Id.* at 71,698. It estimated the one-time costs to state exchanges ($750,000 for the one-time costs for a total of $9 million for the 12 states offering abortion coverage) and ongoing costs of $2.4 million for 2020 and $3.6 million for 2020 to 2024. *Id.* at 71,704–05. It also estimated costs to enrollees for their personal administrative burdens of $35.5 million in the first year. *Id.* at 71,707.

To address the impact on consumers, the rule prohibits issuers from initiating a grace period or terminating an enrollee's coverage if the enrollee does not pay the premium bill separately and continues to make a combined single payment. *Id.* at 71,711. In such a case, the issuer would treat the "portion of the premium attributable to coverage of . . . abortion services as a separate payment

---

[18] Pls. Mot. – ECF No. 36 at 20.

**10**

and must disaggregate the amounts into the separate allocation accounts, consistent with § 156.280 (e)(2)(iii)." *Id.* at 71,685. HHS will not penalize issuers that adopt a uniform policy that declines to put policy holders in grace periods or terminate coverage for failure to pay the separate bill for abortion coverage, but the rule does not relieve the enrollee from making the separate payment and requires issuers to try to collect the premium for abortion coverage. *Id.* at 71,686.

The final rule added a new provision that was not subject to public comment: it allows enrollees to opt out of abortion coverage by choosing not to pay the premium attributable to abortion services. *Id.* at 71,686–87. Enrollees cannot retract the decision in the plan year. *Id.* at 71,687. The enrollee's decision would apply to everyone in the enrollment group, such as covered dependents (children up to the age of 26) and spouses. *Id.*

Due to the COVID-19 pandemic, HHS extended the deadline for implementation of the rule to August 26, 2020.[19]

## 4. Procedural History

The plaintiffs filed the complaint on January 30, 2020.[20] The parties filed cross-motions for summary judgment.[21] All parties consented to the undersigned's jurisdiction.[22] The court held a hearing on June 25, 2020.[23]

## STANDARD OF REVIEW

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The challenged agency action (if not made reviewable by

---

[19] Verduzco Decl. – ECF No. 37 at 2 (¶¶ 5–7); 85 Fed. Reg. 27,550, 27,599 (May 8, 2020).

[20] Compl. – ECF No. 1; First Am. Compl. – ECF No. 25.

[21] Pls. Mot. – ECF No. 36; Cross-Mot. – ECF No. 43.

[22] Consent Forms – ECF Nos. 20 & 31.

[23] Minute Entry – ECF No. 60.

United States District Court
Northern District of California

statute) must be a "final agency action for which there is no other adequate remedy in a court[.]" 5 U.S.C. § 704; *see Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017)."

"The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be — (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2). "'Review under the arbitrary and capricious standard is deferential[.]'" *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 920 (9th Cir. 2018) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)). "[A court's] proper role is simply to ensure that the agency made no 'clear error of judgment' that would render its action 'arbitrary and capricious,' and [courts] require only 'a rational connection between facts found and conclusions made' by the defendant agencies." *Id.* (some internal quotation marks and internal brackets omitted) (quoting *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)); *see Conservation Cong. v. Finley*, 774 F.3d 611, 617 (9th Cir. 2014)).

"Accordingly, [courts] will not vacate an agency's decision unless the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* at 921 (some internal quotation marks and internal brackets omitted) (quoting *Nat'l Ass'n of Home Builders*, 551 U.S. at 658); *accord Sierra Club v. Bosworth*, 510 F.3d 1016, 1022 (9th Cir. 2007) ("[Courts] are 'not empowered to substitute [their] judgment for that of the agency.'") (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)). "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). "When an agency changes its existing position, it 'need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate.'" *Id.* at 2125–26 (*quoting FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

United States District Court
Northern District of California

"Nevertheless, to withstand review[,] 'the agency must articulate a rational connection between the facts found and the conclusions reached.'" *Sierra Club*, 510 F.3d at 1023 (internal brackets omitted) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156–57 (9th Cir. 2006), *abrogated on other grounds by Winter*, 555 U.S. 7). "[Courts] will defer to an agency's decision only if it is 'fully informed and well-considered,' and [they] will disapprove of an agency's decision if it made 'a clear error of judgment.'" *Id.* (some internal quotation marks omitted) (quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988); *West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 924 (9th Cir. 2000)). "Furthermore, when an agency has taken action without observance of the procedure required by law, that action will be set aside." *Id.* (citing *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 567–68 (9th Cir. 2000)).

"'When a party seeks review of agency action under the APA before a district court, the district judge sits as an appellate tribunal.'" *Herguan Univ. v. Immigr. & Customs Enf't*, 258 F. Supp. 3d 1050, 1063 (N.D. Cal. 2017) (internal brackets omitted) (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)). "In APA cases the administrative record is 'the whole record,' which 'consists of all documents and materials directly or indirectly considered by agency decision-makers.'" *Id.* at 1063–64 (quoting *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989); *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993)).

A motion for summary judgment may be used to seek judicial review of agency administrative decisions. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994).

## ANALYSIS

In its new rule, HHS interpreted the statute's requirement of separate payments for separate premiums — specifically, an issuer "shall collect from each enrollee in the plan . . . a separate payment for" the premiums for abortion and non-abortion services and segregate them in different accounts — as requiring issuers to send two bills for the two categories of services, and enrollees to pay the bills in two transactions. 42 U.S.C. § 18023 (b)(2)(B). (As discussed above, HHS allows enrollees to make a combined single payment, and it requires issuers to accept those single

payments.) HHS contends that its interpretation is reasonable and better aligns issuer billing with the statute: rather than "simply itemizing these two components of a single billed amount," as the previous rule allowed, the statutory provisions "contemplate[] issuers billing for two separate 'payments' of these two amounts (for example, two different checks or two different transactions)." 83 Fed. Reg. at 56,022; *see* 84 Fed. Reg. at 71,685.[24] HHS also contends that its interpretation is within its statutory authority and is entitled to *Chevron* deference.[25]

In support of the new rule, HHS explained that it believed that requiring two separate bills (from issuers) and two transactions (from enrollees) better aligned with Congress's intent under the ACA for "collecting separate payments." 84 Fed. Reg. at 71,684 (set forth in the Statement, *supra*).[26] HHS's belief is not an explanation: it concludes that that the prior rule did not adequately reflect Congress's intent (without explaining why), and it provides no context for why its belief advances Congress's intent. *See id.* An agency can change its mind if it provides a reasoned explanation. *Encino Motorcars*, 136 S. Ct. at 2125. But when an agency overrules its prior policy, it should at least explain why, especially when there is industry reliance on the earlier rule. *Id.* at 2126–27 (in reversing the Ninth Circuit's according *Chevron* deference to the Department of Labor's interpretation of the Fair Labor Standards Act's overtime requirements, the Court said that "the Department said almost nothing . . . except that it would not treat [the employees] as exempt because 'the statute did not include such positions and the Department recognizes that there are circumstances under which the requirements for the exemption would not be met.' 76 Fed. Reg. 18838. It continued that it 'believes that this interpretation is reasonable' and 'sets forth the appropriate approach.' *Ibid.*") HHS did not provide a reasoned explanation, and the new rule thus is arbitrary and capricious.

The following points support this conclusion.

---

[24] Defs. Cross-Mot. – ECF No. 43 at 11, 19–20.

[25] *Id.* at 11–12, 17–27.

[26] *Id.* at 17–23.

First, the 2015 Rule resulted from a GAO audit that revealed actual problems. By contrast, nothing in the administrative record shows any noncompliance with section 1303. To the contrary, the state Attorney Generals Multistate Comment Letters are filed every year and provide the accounting assurance that no federal funds are used for abortion services.[27] HHS proffers no reasoned explanation for its change of course. *See Encino Motorcars*, 136 S. Ct. at 2126.

Second, HHS's 2015 rule was based on standard health-insurance industry practice of bundled coverage and single-transaction payments, and many commenters described how states, issuers, and enrollees relied on that policy and how HHS's proposed change of course increased costs, created enrollee confusion, and risked reduced healthcare coverage (which contravenes the ACA's purpose). Industry reliance on the earlier rule is a relevant consideration. *Id.* at 2126–27. HHS did not provide a reasoned explanation about why it departed from its prior policy.

Third, HHS contends that its rule — two billings from issuers and two transactions from enrollees (to account for the premiums for abortion services and for non-abortion services) — is a reasonable interpretation of Congress's requirement that issuers "collect . . . a separate payment." 42 U.S.C. § 18023(b)(2)(B)(i).[28] But the statute does not require separate billings from insurers or separate transactions from enrollees. Moreover, the statute's notice provisions require notice to enrollees of the plan's inclusion of abortion coverage "only as part of the summary of benefits and coverage explanation, at the time of enrollment, of such coverage." 42 U.S.C. § 18023(b)(3)(A). In sum, the statute does not require or even suggest separate billings by issuers or separate transaction-payments by consumers.

HHS also contends that its interpretation is entitled to *Chevron* deference.[29] Assuming that the statute is ambiguous, again, HHS did not identify any reasons why it changed its prior policy and (in essence) says that its statutory interpretation is reason enough to change course. It is not. *Id.* at

---

[27] 6/25/2020 Hr'g Tr. – ECF No. 63 at 16 (p. 16:11–16); *see* AR 78734–78755 (Multistate Attorney Generals).

[28] Defs. Cross-Mot. – ECF No. 43 at 18–21, 33–35.

[29] *Id.* at 22–23.

United States District Court
Northern District of California

1226–27. HHS must identify some problem that it is solving or benefit that it is achieving, meaning it must give a reasoned explanation. *Id.*

HHS also contends that the new rule "makes it more likely that issuers will comply with the additional requirement in Section 1303(b)(2)(B)(ii) that [issuers] maintain separate allocation accounts" to segregate premium payments for abortion services, but it does not explain how.[30] This goes to the issuers' responsibilities under section 1303: calculate the actuarial value for the portion of the premium attributable to abortion services, notify enrollees at the time of enrollment, collect separate payments, segregate the funds, and deposit them into separate allocation accounts to ensure that the funds are used for dedicated purposes. 42 U.S.C. §§ 18023(b)(2)(A)–(B),18023(b)(3). As the plaintiffs point out, separate billing transactions do nothing to affect the segregation and allocation of the payments after they are collected.[31] This is especially true because — notwithstanding the new rule's requirement that enrollees pay the abortion and non-abortion premiums in two transactions (two checks or two electronic payments) — HHS has mandated that issuers must accept single-transaction payments from enrollees.[32]

Moreover, the transactional costs to states, issuers, and enrollees (summarized in the Statement) are substantial and immediate (given the six-month implementation date in the middle of the plan year). (As the court said at the hearing, the two-month extension based on the pandemic does not ameliorate this timeline.)[33] HHS does not identify any transactional benefit.

HHS nonetheless argues that it adequately addressed costs. It contends that it addressed some costs (in the form of loss of coverage) by prohibiting issuers from terminating coverage for enrollees who pay their full premium in a single transaction.[34] It also contends that it "gave full

---

[30] *Id.* at 20.

[31] Pls. Opp'n – ECF No. 44 at 12.

[32] In light of its decision that the rule is arbitrary and capricious, the court does not reach the parties' arguments about whether HHS may exercise its enforcement discretion. The point here is that HHS gave no reasoned explanation for its new rule.

[33] 6/25/2020 Hr'g Tr. – ECF No. 63 at 25–26 (pp. 25:19–26:13).

[34] Defs. Cross-Mot. – ECF No. 43 at 37.

consideration to the [other] costs and burdens the Rule would impose, and made reasonable efforts to minimize them."[35] *See* 84 Fed. Reg. at 71,697 (HHS recognized that the timeline increased costs to issuers by 50 percent). But then it summarily concludes that its "better interpretation" of the ACA "justifies the costs."[36] This is not a reasoned explanation. *Encino Motorcars*, 136 S. Ct. at 2126 (in promulgating its new policy (that the Court reversed), the Department of Labor said that "it had 'carefully considered all of the comments, analyses, and arguments made for and against the proposed changes.' 76 Fed. Reg. 18832.) And it does not show that HHS's "[c]onsideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decision." *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (emphasis in the original).

Fourth, and finally, HHS's inclusion of a new provision (not subject to public comment) — allowing enrollees to opt out of abortion coverage by choosing not to pay the premium attributable to abortion services — supports the conclusion that HHS changed its prior policy without affording any reasoned explanation for the change. *Encino Motorcars*, 136 S. Ct. at 2125.

In sum, agencies can change their policies when they provide a reasoned explanation for the change. *Id.* The 2015 rule — grounded in a GAO audit that revealed problems with compliance — also allowed (as one option) issuers to bill separately for the abortion and non-abortion premiums. But here, HHS — by requiring two issuer bills and two consumer transaction-payments, at substantial transactional cost to states, issuers, and enrollees and without any corresponding benefit — does not advance a reasoned explanation for deviating from its prior rule and industry practice. The new rule is arbitrary and capricious.[37]

---

[35] *Id.* at 36.

[36] *Id.* at 38 (citing 84 Fed. Reg. at 71,695); Defs. Reply – ECF No. 52 at 20.

[37] Given this ruling, the court does not reach the plaintiffs' other arguments.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## CONCLUSION

The court grants summary judgment in favor of the plaintiffs and sets the rule aside. 5 U.S.C. § 706(2)(A); *Pollinator Stewardship Council v. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015).

**IT IS SO ORDERED.**

Dated: July 20, 2020

_____
LAUREL BEELER
United States Magistrate Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA, et al.,

Case No. C  4:20-CV-0068

Plaintiff(s)

v.

U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et al.

Defendant(s).

CONSENT OR DECLINATION
TO MAGISTRATE JUDGE
JURISDICTION

**INSTRUCTIONS:** Please indicate below by checking **one** of the two boxes whether you (if you are the party) or the party you represent (if you are an attorney in the case) choose(s) to consent or decline magistrate judge jurisdiction in this matter. Sign this form below your selection.

☑ **Consent to Magistrate Judge Jurisdiction**

In accordance with the provisions of 28 U.S.C. § 636(c), I voluntarily **consent** to have a United States magistrate judge conduct all further proceedings in this case, including trial and entry of final judgment. I understand that appeal from the judgment shall be taken directly to the United States Court of Appeals for the Ninth Circuit.

**OR**

☐ **Decline Magistrate Judge Jurisdiction**

In accordance with the provisions of 28 U.S.C. § 636(c), I **decline** to have a United States magistrate judge conduct all further proceedings in this case and I hereby request that this case be reassigned to a United States district judge.

DATE:  3/11/2020

NAME:  Bradley P. Humphreys

COUNSEL FOR
(OR "PRO SE"):  Defendants

*Signature*

**19**

XAVIER BECERRA
Attorney General of California
KATHLEEN BOERGERS
Supervising Deputy Attorney General
KETAKEE R. KANE
MICHAEL GOLDSMITH
BRENDA AYON VERDUZCO
Deputy Attorneys General
State Bar No. 315117
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 879-0981
  Fax:  (510) 622-2270
  E-mail:  Brenda.AyonVerduzco@doj.ca.gov
*Attorneys for Plaintiff State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA, STATE OF NEW YORK, STATE OF COLORADO, DISTRICT OF COLUMBIA, STATE OF MAINE, STATE OF MARYLAND, STATE OF OREGON,** and the **STATE OF VERMONT,**<br><br>*Plaintiffs,*<br><br>v.<br><br>**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**; **ALEX M. AZAR, II,** in his official capacity as Secretary of Health and Human Services; **THE CENTERS FOR MEDICARE & MEDICAID SERVICES**; **SEEMA VERMA**, in her official capacity as Administrator of Centers for Medicare and Medicaid Services,<br><br>*Defendants.* | Case No. 3:20-cv-00682-LB<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Administrative Procedure Act Case |

1

**INTRODUCTION**

1.      Plaintiffs the States of California, New York, Colorado, District of Columbia, Maine, Maryland, Oregon, and Vermont (collectively, the States), bring this action to challenge the unlawful agency action by Defendants, the U.S. Department of Health and Human Services (HHS) and Secretary Alex M. Azar, II (collectively, Defendants), that threatens to undermine access to healthcare coverage, specifically safe and legal abortion, and the States' sovereign laws enacted to protect women's constitutional rights.  Defendants have unlawfully reinterpreted Section 1303 of the Patient Protection and Affordable Care Act (ACA) and issued an onerous and unnecessary regulation designed to restrict women's constitutionally protected reproductive rights by creating barriers to abortion coverage.  In doing so, Defendants seek to frustrate the States' sovereignty by coercing the States to change their policies relating to the protection of abortion care.

2.      A central feature of the ACA is the requirement that every state establish a "health insurance exchange."  Exchanges are marketplaces in which consumers and small businesses can shop for and purchase private health insurance coverage.  The ACA gave states the flexibility to develop and host their own exchanges, or let the federal government establish and run exchanges for them.  An exchange established by the state itself is a state-based exchange (SBE) and those operated by HHS are federally facilitated exchanges (FFE).  In states with FFEs, the exchange may be operated by HHS alone or in conjunction with the state.  And some states have exchanges that are SBE-FPs, meaning they are SBEs but use the federal information technology platform, including the federal exchange website www.Healthcare.gov.[1]

3.      States that choose to implement their own exchanges may tailor the exchanges to their state's unique public health priorities, such as ensuring coverage for services required by state laws for its residents.  An important aspect of developing its own insurance exchange is a

---

[1] In Plaintiff States, California New York, Colorado, the District of Columbia, Maryland, and Vermont, operate state-based exchanges (SBEs), while Oregon operates a state-based exchange on the federal platform (SBE-FP), and Maine operates a federally facilitated exchange (FFE).  The States represent the diversity contemplated by the ACA, which authorized significant state flexibility in the operation of the States' health insurance markets.

1    state's ability to define standards for and selecting plans that qualify for participation in its

2    exchange. State exchanges are responsible for annually certifying or recertifying plans to be sold

3    on their exchanges as qualified health plans (also known as QHPs), plans that cover the essential

4    health benefits (EHB) required under the ACA, as well as any benefits mandated by state law

5    (e.g. abortion coverage).

6         4.    States have historically retained general police powers to promote and regulate public

7    health. Since states regulate their own healthcare markets and the ACA intentionally respects the

8    power of the States to govern the individual market, the States of California, New York,

9    Colorado, District of Columbia, Maine, Maryland, Oregon, and Vermont all require or encourage

10   the provision of abortion coverage in qualified health plans.

11        5.    The States require or allow abortion coverage because it is critical to ensuring that *all*

12   residents have access to comprehensive healthcare services including coverage for abortion. In

13   the States, more than half a million women[2] are enrolled in, and benefit from, private qualified

14   health plans that offer coverage for abortion services in the States' individual health insurance

15   exchanges. As such, the Rule threatens the States' policy priorities and flexibility authorized by

16   the ACA.

17        6.    On December 27, 2019, HHS issued a final rule titled, "Patient Protection and

18   Affordable Care Act: Exchange Program Integrity" (hereinafter Rule) which contains changes to

19   how State Exchanges and health insurance plans segregate consumers' premium payments for

20   abortion coverage under 45 C.F.R. §156.280. Patient Protection and Affordable Care Act;

21   Exchange Program Integrity, 84 Fed. Reg. 71,674 (December 27, 2019) (to be codified at 45

22   C.F.R. pt. 155, 156). HHS contends the Rule is required to better align implementing regulations

23

24        [2] This total represents 2019 enrollment data, identifying women of reproductive age,
     between the ages of 15-49 years old who participate in a qualified health plan that provide
25   abortion coverage, and reaches a total of 509,014 women potentially impacted by the Rule. In the
     State of California 388,661 women of reproductive age would be at risk of abortion coverage
26   loss; approximately 56,000 in the State of New York; approximately 18,080 in the State of
     Colorado; 8,148 in the District of Columbia; approximately 20,000 in the State of Maine; and
27   36,205 in the State of Maryland. This total does not include the States of Oregon and Vermont,
     for which data was not readily available at the time of filing of this complaint.
28

3

of Section 1303 of the ACA with other extraneous federal restrictions on the use of federal funds for abortion services. However, issuers have been in compliance with those restrictions by creating segregated accounts that could be used only for abortion services. And in prior guidance, HHS endorsed the practice of billing policy holders in a single transaction as a way to comply with the segregated-use requirements. But nearly after a decade since the ACA became law, the Rule would now require issuers (insurance companies) to send separate bills—and collect separate payments from policy holders—of an amount no less than $1, for the portion of the insurance premium attributable to abortion coverage. These changes violate key provisions of the ACA, the Administrative Procedure Act, and the U.S. Constitution, and could potentially cost the States significant federal matching funds for noncompliance.

7. Once implemented, the Rule will require health issuers selling qualified health plans in states that offer abortion coverage to comply with the onerous requirements of sending two separate bills to each policy holder. Similarly, HHS presumes that these changes will also apply to the three State exchanges that currently perform premium billing and payment processing for issuers participating in the individual market. Operationally, the Rule penalizes issuers for doing business in the States—where access to comprehensive reproductive care is protected by state laws that mandate or allow abortion coverage, and in states which have heavily invested in the administration of their own exchange. Further, the Rule disincentivizes issuers from providing abortion coverage in states that do not yet have specific laws restricting it, by creating barriers to doing so. In addition, the Rule will require costly changes to the States' coverage and enrollment policies, imposing new oversight responsibilities on the States' agencies, including state regulators and insurance commissioners.

8. In the end, the Rule will create significantly more problems than those HHS purportedly seeks to solve. Contrary to the ACA's requirement of equitable access to healthcare, the Rule complicates access to care. The Rule will increase consumer confusion because those who do not understand the purpose of the two separate bills and payments may inadvertently fail to make complete premium payments on time, putting their coverage at risk of termination. Indeed, HHS concedes the Rule will likely increase consumer confusion. 84 Fed. Reg. 71,686.

4

9.     This confusion may result in premium increases or loss of coverage, affecting almost 2.6 million enrollees who receive abortion coverage through a qualified health plan in the 11 impacted state-based exchanges.  84 Fed. Reg. 71,698.  In the States alone, the Rule puts the coverage of almost 2.3 million enrollees in the individual market at risk of coverage termination.[3] The Rule will have a disparate impact on women and their access to abortion care—a critically time-sensitive and women-specific procedure.

10.     This is precisely the type of rulemaking that Congress prohibited when it enacted Section 1554 of the ACA.  Section 1554 prohibits the Secretary from promulgating any regulation that creates unreasonable barriers to the ability of individuals to obtain appropriate medical care. 42 U.S.C. § 18114 (2019).  Now, a decade after the passage of the ACA, HHS's onerous new Rule threatens to rescind a cornerstone of the statute's enactment—the authority and flexibility granted to states to operate their state-based exchanges to meet the state's policy priorities.

11.     Moreover, HHS's Rule threatens the States' public fiscs, as noncompliance with the Rule risks millions of federal dollars paid to the States for the administration of health programs. Under the ACA's financial integrity section, 42 U.S.C. § 18033(a)(4) (2018), HHS may conclude that the States' inability to comply, or allow issuers to comply, with the separate billing requirements amounts to a "pattern of abuse" from compliance with HHS standards related to Title I of the ACA.  If "the Secretary determines that an Exchange has engaged in serious misconduct with respect to compliance with the requirements of, or carrying out of activities required" under the ACA, HHS has the authority to rescind up to one percent (1%) of the federal funding dollars due to a state *under any program administered by HHS.*  84 Fed. Reg. 71,678.

12.     HHS acknowledges that the ACA "designate[s] the state insurance commissioners as responsible for monitoring, overseeing, and enforcing the provisions in section 1303."  *Id.* at

---

[3]  Collectively the Plaintiff States reported a total enrollment of 2,270,472 in 2019.  This includes 1,513,883 enrollees in the state of California; 271,873 in the state of New York; 18,035 in the District of Columbia; 70,987 in Maine's ACA individual market; 156,963 in the state of Maryland; 148,180 in the state of Oregon; and 25,223 in the State of Vermont, *see* CMS 2019 OEP State-Level Public Use File, accessible at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Marketplace-Products/2019_Open_Enrollment, and approximately 65,328 enrollees in plans offering abortion coverage in the State of Colorado.

71,691-692 (citing § 18023 and the implementing regulations at § 156.280(e)(5)).  Nevertheless, HHS asserts that states do not have "exclusive enforcement authority with respect to all provisions in Section 1303" and warns state-based exchanges, that under the authority granted to it by 42 U.S.C. § 18041(c)(2), "the Secretary may step in to enforce the requirement against the non-compliant issuer," in place of the exchange itself.  *Id.*  And HHS hints at now restricting previously afforded state flexibility, reminding "states concerned about enforcement and oversight of these requirements that, under section 1321(c), states may elect not to establish and operate an Exchange, thereby defer[] those responsibilities to HHS."  84 Fed. Reg. 71,694.

13.     The States stand to lose millions of dollars annually for the administration of healthcare programs, which depend on federal dollars.  Jeopardizing these federal matching dollars would significantly harm the States' residents and families, as they support critical healthcare programs and public health initiatives.  Thus, through the Rule's onerous requirements and the resulting personal and societal costs, HHS seeks to thwart the States' laws and policies long committed to women's reproductive freedom.

14.     Further, the Rule exacerbates these harms, by imposing these new requirements on an administratively and operationally infeasible timetable that will cause excessive burdens on the States' health insurance exchanges and health insurance markets.  Numerous state-based exchanges commented, including Covered California, Connect for Health Colorado, Connecticut's Access Health CT, District of Columbia Health Benefit Exchange Authority, New York State of Health, as well as the Attorneys General of California, New York, Oregon, Pennsylvania, and Washington, explaining to HHS that the Rule involved significant administrative complexities, and many raised that "mid-year implementation" of the proposed changes would be "unworkable and burdensome on both states and issuers."  (Comment submitted by Connect for Health Colorado).  Blue Shield of California, one of the largest issuers in California, submitted comments estimating that it would take at least 18 months to put these changes into place.  (Comment submitted by Blue Shield of California).

15.     Even after acknowledging commenters' implementation challenges, HHS's final Rule requires compliance with these changes by June 27, 2020—after open enrollment has been

1   finalized and mid-plan year.  HHS simply states that, "we believe 6 months is sufficient…to

2   implement the administrative and operational changes to billing processes necessary to

3   comply[,]" while acknowledging that some issuers "may seek to exit the individual market in a

4   state" as a result of the Rule.  84 Fed. Reg. at 71,689, 71,690.  Ostensibly, "such a short time

5   period to implement the new regime is further evidence that the [Rule] is meant to coerce insurers

6   into dropping abortion coverage."  (Comment of Positive Women's Network-USA (PWN-USA)

7   on Proposed Rule (Nov. 09, 2018)).

8        16.    The States have each taken crucial steps to safeguard women's access to reproductive

9   healthcare and have made this a policy priority.  As mentioned, The States of California, New

10  York, Colorado, District of Columbia, Maine, Maryland, Oregon, and Vermont all require or

11  encourage the provision of abortion coverage in qualified health plans.  This commitment to

12  women's reproductive freedom captures the importance of securing coverage to ensure that

13  individuals have access to all the services they may need and have the option of exercising

14  constitutionally protected rights.

15       17.    California has a long history of protecting women's access to comprehensive

16  reproductive health, including abortion care.  The fundamental right to choose to bear a child or

17  choose to obtain an abortion is the official public policy of the State, protected in both the State's

18  constitution and by statute.  *See* Cal. Const., art. I, § 1; Cal. Health & Saf. Code § 123462(b)

19  (Dering 2019).  In furtherance of these rights, state law requires that all health plans regulated by

20  the State offer abortion coverage as part of their basic healthcare services.  California's Governor

21  recently issued the California Proclamation on Reproductive Freedom in 2019, reaffirming the

22  State's commitment to "uphold women's equality and liberty by protecting their reproductive

23  freedom, educating Californians about their rights to reproductive freedom," reaffirming

24  reproductive rights "and acting as a model for other states that want to ensure full reproductive

25  freedom for women."[4]

26

27       [4] *See* https://www.gov.ca.gov/wp-content/uploads/2019/05/Proclamation-on-
    Reproductive-Freedom.pdf.

28

18.    New York has also enacted some of the strongest protections for women's access to comprehensive healthcare.  New York first legalized abortion in 1970, three years before the Supreme Court established the constitutional protections of *Roe v. Wade*.  In 2019, New York enacted the Reproductive Health Act, to align state law further with federal law, explicitly providing that comprehensive reproductive healthcare is a fundamental component of every individual's health, privacy, and equality.  N.Y. Pub. Health L. § 2599-aa (2019).  Consequently, it is the policy of the state that every individual who becomes pregnant has the fundamental right to choose to carry the pregnancy to term, to give birth to a child, or to have an abortion.  *Id.*  Thus, New York state law requires that health insurance plans must include abortion coverage, and with the exception of high-deductible plans, must cover abortion care without any cost-sharing.

19.    Colorado's laws do not restrict abortion rights and allow issuers participating in Colorado's state exchange to offer qualified health plans that provide abortion coverage.  In 2019, approximately 60 health plans offered on Colorado's individual insurance marketplace covered abortion.

20.    The District of Columbia's laws do not restrict abortion rights and allow issuers participating in the District's state exchange to offer qualified health plans that provide abortion coverage.  All health plans offered on the District's individual insurance Marketplace cover abortion.

21.    Maine enacted the Reproductive Privacy Act in 1993, which declares that "[i]t is the public policy of the State that the State not restrict a woman's exercise of her private decision to terminate a pregnancy before viability."  Me. Rev. Stat. tit. 22, § 1598(1).  Maine law requires carriers offering health plans in Maine to provide coverage for maternity services, which is designated as part of an "essential health benefits package."  Me. Rev. Stat. tit. 24-A, § 4320-D (effective March 19, 2019).  Maine law further requires a carrier offering a health plan in Maine that provides maternity services to also provide coverage for abortion services.  *Id.* § 4320-M (effective September 19, 2019).  Maine's laws thus require all carriers offering health plans on the Marketplace to provide coverage for abortion services.

22.     Maryland law provides that the state "may not interfere with the decision of a woman to terminate a pregnancy" before viability of the fetus, to protect the woman's life or health, or if the fetus bears a genetic defect.  Md. Code Ann., Health - Gen. § 20-209(b).  In addition, Maryland's Medicaid program covers abortion services for eligible individuals with state-only funds.  Md. Cod. Regs. Tit. 10, § 09.02.04(G).  Although Maryland does not have a law that requires private health plans to cover abortion services, all health plans offered on the state's individual insurance marketplace cover abortion.

23.     Oregon has long been a leader in enacting policies and programs that support access to high-quality reproductive health services.  In 2017, Oregon passed the Reproductive Health Equity Act (House Bill 3391), which requires private health insurance plans to cover abortions with no out-of-pocket costs.  Specifically, the law requires all health benefit plans offered in the state to provide coverage for abortions and prohibits imposition of "a deductible, coinsurance, copayment or any other cost-sharing requirement on the coverage required by this section."  Or. Rev. Stat. Ann. § 743A.067(2)-(3).

24.     Vermont passed a Freedom of Choice Act in 2019,  *See* 2019 Vt. Laws No. 47, codifying that, "[t]he State of Vermont recognizes the fundamental right of every individual who becomes pregnant to choose to carry a pregnancy to term, to give birth to a child, or to have an abortion."  Vt. State. Ann. tit. 18, § 9493(b).  Consistent with Vermont state policy, Vermont has selected an essential health benefit benchmark plan, since 2013, that includes coverage of abortion services.[5]  All individual and small group health plans in Vermont therefore offer coverage for abortion services.  As a result, the final rule impacts not a subset of the market, but the entirety of Vermont's merged individual and small group market.

25.     The States seek declaratory relief on the grounds that the Rule violates the Administrative Procedure Act (APA), 5 U.S.C § 706, because it is contrary to law, exceeds

---

[5] The State of Vermont continues to evaluate the impact the Rule will have on consumers in light of the state's benchmark plan, including ways to mitigate consumers' coverage termination risks.  This too is an added burden imposed by Rule, particularly one that seeks implementation to be achieved mid plan year.

9

Defendants' authority, and is arbitrary and capricious. Additionally, the Rule is unlawful under the Constitution's Tenth Amendment.

## JURISDICTION

26. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a civil action arising under the Constitution and laws of the United States. Further, the Court has jurisdiction under 28 U.S.C. § 1361 because this is an action to compel officers or agencies of the United States to perform a duty owed to Plaintiffs. Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. § 702.

27. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ § 1361, 2201-2202, 5 U.S.C. §§ 705-706, and the Court's equitable powers.

28. Defendants' issuance of the Rule on December 27, 2019, constitutes a final agency action and is therefore judicially reviewable within the meaning of the APA. 5 U.S.C. §§ 704, 706.

## VENUE

29. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e) because the State of California and its Attorney General have offices in Oakland, California, and this action seeks relief against the United States, agencies of the United States, and officials acting in their official capacities.

## INTRADISTRICT ASSIGNMENT

30. Pursuant to Civil Local Rules 3-5(b) and 3-2(c), assignment to the Oakland Division or San Francisco Division is appropriate because Plaintiff the State of California and its Attorney General maintain offices therein.

## PARTIES

31. Plaintiff the State of California, by and through Attorney General Xavier Becerra, brings this action. California is a sovereign state in the United States of America. The Attorney

10

Case 3:20-cv-00682-LB Document 45-7 Filed 02/26/21 Page 30 of 76

1   General is the chief law enforcement officer of the State and has the authority to file civil actions

2   in order to protect the health and welfare of Californians and advance the State's interest in

3   protecting women's access to reproductive healthcare.  Cal. Const., art. V, § 13; Cal. Bus. & Prof.

4   Code § 321.  This challenge is brought pursuant to the Attorney General's independent

5   constitutional, statutory, and common law authority to represent the public interest.

6        32.     Plaintiff the State of New York, by and through its Attorney General Letitia James,

7   brings this action.  New York is a sovereign state in the United States of America.  The Attorney

8   General is New York State's chief law enforcement officer and is authorized to advance the

9   State's interest in protecting women's access to reproductive healthcare services.

10        33.     Plaintiff the State of Colorado is a sovereign state of the United States of America.

11   The State of Colorado brings this action by and through its Attorney General, Philip J. Weiser.

12   The Attorney General has authority to represent the state, its departments, and its agencies and

13   "shall appear for the state and prosecute and defend all actions and proceedings, civil and

14   criminal, in which the state is a party."  Colo. Rev. Stat. § 24-31-101.

15        34.     Plaintiff the District of Columbia (the District), by and through its Attorney General

16   Karl A. Racine, brings this action.  The District is a municipal corporation empowered to sue and

17   be sued, and is the local government for the territory constituting the permanent seat of the federal

18   government.  The Attorney General is the Chief Legal Officer for the District and possesses all

19   powers afforded the Attorney General by the common and statutory law of the District.  The

20   Attorney General is responsible for upholding the public interest and has the authority to file civil

21   actions in order to protect the public interest.  D.C. Code § 1-301.81.

22        35.     Plaintiff the State of Maine, by and through its Attorney General Aaron M. Frey,

23   brings this action.  Maine is a sovereign state of the United States of America.  The Attorney

24   General of Maine is a constitutional officer with the authority to represent the State of Maine in

25   all matters and serves as its chief legal officer with general charge, supervision, and direction of

26   the State's legal business.  Me. Const. art. IX, Sec. 11; Me. Rev. Stat. tit. 5, §§ 191 *et seq.*  The

27   Attorney General's powers and duties include acting on behalf of the State and the people of

28   Maine in the federal courts on matters of public interest.  The Attorney General has the authority

11

1  to file suit to challenge action by the federal government that threatens the public interest and

2  welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

3       36.    Plaintiff the State of Maryland, by and through its Attorney General Brian E. Frosh,

4  brings this action. Maryland is a sovereign state in the United States of America. The Attorney

5  General is Maryland's chief legal officer with general charge, supervision, and direction of the

6  State's legal business. The Attorney General's powers and duties include acting on behalf of the

7  State and the people of Maryland in the federal courts on matters of public concern. Under the

8  Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney

9  General has the authority to file suit to challenge action by the federal government that threatens

10  the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md.

11  Laws, Joint Resolution 1.

12       37.    Plaintiff the State of Oregon, by and through its Attorney General Ellen Rosenblum,

13  brings this action. The State of Oregon is a sovereign state of the United States of America.

14  Attorney General Rosenblum is the Chief Law Officer of Oregon and is empowered to bring this

15  action on behalf of the State of Oregon and its affected state agencies. Or. Rev. Stat. §§ 180.060,

16  180.210, 180.220.

17       38.    Plaintiff the State of Vermont, by and through its Attorney General, Thomas J.

18  Donovan, brings this action. Vermont is a sovereign state in the United States of America. The

19  Attorney General is the state's chief law enforcement officer and is authorized to pursue this

20  action pursuant to Vt. Stat. Ann. tit. 3, §§ 152 & 157.

21       39.    The States have an interest in ensuring women's reproductive healthcare is both

22  available and accessible. Healthcare is one of the primary powers of the States. Moreover, under

23  Section 1303, states are primarily responsible, through their insurance commissioners and

24  regulating bodies, for the regulation of health insurance. Defendants' actions interfere with this

25  authority.

26       40.    The States rely on Defendants' compliance with both procedural and substantive

27  requirements of the APA so they can meaningfully participate in an impartial and public decision-

28  making process that is consistent with the ACA's requirements of equitable access to healthcare.

12

This is especially true in matters related to federal regulatory schemes and agency activities that may have significant adverse impacts on access to comprehensive healthcare, including access to abortion coverage.

41. Each State is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its state sovereignty caused by Defendants' issuance of the illegal Rule, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests. In particular, the States will suffer concrete and substantial harm because the Rule frustrates the States' public health interests by encumbering women's access to abortion services made available through qualified health plans.

42. Further, the States are aggrieved by the actions of Defendants and have standing to bring this action because of the injuries that will be caused to the States by the implementation and enforcement of Defendants' Rule creating unnecessary and costly requirements that will likely limit women's ability to obtain abortion services. The States will suffer concrete and substantial harm because they will incur unnecessary administrative costs caused by the Rule's onerous burdens on the States' exchanges and regulatory agencies. The Rule will also cause the States additional injuries associated with resulting unwanted pregnancies and the related attendant harms and increasing uncompensated care costs for entire families stemming from the inadvertent loss of healthcare coverage for failure to pay the separate bill.

43. Defendant, Alex M. Azar, II, is Secretary of HHS and is sued in his official capacity. Secretary Azar has responsibility for implementing and fulfilling HHS's duties under the Constitution and the APA.

44. Defendant, Seema Verma, is Administrator of the Centers for Medicare and Medicaid Services (CMS) and is sued in her official capacity. Administrator Verma has responsibility for implementing and fulfilling CMS's duties under the Constitution and the APA.

45. Defendant, HHS, is a federal agency of the United States government and bears responsibility, in whole or in part, for the acts complained of in this Complaint. CMS is a federal agency and an entity within HHS.

# FACTUAL AND PROCEDURAL BACKGROUND

## I.    THE ACA AND SECTION 1303 ABORTION FUNDING RESTRICTIONS

46.    In 2010, Congress enacted the ACA, landmark legislation that enabled more than 20 million Americans to gain health coverage.  The ACA vastly increased coverage by expanding the traditional Medicaid program, providing subsidies to lower the cost of coverage, and created effective health insurance exchanges to allow consumers a marketplace with choices for private health insurance coverage.  Among its many reforms, the ACA prohibited issuers from charging people with pre-existing health conditions, such as pregnancy, more for care based on their health status, charging women more than men, or denying people the coverage they need.  The law created consumer protections in the private insurance market, limiting issuers' ability to set annual lifetime limits on total benefits or rescind coverage, except in cases of fraud.  And issuers were required to cover dependents up to age 26 under their parents' health plans, include annual out-of-pocket limits, and provide rebates to the insured if total benefits do not exceed statutory shares of premiums received.  The ACA improved the quality, accessibility, and affordability of health insurance coverage both for people who were already insured and for the previously uninsured.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (*NFIB*); 42 U.S.C § 18091(2)(C), (F) & (G) (2019).

47.    To ensure even more broad-based access to health insurance, the ACA included key provisions, primarily Section 1554 and Section 1557, to create and safeguard parity in healthcare access.  Among other things, the ACA's Section 1554 prohibits the Secretary of HHS from promulgating any regulation that creates unreasonable barriers to the ability of individuals to obtain appropriate medical care, impedes timely access to healthcare, or limits the availability of treatment for the full duration of a patient's medical needs.  42 U.S.C. § 18114.

48.    Section 1557 of the ACA established the first federal law to prohibit a broad range of health programs or activities—including the growing health insurance exchange—from discriminating against individuals on the basis of any classification listed under different federal civil rights statutes, such as race, color, national origin, and sex.  42 U.S.C. § 18116 (2019).

49.     These provisions were designed to guarantee that the benefits of the ACA—expanded healthcare coverage, patient protections, and reductions to rising healthcare costs—were attainable by all.  Together, Sections 1554 and 1557 specifically addressed the numerous ways in which regulatory schemes might deny these opportunities and protections to certain vulnerable groups, such as women, those with preexisting conditions, and low-income communities of color.

50.     The ACA's comprehensive transformation of the country's healthcare system contemplated the important issue of abortion coverage.  In enacting the ACA, Congress struck a balance between maintaining restrictions on federal funding for abortion, while ensuring that states had flexibility to permit coverage in the private market.  Most relevant to these restrictions is the Hyde Amendment, a restriction on the use of federal Medicaid funds for abortion services, in the annual appropriations legislation that funds the activities and services provided by HHS.  The Hyde Amendment allows for certain, limited exceptions for the termination of pregnancies that are the result of rape or incest, or if a woman suffers from a life-threatening physical condition caused by or arising from the pregnancy itself, as certified by a physician.  *See* 42 C.F.R. §§ 441.202, 441.203, and 441.206.

51.     The ACA's implementing regulations, 45 C.F.R. Parts 155 and 156, established certain standards for the creation and regulation of exchanges and participating health issuers.  These regulations authorized HHS to oversee exchange program compliance with quality standards related to Title I of the ACA to ensure their financial integrity, including the authority to conduct investigations and annual audits.

52.     And through Section 1303, Congress included additional standards that prohibited using federal funds, specifically federal advance premium tax credits (APTCs) or cost-sharing reductions (CSRs), to pay for abortion coverage.  In Executive Order No. 13535, President Obama established that the ACA maintains current Hyde Amendment restrictions governing abortion policy and extends those restrictions to the newly created health insurance exchanges.  75 Fed. Reg. 15,599 (Mar. 29, 2010).  Since its inception, Section 1303 has required separate accounting and transparency requirements for coverage of abortion services (for which federal

Case 3:20-cv-00682-LB Document 45-7 Filed 02/26/21 Page 16 of 789

1  funding is prohibited), provided by qualified health plans sold through the individual health

2  insurance exchanges.

3     53.    Section 1303 grants significant latitude to state and private issuers.  First, the section

4  recognizes states' sovereignty in the regulation of healthcare and provides flexibility for states to

5  make the decision about abortion coverage provided through their respective exchanges.  Second,

6  the section sets special rules to allow participating issuers the option of offering such coverage in

7  qualified health plans, but prohibits the use of federal funds to pay for abortion services, "based

8  on the law as in effect as of the date that is six months before the beginning of the plan year

9  involved," unless the pregnancy is a result of rape, incest, or would endanger a woman's life.  *See*

10  Patient Protection and Affordable Care Act, Pub. L. 111-148, § 1303, 124 Stat. 119, 896; 42

11  U.S.C. § 18023 (2019).

12     54.    Consequently, since the implementation of health insurance exchanges under the

13  ACA, qualified health plan issuers may not use federal exchange subsidies, specifically APTCs or

14  CSRs, to pay for otherwise legal abortion services for which federal funding is prohibited.  42

15  U.S.C. § 18023(b)(2)(A).

16     55.    Section 1303 provides that if a qualified health plan includes—or is required to

17  include—coverage of abortion services, issuers must charge all policy holders at least one dollar

18  ($1) per month for the premium attributable to abortion services, which must then be deposited

19  and maintained in a separate allocation amount.  The remainder of the insurance premium not

20  related to abortion services must be deposited and maintained in a separate account. 42 U.S.C. §

21  18023(b)(2)(B)(i)-(ii) and (b)(2)(C)-(b)(2)(D).  Further, issuers are required to provide notice to

22  enrollees of the qualified health plan's inclusion of abortion coverage, "only as part of the

23  summary of benefits and coverage explanation, at the time of enrollment, of such coverage."  *Id.*

24  § 18023(b)(3)(A).  Finally, the statute assigns State health insurance commissioners the task of

25  ensuring that issuers of qualified health plans comply with requirements to segregate exchange

26  plan funds.  *Id.* § 18023(b)(2)(E).

27     56.    In 2014, only a few months after the implementation of Section 1303 in the individual

28  market, and amid the ongoing development of state-based and federally facilitated exchanges, a

1    Government Accountability Office (GAO) report identified some inconsistencies regarding the

2    implementation of Section 1303. The GAO conducted a national review of state with no laws

3    restricting abortion coverage, and rested its report on an examination of a sample of only eighteen

4    qualified health plan issuers in ten states where qualified health plans cover abortion. Of these,

5    the report found that two failed to collect the statutory minimum of $1 per enrollee per month,

6    four failed to include notices of abortion coverage, and most did not collect payments as

7    regulations then allowed—by sending a bill itemizing the separate payments or by sending

8    separate bills for the coverage.

9        57.    In 2015, HHS responded to the GAO report with a final rule, which identified several

10   alternatives issuers could pursue to satisfy the statutory requirements of Section 1303. HHS

11   Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10,750, at 10,840 (Feb. 27,

12   2015). Issuers were either to (1) send the enrollee a single monthly bill that separately itemizes

13   the premium amount for abortion services; (2) send a separate monthly bill for these services; or

14   (3) send the enrollee a notice at or soon after the time of enrollment that the monthly bill includes

15   a separate charge for such services and specify the charge. *Id.* In October 2017, CMS's Center

16   for Consumer Information and Insurance Oversight (CCIIO) issued a bulletin that again listed

17   these same options as ways for issuers to comply with the segregated funding requirements.[6]

18       58.    To date, HHS and CMS have issued no reports of complaints regarding any violations

19   of Section 1303 or the misuse of federally appropriated funds for abortion services or coverage.

20       59.    More broadly, the enactment of the ACA, Sections 1554, 1557, and 1303 maintain

21   current federal restrictions governing abortion policy, but nevertheless preserve the longstanding

22   flexibility afforded to the States related to women's reproductive freedom and sets national goals

23   for expanding access to affordable healthcare coverage.

24   II.   THE STATES HAVE ENACTED LAWS AND POLICIES PROTECTING ACCESS TO
          ABORTION CARE
25

26

27       _____

         [6] https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Section-
28   1303-Bulletin-10-6-2017-FINAL-508.pdf

                                               17

60.     The States have a sovereign interest in the creation and enforcement of a legal code. Pursuant to these interests, the States have grounds to challenge HHS's actions because the Rule undermines their sovereignty and threatens their authority to regulate matters that the States control by frustrating enforcement of state laws and policies aimed at protecting access to abortion care.

**A.     California**

61.     California laws protect a woman's right to healthcare and specifically protect a women's right to abortion.  In 1972, California voters amended the state Constitution to include a right of privacy among the inalienable rights protected in the State.  Cal. Const. Art. I, § 1*; Chico Feminist Women's Health Ctr. v. Butte Glenn Med. Soc'y*, 557 F. Supp. 1190, 1201-1202 (E.D. Cal. 1983) (citing *White v. Davis*, 13 Cal. 3d 757 (1975)).  The right to privacy under article I, section 1, provides "all women in this state rich and poor alike possess a fundamental constitutional right to choose whether or not to bear a child."  *Comm. to Defend Reprod. Rights v. Myers*, 29 Cal. 3d 252, 262 (1981).  Accordingly, state law confirms that private parties cannot interfere with the right to procreative choice under article I, section 1.  *Chico*, 557 Supp. at 1202-03; *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 20 (1994).  In addition, the constitutional right of a woman to decide whether to bear a child or terminate a pregnancy, guaranteed under article I, section 1, is also protected from State interference.  *Chico*, 557 F. Supp. at 1202; *Myers*, 29 Cal. 3d at 284.

62.     Additional state laws track these constitutional protections.  The Reproductive Privacy Act of 2002 (RPA) declared as state public policy that, "[e]very woman has the fundamental right to choose to bear a child or to choose and to obtain an abortion."  Cal. Health & Saf. Code § 123462(b).  The Reproductive Privacy Act expressly provides that "[t]he state may not deny or interfere with a woman's right to choose or obtain an abortion …."  Cal. Health & Saf. Code § 123466.  As a result, in California, all health plans are required to cover abortion services.  *See Missionary Guadalupanas of Holy Spirit Inc. v. Rouillard*, 38 Cal. App. 5th 421, 427–28 (Ct. App. 2019), review denied (Nov. 20, 2019) (finding that "[b]ecause California law guarantees every woman the right to choose whether to bear a child or obtain an abortion, the

18

1   only legally tenable interpretation of the law is that abortions are basic health care services, which

2   health care service plans are required to cover.").

3   **B.    New York**

4   63.    On January 22, 2019, New York State signed into law the Reproductive Health Act,

5   which legalizes abortion at any time "when necessary protect the woman's life or health."[7] The

6   Act updates New York State law to address "constitutional flaws and recognize a woman's

7   fundamental right to access safe, legal abortion. The bill moved abortion from the Penal Law to

8   the Public Health Law, which removes longstanding harmful and burdensome barriers to

9   accessing reproductive healthcare and protects New Yorkers against future Federal intrusion." *Id.*

10  The Reproductive Health Act is codified in N.Y. Pub. Health L. § 2599-aa (2019). Additionally,

11  New York Insurance Law §§ 3216(l), 4304(l), 4306-h, 4328(b)(1) provides that plans, including

12  those participating on the New York State of Health, New York's health plan exchange, cover

13  ambulatory patient services and prescription drugs. New York regulation prohibits health plans

14  from excluding coverage by type of illness, accident, treatment, or medical condition except as

15  expressly permitted in the regulation. *See* N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16(c).

16  Medically necessary abortion services are not listed in the regulation and therefore cannot be

17  excluded as further clarified in § 52.16(o).

18  **C.    Colorado**

19  64.    Although Colorado does not have a law that requires private health plans to cover

20  abortion services, Colorado's laws do not restrict abortion coverage and allow issuers

21  participating in Colorado's state exchange to offer qualified health plans that provide abortion

22  coverage. Colorado's individual insurance marketplace provides access to numerous plans that

23  cover abortion.

24  65.    Moreover, Colorado protects a woman's right to abortion. Colorado repealed its laws

25  criminalizing abortion in 2013 (Colo. Rev. Stat. §§ 18-6-101—105) and Colorado specifically

26

27

28  ───────────────
    [7] https://nyassembly.gov/Press/files/20190122.php

prohibits the prosecution of a woman for any act or any failure to act with regard to her own pregnancy (Colo. Rev. Stat. § 18-3.5-102).

### D. District of Columbia

66.    Although the District does not have a law that requires private health plans to cover abortion services, the District's laws do not restrict abortion coverage and allow issuers participating in the District's state exchange to offer qualified health plans that provide abortion coverage.  In fact, all health plans offered on the District's individual insurance marketplace cover abortion.

67.    Moreover, the District of Columbia protects a woman's right to abortion.  A 1901 law that criminalized abortion except to preserve the life or health of the mother (D.C. Code § 22-101) was repealed in 2003 along with other outdated statutes.  The Committee Report on Bill 15-79, the "Elimination of Outdated Crimes Amendment Act of 2003," noted that the law was "outdated and unnecessary because abortion is not appropriate for criminal sanction, particularly in light of the U.S. Supreme Court's decision in *Roe v. Wade*."

### E. Maine

68.    Maine's Reproductive Privacy Act declares that "[i]t is the public policy of the State that the State not restrict a woman's exercise of her private decision to terminate a pregnancy before viability."  Me. Rev. Stat. tit. 22, § 1598(1).  Consistent with this state policy, all health plans as defined in Maine's Insurance Code are required to cover abortion services.  Me. Rev. Stat. tit. 24-A, §§ 4320-D & 4320-M.

69.    Maine has taken recent action to support women's reproductive freedom, by enacting a new law to protect insurance coverage of all forms of reproductive healthcare.  In 2019, Maine enacted a requirement that the State pay for abortion services for Medicaid eligible women, which services are not federally approved Medicaid services.  Me. Rev. Stat. Ann. tit. 22, § 3196 (effective September 19, 2019).  In the same legislative vehicle, the state enacted a requirement that all health plans offering maternity services shall also provide coverage for abortion services, with a possible exemption for a religious employer as defined in 26 U.S.C. § 3121(w)(3)(A). Me. Rev. Stat. Ann. tit. 24-A, § 4320-M.

### F. Maryland

70.     Maryland has long offered strong protections for women's rights to access healthcare. Women's abortion rights have been firmly protected under Maryland law since voters in 1992 overwhelmingly passed a referendum question protecting a woman's right to abortion.  Richard Tapscott, *MD Backs Measure on Abortion Rights*, Washington Post (Nov. 4, 1992)[8]; Md. Code Ann., Health Gen. § 20-209.  The State of Maryland may not interfere with the decision of a woman to terminate a pregnancy: (1) before the fetus is viable; or (2) at any time during the pregnancy if the termination is necessary to protect the life or health of the woman; or the fetus is affected by genetic defect or serious deformity or abnormality.  Md. Code Ann., Health Gen. § 2-209(b).  Maryland's recognition of a woman's right to abortion is further reflected by Maryland's decision to voluntarily provide state-funded abortion coverage for eligible women in its Medicaid program.  Md. Code Regs. 10.09.02.04G. Maryland also offers abortion services to incarcerated women.  Md. Code Ann., Correctional Srvs. § 9-601(j)(2)(v).

71.     In Maryland abortion coverage is part of the essential health benefits package, required of all non-grandfathered individual and small group plans sold on Maryland's Health Benefit Exchange, and all individual qualified health plans cover abortions.

### G. Oregon

72.     Oregon also recognizes the critical nature of access to comprehensive, high quality reproductive health care for its residents.  In 2017, Oregon passed the Reproductive Health Equity Act (House Bill 3391), which requires private health insurance plans to cover abortions with no out-of-pocket costs and bans discrimination in the delivery of reproductive health services.  The law prohibits a public body, including any state or local government agency or employee of the agency from interfering with or restricting benefits, facilities, services or information regarding a woman's right to choose to terminate a pregnancy.  Or. Rev. Stat. Ann. § 659.880.  Specifically, the Reproductive Health Equity Act requires all health benefit plans offered in the state to provide coverage for abortions and prohibits the imposition of "a deductible, coinsurance, copayment or

---

[8] https://www.washingtonpost.com/archive/politics/1992/11/04/md-backs-measure-on-abortion-rights/cb000417-7fed-430a-be69-79203fcd2de2/.

any other cost-sharing requirement on the coverage required by this section."  Or. Rev. Stat. Ann. § 743A.067(2)-(3).

### H. Vermont

73.     Vermont also moved to protect abortion rights by enacting the Freedom of Choice Act in 2019.  *See* 2019 Vt. Laws No. 47.  As the legislature explained its intent:  "Currently Vermont does not impose legal restrictions on the right to abortion. . . . The General Assembly intends this act to safeguard these existing rights to access reproductive health services in Vermont by ensuring those rights are not denied, restricted, or infringed by a governmental entity."  *Id.* § 1.  And, as codified:  "The State of Vermont recognizes the fundamental right of every individual who becomes pregnant to choose to carry a pregnancy to term, to give birth to a child, or to have an abortion."  Vt. State. Ann. tit. 18, § 9493(b).

74.     The act further provides:  "A public entity shall not . . . interfere with or restrict, in the regulation or provision of benefits, facilities, services, or information, the choice of a consenting individual to terminate the individual's pregnancy."  Vt. Stat. Ann. tit. 18, § 9497(2). Likewise, "A public entity shall not . . . interfere with or restrict, in the regulation or provision of benefits, facilities, services, or information, the choice of a health care provider acting within the scope of the health care provider's license to terminate or assist in the termination of a patient's pregnancy."  *Id.* § 9497(4).  The statute further provides a private right of action against a public entity for any "individual injured as a result of a violation of this chapter," including costs and attorney's fees as well as injunctive relief.  *Id.* § 9498.

75.     Vermont also aims to protect women's reproductive freedom through its healthcare exchange.  As such, since 2013, Vermont has selected an essential health benefit benchmark plan that includes coverage of abortion.  All individual and small group health plans in Vermont therefore offer coverage of abortion services.

### III. HHS'S ILLEGAL RULE RESTRICTS ACCESS TO ABORTION COVERAGE AND HARMS THE STATES AND THEIR RESIDENTS

76.     Defendants' new Rule represents a capricious intent to frustrate the status quo by imposing upon issuers and state exchanges unnecessary separate billing requirements.  Section

1303 of the ACA prohibits the use of federal funds for abortion services, and current

implementing regulations provided issuers with various methods of complying with the statute's

requirements by providing appropriate notice, sending single bills with itemized amounts, and

creating segregated accounts that could only be used to pay for abortion services.  As discussed

above, both in 2015 and 2017, HHS guidance specifically allowed issuers either to: (1) send the

enrollee a single monthly bill that separately itemizes the premium amount for abortion services;

(2) send a separate monthly bill for these services; or (3) send the enrollee a notice at or soon after

the time of enrollment that the monthly bill includes a separate charge for such services and

specify the charge.  *See* ¶55.

**A. Summary of the Rule's Separate Billing Requirements**

77.     The Rule changes the statute's implementing regulations, 45 C.F.R. § 156.280, in two

significant ways.  First, the Rule requires issuers to separately bill for the portion of the premium

attributable to abortion services (an amount no less than $1).  Second, the Rule requires a separate

payment from consumers.  Issuers can no longer send a single monthly invoice or bill that

itemizes the separate amount for abortion services, or notify enrollees as part of the summary of

benefits and coverage explanation at the time of enrollment.  Instead, issuers will need to send a

separate monthly bill, either by mail (in an envelope containing two separate bills) or

electronically (in two separate emails), to each policy subscriber.  And consumers would be

instructed to no longer pay the premium total in one payment but must pay each bill separately,

either by separate paper checks or by two electronic transactions.

78.     If implemented and enforced, HHS's new Rule will unnecessarily disrupt the way in

which issuers that provide abortion coverage bill for healthcare coverage in the States, by forcing

an irrational and onerous regulatory scheme that singles out and limits access to a critical

women's healthcare procedure—abortion.

79.     Further, the final Rule will allow issuers to modify the benefits of their qualified

health plan, either at the time of enrollment or during a plan year, to effectively allow enrollees to

opt out of abortion coverage by not paying the separate bill for such services.  This opt out policy

was neither included in the proposed rule, nor made available for notice-and-comment prior to its

23

inclusion in the final Rule. And unlike the accelerated six-month compliance grace period for separate billing changes to § 156.280(e)(2), this change will become effective on February 25, 2020. 84 Fed. Reg. 71,687.

80. HHS is essentially *expediting* the Rule's end goal of circumscribing access to abortion, by instituting a policy of non-enforcement against issuers that allow policy holders to opt out of the otherwise applicable and substantive requirement to include abortion coverage as a benefit in their qualified health plan. HHS intends to disincentivize abortion coverage by encouraging issuers to permit policy holders to modify the benefits *required* in their qualified health plan and remove the abortion coverage benefit by simply choosing not to pay the separate bill of $1. 84 Fed. Reg. 71,686. No other health benefit can be excised from the policy in this manner. This non-enforcement policy demonstrates HHS's capriciousness and disregard for state laws that require abortion coverage. It prompts unnecessary consumer confusion about what they are opting out of and leaves many affected issuers in states that require abortion coverage with an illusory option not available to them unless issuers choose to violate their respective state laws.

81. While HHS indicates that issuers must take appropriate measures to ensure that non-payment is not accidental due to unfamiliarity with the Rule's changes, by providing a policy holder with the opportunity to check a box on their bill, or pushing a button on their online bill— confusion as to why this is necessary or an option will nevertheless result. *Id.* at 71,687. Additionally, "an opt-out [by a policy holder] would be effective for the remainder of the benefit year," because they "would not be allowed to retract their opt-out decision and reinstate coverage" by similarly choosing to simply opt back in and pay $1. *Id.* at 71,687. The policy holder's decision to opt out of that coverage would apply to all persons in the enrollment group under the policy, including dependents (such as adult children up to the age of 26) and spouses. *Id.*

82. This represents an assault on the States' right to prioritize and mandate procreative choice and infringes on the enrollee's ability to obtain comprehensive health services. The States could have voiced such concerns with HHS's new non-enforcement policy related to the discretionary opt out alternative granted to issuers, but none were presented the opportunity for

24

1   notice-and-comment during the proposed rule's comment period.  In fact, the States could have

2   raised that this policy is irrational, as it is not mandatory, and it is not a viable option for states

3   with abortion coverage mandates.  Nor could this be a logical outgrowth of the proposed rule's

4   changes or submitted comments, because the States could not have seriously contemplated this as

5   a viable option for issuers in their states, much less mid-plan year.  At bottom, the Rule serves to

6   actively impede the provision of abortion services in the States.

7        83.    HHS's stated goal in promulgating this Rule is to "better align with the intent of

8   section 1303 of the PPACA."  84 Fed. Reg. 71,685.  But, HHS wholly fails to provide an

9   adequate justification for this change.  Nowhere in the Rule does HHS identify any evidence or

10  reports demonstrating that federal funds, through advance premium tax credits, cost-sharing

11  reductions or otherwise, have been inappropriately used to pay for the provision of abortion

12  services in violation of Section 1303.  And nowhere does HHS indicate that the department has

13  conducted any due diligence in renewing or revisiting the five-year old GAO findings of 2014.

14  HHS simply states that the Rule will address remaining issuer compliance issues, "if any,

15  previously identified" in the GAO report, and that "regardless of whether there are ongoing

16  compliance issues," its primary goal is to "better align" regulatory requirements with the statute.

17  *Id.* at 71,692.

18       84.    The real misalignment lies with HHS's unsupported justification for the changes in

19  the Rule.  HHS even offers up—after-the-fact—numerous commenters' concerns regarding the

20  transparency of qualified health plans and coverage of abortion services as evidence to justify

21  implementation of the Rule in only six months.  Instead, HHS claims additional delay would be

22  "imprudent," "given that [HHS is] now aware of these consumer concerns."  *Id.* at 71,690.

23       85.    Abating consumers' speculative concerns about transparency is yet another purported

24  basis for HHS's opt out policies that issuers could develop as early as February 25, 2020, and

25  flatly constitutes capricious rulemaking.  Indeed, the Rule represents unreasonable agency action

26  in search of a problem to implement regulatory burdens that solely frustrate the provision of

27  abortion services.

28

**B. The Rule Exceeds Statutory Authority by Imposing Unreasonable Burdens on the Provision of Abortion Coverage**

86. Established canons of statutory interpretation render the Rule an unreasonable exercise of authority by HHS. The Rule seeks to amend the implementing regulations of Section 1303, by adding § 156.280 (e)(2)(ii)-(iii), requiring qualified health plans to:

> (A) *Send to each policy holder* of a QHP [qualified health plan] monthly bills for each of the amounts specified in paragraphs (e)(2)(i)(A) and (B) of this section, *either by sending separate paper bills which may be in the same envelope or mailing, or by sending separate bills electronically, which must be in separate emails or electronic communications*; and

> (B) Instruct the policy holder to pay each of the amounts specified in paragraphs (e)(2)(i)(A) and (B) of this section through separate transactions. Notwithstanding this instruction, if the policy holder fails to pay each of these amounts in a separate transaction as instructed by the issuer, the issuer may not refuse the payment and initiate a grace period or terminate the policy holder's QHP coverage on this basis.

> (iii) Deposit all such separate payments into separate allocation accounts as provided in paragraph (e)(3) of this section. In the case of an enrollee whose premium for coverage under the QHP is paid through employee payroll deposit, the separate payments required under paragraph (e)(2)(i) of this section shall each be paid by a separate deposit.

84 Fed. Reg. 71,710 (italicized for emphasis).

87. The Rule cannot be reconciled with either the text or purpose of Section 1303.

88. The statute's plain text is clear. Section 1303(a) provides that any state may elect to prohibit or authorize abortion coverage. 42 U.S.C. § 18023(a). Subsection (b) establishes "special rules relating to coverage of abortion services" that involve the "prohibition on the use of Federal funds" in state-based and federally facilitated exchanges. § 18023(b)(1)-(2). While Section 1303(B) requires that payments be collected and deposited in separate accounts to ensure separate allocation, it does not concern itself with *how* the payments are collected from enrollees. The import of Section 1303 is rather, how federal funds (attributable to essential health benefits and possibly subsidized by premium tax credits) are spent, because these are prohibited from being commingled or *spent* on abortion services.

26

89.     In addition, by statute, qualified health plans that provide abortion services are required to notify enrollees "*only* as part of the summary of benefits and coverage explanation, *at the time of enrollment* of such coverage." 42 U.S.C. § 18023(b)(3)(A).  In spite of the statutory limitation, the Rule requires issuers to provide additional notice related to the provision of abortion coverage within a qualified health plan.  Under the new Rule and contrary to the statute's instruction, issuers are required to notify enrollees on an on-going monthly basis of their abortion coverage through the separate bills.  The 2015 final regulations observed that section 1303 did not mandate a monthly notice, explaining that section 1303 allows, but does not require a qualified health plan issuer to identify the separate premium for abortion services *on the monthly premium bill* in order to comply with the separate payment requirement.  80 Fed. Reg. 10750, at 10840 (Feb. 27, 2015).

90.     Moreover, Section 1303's notice provision states that notice "*shall* provide information *only* with respect to *the total amount of the combined payments* for services."  42 U.S.C. § 18023(b)(3)(B) (emphasis added).  It does not state that separate amounts for each service covered by the plan shall identified.  Therefore, not only is notice required only at the time of enrollment, but it is also limited to the total amount of the combined premium payments for services.

91.     The purpose of the statute is clear:  to ensure that funds collected are directed to, and maintained in, segregated accounts to guarantee that any payment for abortion services are made explicitly with premium payments collected for such services.

92.     Plainly put, the Rule's new provisions requiring separate billing and separate payments for abortion coverage do little to mitigate the risk of how issuers treat abortion and non-abortion related funds.  Rather, the purpose of Section 1303 lies in the establishment of the segregated accounts and funds that are used to pay for abortion services.  HHS's new Rule will merely increase the costs of abortion coverage for issuers, State exchanges, and individuals.

93.     The Rule, if implemented, would expand the requirement that issuers "collect" separate payments beyond statutory requirements.  Section 1303 of the ACA and § 156.280 do not specify—and need not specify—the method an issuer must use to comply with the separate

27

1    payment requirement.  The previous regulations make clear that Section 1303 may be satisfied in

2    a number of ways, discussed above in paragraph 57.

3          94.    Section 1303 itself confirms this.  The provision relevant to the Rule's promulgation

4    is titled, "[p]rohibition *on the use* of [f]ederal funds" which specifies that "the issuer of the plan

5    shall not *use* any amount attributable to" federal dollars, specifically in the form of ACA

6    subsidies like advanced premium tax credits or cost-sharing reductions to pay for abortion

7    services.  42 U.S.C. § 18023(b)(2)(A) (emphasis added).  Section 1303 is primarily concerned

8    with the use of these funds, not the method of collecting premium payments, and such added

9    requirements fall outside of the agency's authority.  Moreover, the changes to the implementing

10   regulations at § 156.280(e)(2) are related to the provision in the statute concerned with the

11   "[e]stablishment of allocation accounts," under § 18023(b)(2)(B)(i), which is meant to ensure that

12   premiums are segregated to pay for corresponding services.

13         95.    A faithful reading of Section 1303 demonstrates that Congress's principal goal was

14   the segregation of accounts to ensure that federal funds are not used to pay for otherwise legal

15   abortion services.  The means by which the issuer acquires these premium payments from the

16   plan enrollee or the policy subscriber is irrelevant.

17         96.    HHS's Rule is contrary to the text, the history, and purpose of Section 1303, because

18   it imposes additional requirements in a manner that plainly exceeds Section 1303's statutory

19   authority.

20   **C.    The Rule is Contrary to the ACA**

21         97.    The Rule creates unreasonable and unnecessary barriers to access healthcare coverage

22   and unjustifiably restricts women's access to reproductive healthcare—directly undermining the

23   ACA itself.

24         **1.    The Rule is Contrary to Section 1554 of the ACA**

25         98.    The Rule also conflicts with Section 1554, which explicitly prohibits the Secretary of

26   HHS from promulgating "any regulation" that limits access to healthcare services.  HHS may not,

27   unless expressly authorized in the ACA, promulgate any regulations that "(1) creates any

28   unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes

                                                    28

timely access to health care services; … or (6) limits the availability of health care treatment for the full duration of a patient's medical needs." 42 U.S.C. §18114.  Section 1303 contains no express authorization to limit access to healthcare services, as explained above, its only function is to ensure payment for certain abortion services is appropriately segregated and tracked.

99.    This prohibition extends to any health program or activity, any part of which is receiving Federal financial assistance.  HHS has failed to examine the Rule's inconsistency with Section 1554, despite the fact that numerous commenters pointed to HHS' limitations under Section 1554.  The Rule's onerous requirements, "would clearly create new, unreasonable barriers to obtaining health care by causing people to lose insurance coverage," and thus access to actual services.  (Comments submitted by the American Civil Liberties Union (ACLU), Planned Parenthood Federation of America (PPFA), and the Attorneys General Multistate letter).

100.    And HHS is well aware of its own limitations and statutory authority.  HHS analyzed Section 1554 in its recent rulemaking regarding the contraceptive coverage mandate—yet another regulation impacting a women-specific healthcare issue.  *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57552 (Nov. 15, 2018) (to be certified as 29 C.F.R. Pt. 2590).  HHS has a basic obligation to examine its legal authority to act.  *See Sierra Club v. Pruitt*, 293 F.Supp.3d 1050, 1061 (N.D. Cal. 2018) (rejecting agency's waiver argument where agency was presented with sufficient challenges to its behavior and still failed to fulfill its "obligation to examine its own authority").

### 2.    The Rule is Contrary to the Section 1557 of the ACA

101.    The Rule is similarly in conflict with, and undermines, the anti-discrimination protections provided by the ACA.  The ACA is the first federal law to prohibit discrimination, setting forth in Section 1557 a clear prohibition against discrimination in a broad range of health programs and activities, against individuals on the basis of any classification listed under four different federal civil rights statutes, including Title VI of the Civil Rights Act of 1964 (race, color, national origin, and sex), and Title IX of the Education Amendments of 1972 (sex).  42

U.S.C. § 18116. Section 1557 seeks to advance healthcare outcomes and reduce health disparities by protecting groups vulnerable to discrimination in the healthcare context, including women.

102.     HHS's Rule discriminates against women by imposing unnecessary burdens and challenges to obtaining a healthcare service unique to women—abortion. Section 1303 authorizes issuers participating in the ACA's health insurance exchange to choose whether to offer abortion in qualified health plans. HHS recognizes, as it must, that coverage for abortion is utilized and sought out only by women, as it is "women who may *ultimately access* such services." 84 Fed. Reg. 71,694 (emphasis added). HHS does not deny the disparate impact the Rule will have on women, since women are more likely the enrollees who "would be most likely to intentionally enroll in a [qualified health plan] with [abortion] coverage." *Id*. at 71, 695.

103.     Unilaterally increasing the barriers to access healthcare services by targeting qualified health plans with healthcare benefits accessed only by women is discriminatory. If the Rule is implemented, men who are enrolled in qualified health plans that do not offer abortion and are not subject to separate abortion billing requirements, may continue to access the full range of healthcare services available to them without risk of confusion, delay, and ultimate denial of services because of this Rule's statutorily unauthorized administrative requirements. In contrast, women will be exposed to increased barriers to access to care, which ultimately will result in greater health risks to some women, who, without full abortion coverage, are subjected involuntarily to the increased health risks of pregnancy (discussed in detail in *Subsection III.F(6)*).

### D.     The Rule's Unnecessary Changes Require Extreme Costs

104.     While HHS updated the cost estimates in the final Rule, it failed to meaningfully consider the weight of this burden on the States, issuers, and consumers. In doing so, HHS discounted commenters' serious concerns about the Rule's costs and impacts. On December 9, 2019, the States of California and Oregon met with the Office of Management and Budget to reiterate the significant financial burden the Rule would cause on the states and the issuers that

several states previously raised in comments.[9]  California and Oregon requested that HHS accurately label the Rule "economically significant," thereby requiring the agency to perform an appropriate cost-benefit analysis and assess the costs and benefits of "reasonably feasible alternatives" to the proposal, because, among other impacts, the Rule clearly has an effect on the economy of far more than $100 million in any single year.  *See* Exec. Order 12866 §3(f); 58 Fed. Reg. 51,735 (Oct. 4, 1993).  Still, HHS's insistence that the Rule only clarifies the statute and does not directly impose *new* requirements is contradicted by the cost-benefit analysis HHS was forced to update "for accuracy" after numerous commenters showed that the agency greatly underestimated its burdens.  The updated analysis, reflects that an unreasonable amount of money is required to implement these changes.  *See generally* 84 Fed. Reg. 71,698.

105.     The Rule's impact reaches multiple states and millions of enrollees.  The Rule itself estimates that in 12 state-based exchanges alone, 71 qualified health plan issuers will offer 1,129 plans that include abortion coverage and will be subject to the Rule.  84 Fed. Reg. 71,696.  To become compliant, issuers will need to take several steps, including but not limited to, restructuring budgets, planning, contracting, building IT-systems, creating billing-related outreach, and providing new call center training.

106.     HHS estimates that one-time costs to bring all affected issuers (94 total) across the country into compliance and implement the technical changes required would cost $2.7 million per issuer.  Moreover, HHS's unreasonable push to accomplish this billing change in only six months, during the middle of the plan year, would cost each issuer about $4.1 million in higher contracting costs for system changes and overtime personnel payments.  This would bring the total one-time costs for all 94 issuers to $385 million.  84 Fed. Reg. 71,697.

107.     In addition to hefty one-time costs, there are substantial ongoing annual costs.  For instance, issuers must absorb economic burdens from hiring additional personnel, enrollee outreach, billing accuracy and reconciliation processes, quality assurance, and recordkeeping.  By

---

[9] *See* Office of Information and Regulatory Affairs, EO 12866 Meetings Dashboard, https://www.reginfo.gov/public/do/viewEO12866Meeting?viewRule=true&rin=0938-AT53&meetingId=4927&acronym=0938-HHS/CMS.

HHS's own estimate, this would cost approximate $1.07 million per issuer.  The annual burden for all impacted issuers would reach about $100.2 million.  *Id*. at 71,698.

108.   To accomplish its Rule, HHS estimates that, on average, annual materials and printing costs for all issuers sending paper bills to the 2.6 million enrollees over three years alone (2020 to 2022), would be approximately $887,721—not counting the costs associated with electronic transactions and IT changes.[10]  *Id*. at 71,699.

109.   The costs to state exchanges are equally alarming.  The Rule estimates that on average, each state exchange, will incur in 2020 one-time costs of $750,000, and ongoing annual costs of approximately $200,000 for the six months of implementation in 2020, and $400,000 in 2021—costs HHS anticipates will decrease in following years.  *Id.* at 71,705.  The total ongoing costs for all 12 state-based exchanges that permit the sale of qualified health plans offering abortion coverage is expected to be $2.4 million in 2020 alone.  *Id.*

110.   HHS itself acknowledges, that compliance with the Rule could force issuers to (a) drop coverage of abortion altogether, (b) absorb excessive costs themselves in states that require coverage by law or policy, or (c) pass on these costs to consumers in the form of increased premiums.  In fact, in the preamble of the Rule, HHS states that, "[s]ubject to applicable state law, it is ultimately at the issuer's discretion whether to cover…abortion services in their [qualified health plans], and thus to incur any associated burden" imposed by the Rule.  84 Fed. Reg. 71,688.  And while HHS recognizes that these changes have the potential to increase out-of-pocket costs for enrollees seeking abortion services or in effect leave enrollees without healthcare coverage, HHS fails to fully account for these costs to consumers, the impact on women specifically, and by extension, the harms to the States' public health and increased costs to their fiscs.

111.   Notably, HHS admitted that maintaining the status quo would promote stability for issuers and the evolving exchanges.  84 Fed. Reg. 71,708.  However, choosing instead to pursue

---

[10] This cost assumes that more consumers will increasingly opt to receive electronic bills over time, e.g., 90 percent in 2020, 88 percent in 2021, and 86 percent in 2022.

1   its stated purpose to "better align" the Rule with Section 1303, HHS declined to withdraw its

2   proposals.

3       112.    HHS instead purports to consider alternatives to the final Rule, though it is clear that

4   they did not meaningfully consider these alternate options. The Rule runs through several options

5   that are as unreasonable as the final Rule.

6       113.    First, HHS considered eliminating the requirement that issuers must provide

7   instruction to consumers who fail to make payments separately, but concluded that consumer

8   education is important to achieve better alignment with section 1303. *Id.* at 71,708. However,

9   this option lacks common sense, because while issuers are required to spend additional resources

10  tracking down consumers who mistakenly fail to pay the two bills in separate transactions, policy

11  holders are free to continue paying their premiums in a single transaction.

12      114.    Second, the agency admits to having considered further expediting the effective

13  implementation of the Rule, up three months from the date of publication, increasing one-time

14  costs by 100% and driving up total estimated costs for issuers, exchanges, and consumers, up to

15  $740 million in 2020. *Id.* But considering an alternative that exorbitantly increases the costs and

16  burdens for all parties involved, such that in relation it seemingly makes the initial proposal's

17  costs seem modest by comparison, is hardly representative a viable option. Particularly given the

18  agencies last and final consideration, which concerned the proposed rule's excessive costs.

19      115.    In this final alternative, HHS claims to have considered following through with the

20  separate mailing requirement (requiring two envelopes) as initially proposed. *Id.* HHS calculates

21  that after updating its deep underestimation of the costs of requiring issuers to send separate

22  envelopes, the costs would have been resulted in an additional $11 million in 2021 for all issuers.

23  *Id.* However, this alternative only scratches at the surface of the excessive costs that the Rule

24  itself estimates compliance will require. To say HHS "mitigated" the costs by eliminating the

25  two-envelope mailing requirement does little to acknowledge the serious problems with the

26  excessive cost of this unnecessary Rule, particularly when as finalized, the total one-time costs

27  for all 94 issuers reaches $385 million, and the annual ongoing burdens $100.2 million. *Id.* at

28  71,697-698.

116. However, without any evidentiary support at all, HHS decided that "better alignment" with HHS's new, and unsupported, interpretation of Section 1303 simply outweighs the Rule's drastic costs and financial burdens described above.

117. The Rule never discusses or considers attainable alternatives that target the primary purpose of the statute. For example, there is no discussion or consideration of the verification requirements or processes currently in effect. Nor is there any discussion of the account segregation plans submitted and reported by issuers to state regulators that certify the back-end reconciliation and verification of the abortion billing process and segregation of funds. Judicious rulemaking would have at a minimum addressed the relevant transactions that already occur after abortion services are obtained, including the maintenance of the plans' segregated accounts, to provide assurance that issuers pay for abortion services with segregated funds that do not include federal subsidies.

### E. The Rule is Illogical and the Final Modifications Cannot Cure its Deficiencies

118. The Rule is illogical because it fails to accomplish HHS's purported goal. The Rule's changes do nothing to achieve HHS's stated objective of compelling consumers to pay separate bills. While the Rule requires that issuers send out separate bills (either in one envelope or two electronic transmissions), consumers who are policy holders are seemingly free to ignore the Rule and continue to pay a monthly bill in a single transaction. Specifically, the final Rule requires that issuers must instruct policy holders to pay each bill through separate transactions, but are prohibited from refusing a combined payment, and cannot initiate either a grace period or terminate the policy holder's coverage on the basis that the policy holder did not send two separate payments as requested by the issuer. § 156.280(e)(2)(ii)(B); 84 Fed. Reg. 71,685.

119. As HHS itself acknowledges, it is common and likely for a policy holder to pay one payment, rather than two payments. HHS agrees that requiring two payments could, in spite of expensive and "fulsome outreach and education efforts to explain the billing scheme to the policy holder, consumer confusion could still lead to inadvertent coverage losses." *Id.* at 71,686.

120.     These problematic features of the Rule not only demonstrate inadequate rulemaking considerations and capricious rulemaking, but its unworkability further provides evidence that Congress did not intend for these burdens to result by instructing how issuers should collect separate—physical or transactional—payments from policy holders.  Rather, Congress wanted to ensure that issuers placed payments in segregated accounts and did not use federal subsidies to pay for abortion services.

121.     Even the final Rule's modifications underscore the senselessness of the new billing requirements.  For example, the final Rule eliminated the excessive mailing costs (estimated by HHS at $11 million) by allowing issuers to send separate monthly bills in one single envelope to each policy holder, as opposed to the previous proposal of separate bills in two separate envelopes.  This change was made despite the position taken in the proposed regulation, that sending two separate bills will reduce consumer confusion because consumers may "inadvertently miss or discard a second paper bill included in a single envelope."  Patient Protection and Affordable Care Act; Exchange Program Integrity, 83 Fed. Reg. 10750, at 56023 (Nov. 9, 2018).  However, issuers must still send separate monthly bills when transmitting bills through email or other electronic means.

122.     The final Rule's modification—now allowing single envelope mailing—still largely ignores the evidence before HHS.  This includes comments submitted by, among others, Blue Shield of California, Covered California, Access Health CT, and the District of Columbia' Health Benefit Exchange Authority pointing to the excessive administrative costs—beyond its mailing burdens—that are associated with redesigning billing systems, processing invoices and "binder payments" for new enrollments, and additional customer service support required to facilitate these changes.  All of these expenses will likely lead to increased premiums for consumers.  And despite inserting language notifying policy holders they will receive a separate email with another bill, the separate email might more easily be missed by policy subscribers clearing their inbox believing they have already paid their premium.

123.     Moreover, the Rule fails to quantify—at all—the disproportionate costs and personal burdens that will befall policy holders, States' low-income and rural residents who do not have

35

easy access to the internet (raised by comments submitted by the National Women's Law Center),
or do not have active checking accounts, debit and credit cards. In light of these circumstances,
other preferences for hard mail communication, and despite encouragement to "opt into email
as… [the method of] preferred communication … 70% of enrollees continue to receive
communications via standard mail" in California alone. (Comment submitted by Covered
California). HHS itself estimates that approximately 90% of policy holders will receive paper
bills in 2020. 84 Fed. Reg. 71,699. HHS claims to "understand that many enrollees face barriers
to accessing the internet and have little choice but to receive paper bills," yet it fails to consider
the resulting costs to low-income individuals. *Id.* Specifically, the Rule does not fully account
for the increased personal administrative expense to enrollees. *Id.* at 71,706-707 (only addressing
the costs to "read and understand the separate bills received.").

124.    These problematic features of the Rule demonstrate inadequate rulemaking
considerations and resulting in capricious agency action.

**F.    HHS Failed to Consider Key Problems with the Proposed Rule**

125.    HHS ignored numerous comments from individuals, states, issuers, and private
organizations that warned against complicating the administrative burdens already imposed on the
healthcare markets and exchanges and the potential for those burdens to result in harm to the
states' fiscs, consumers, and public health.

**1.    The Rule Illegally Imposes Administrative Burden on the States'
Regulators by Penalizing Issuers for Offering Abortion Coverage**

126.    Defendant's Rule penalizes issuers for doing business in the States. The Rule's
excessive regulatory burdens unfairly and disproportionately target the States that choose to
invest in women's access to comprehensive healthcare, particularly in Plaintiff States that
mandate or allow health plans to cover abortion services as part of the essential health benefits.
By extension, the Rule seeks to further disincentivize issuers from providing abortion coverage in
those states that do not yet have specific laws restricting it, by creating barriers to doing so.

127.    While the Rule creates onerous requirements for issuers to abide by, these changes
contemplate and necessarily demand from the States' equally burdensome and costly adjustments

to the way in which the States' regulate their health insurance markets and administer their health exchanges. To comply and respond to the changes issuers are subject to, the States will have to make unnecessary structural changes that only add administrative costs and divert funds from other critical aspects of the States' insurance market and exchange operations.

128.     To begin, the Rule will add unnecessary burdens requiring issuers to expend time and money to alter budgets and allocate resources for the technical build of their systems. Issuers will need to account for various changes, including changes to enrollment processes; generating multiple billing statements; automating separate invoices (mail or electronic communication); adding electronic communications and payment links; processing separate payment collections; restructuring response processes and call center training; conducting billing-related outreach and interactive voice response (IVR) technology; updating enrollee notifications related to non-payment and grace periods; updating Health Insurance Casework System (HICS) and Department of Insurance (DOI) complaint processes; restructuring grievance/appeals processes; and conduct testing to ensure billing accuracy. This long list of added burdens will likely cause issuers to spend more in resources to deal with the resulting consumer confusion from multiple bills, missed payments, system errors, and delinquent notices. But these changes are not appropriate, economically sound, or necessary.

129.     Therefore, if implemented, the Rule will place participating issuers in the difficult position of having to comply with state laws that require or allow abortion coverage by absorbing significant costs and passing these costs on to consumers in the form of increased premiums, dropping abortion coverage in states without an abortion coverage mandate, or leaving the insurance market altogether. Any increase in premiums risks denying consumers—who cannot afford the premium increase—critical health coverage. And the same could result if issuers choose to drop coverage or leave the state due to the cost of offering abortion coverage under this Rule.

130.     In addition, responding to these changes required by the Rule also places the States' in a bind. For example, to be able to bill separately, some issuers like Blue Shield in California, will need to issue two separate insurance policies per enrollee, one exclusively for coverage of

37

abortion services, and another for coverage of the remaining health benefits. Covered California, the state's exchange, cannot accommodate this need for separate transactions, because state law mandates that all insurance policies they produce include abortion coverage in a *single policy*. *See* Cal. Health & Safety Code §1340 *et seq*. To comply then, the Rule will force Blue Shield to absorb the costs of the structural changes discussed above, and will incur additional costs for its weekly and monthly reconciliation of separate insurance billings with Covered California's single policies. The Rule would impose these unreasonable requirements despite the fact that all issuers already comply with section 1303's segregation requirements.

131. Moreover, under the Rule, the separate billing and separate payment requirements will also increase the administrative costs of the States' insurance regulators.

132. In California, Department of Managed Health Care (DMHC) and the California Department of Insurance (CDI), are two of the state agencies that regulate health insurance plans. DMHC primarily regulates health maintenance organizations (HMOs), while CDI has jurisdiction over traditional health insurance. In California, issuers already submit to these respective agencies annual filings regarding their premium segregation plans, complete with separate financial accounting systems, monthly reconciliation processes, and internal controls to ensure that they are in accordance with federal regulations.[11] Every carrier does this differently, and Covered California would have to work independently with the State's 11 insurance carriers to determine a synchronized approach that is appropriate for both agencies.

133. First, the California Department of Managed Health Care, which oversees a majority of the qualified health plans impacted, estimates that compliance with the new Rule will unnecessarily increase the state agency's administrative burden of over one million dollars. This includes: (1) $200,000 related to the increase in call volumes to deal with consumer complaints and confusion over premium bills; (2) $150,000 for additional "segregation of funds plans" legal reviews submitted by issuers; (3) $400,000 for enacting new regulatory packages clarifying

---

[11] 45 C.F.R. 156.280(e)(5)(ii). California Dep't of Managed Health Care "segregation plan" filings: Kaiser, Anthem, Blue Shield, Molina, Oscar, Chinese Community Health Plan, HealthNet, L.A. Care, Santa Clara County, Sharp, and Western Health Advantage (documenting current compliance with segregation accounts).

safeguards and cancellation dollar thresholds for issuers; and (4) $300,000 for additional analysis required to be conducted by its Office of Plan Licensing related to issuer filings and disclosures for compliance with the Rule. All of these costs are unnecessary, as all the plans currently comply the California's segregation policies involving abortion coverage in qualified health plans.

134. A second impacted California regulator is the California Department of Insurance, which is the largest consumer protection agency in the state. The department estimates the implementation of the Rule will bring about significant administrative burdens totaling about $156,390 initial costs for plan year 2020, and ongoing costs of $247,620. These costs include: (1) $151,900 for the 2020 plan year and $141,120 in ongoing costs due to increases in call volumes to their consumer services call center (and additional full-time personnel); (2) $2,130 for consumer services training; (3) $1,233 for consumer education materials; (4) $1,127 for additional legal review of the Rule's policy changes; (5) and $106,500 in annual costs of additional hearings regarding wrongful termination of coverage that will require legal evaluation and handling.

135. Similarly, New York State Department of Financial Services ("NYS DFS"), will face a range of administrative burdens, including having to field a significant increase in calls and other inquiries from consumers regarding the receipt of multiple bills and the requirement for separate payments for health plan premiums. In addition, NYS DFS expects to receive calls and inquiries about the potential loss of coverage for medical services. Consequently, NYS DFS will need to direct resources to respond to the increased number of consumer calls and inquiries related to this Rule, including but not limited to development of Q&A's for NYS DFS staff, and consumer education materials for distribution on the NYS DFS' website and potentially other outlets.

136. In addition, NYS DFS, as New York's primary regulator of health insurance plans, will need to respond to insurers' inquiries about the Rule's effects and will be required to provide regulatory guidance on the Rule. NYS DFS will need to devote resources to developing and implementing circular letters and other forms of guidance for the health plan industry in New

39

1  York State. Multiple stakeholder groups would be required to be convened, and staff would have

2  to be directed to oversee these groups – plans, consumers, and providers. NYS DFS would

3  ultimately have to expend additional resources to draft and review, and finally publish a circular

4  letter.

5  137.    In Colorado, the Division of Insurance ("CO DOI") supervises the insurance industry

6  by responding to consumers' questions, investigating their complaints, and helping them to

7  understand their insurance and by regulating and monitoring insurance companies in Colorado for

8  compliance. CO DOI also anticipates an array of administrative burdens as a result of the Rule.

9  138.    First, CO DOI expects the Rule to impact its consumer-facing responsibilities by

10  requiring additional resources to ensure adequate consumer education through consumer outreach

11  materials or website notices. CO DOI also anticipates it will receive increased calls and inquiries

12  from consumers regarding the potential loss of coverage and separate billing confusion, and an

13  increase in complaints to CO DOI's Consumer Services division. Second, CO DOI anticipates

14  devoting additional resources to providing notice and guidance to the industry as to how to

15  comply with the Rule and ensuring compliance through additional review of issuers' filings and

16  billing processes.

17  139.    In the District of Columbia, the Department of Insurance, Securities and Banking

18  (DISB) protects the interests of District consumers by ensuring that insurers and individuals

19  presenting insurance products in the District are qualified, appropriately licensed, and meet and

20  act in accordance with all requirements of the insurance laws. DISB estimates the

21  implementation of the Rule will bring about significant administrative burdens and costs, which

22  include: (1) an increase in call volume and AskTheCommissioner email requests about the Rule;

23  (2) an increase in formal complaints to DISB's Consumer Services Division; (3) an increase in

24  operational costs associated with training the Consumer Services Division and Forms Examiners;

25  and (4) an increase in costs for drafting and distributing consumer education materials.

26  140.    Maine operates a Federally-facilitated Marketplace (FFM) and conducts plan

27  management activities to support certification of qualified health plans by CMS. Administration

28

40

of Maine's individual marketplace,[12] including premium billing and collection functions, is handled at the federal level through the FFM and not by the State. Maine law, however, requires carriers seeking to cancel an individual health insurance policy for nonpayment of premium to provide notice prior to cancellation. Me. Rev. Stat. tit. 24-A, §2707-A; 02-031 C.M.R., Ch. 580. Insurers further must provide a grace period (of 7, 10, or 31 days) for the payment of premium, during which grace period the policy shall continue in force. *Id.* § 2707. Consumers whose health insurance coverage has been cancelled without being provided the required notice or grace period upon a failure to pay the separate premium contemplated by the Rule may request a hearing before the Maine Superintendent of Insurance. Me. Rev. Stat. tit. 24-A, § 229. The Rule's unique separate billing and payment requirements, nowhere comparable in any other line of insurance, are likely to result in consumer confusion and result in more cancellations of policies for nonpayment of premiums. This will result in additional administrative burden and expense for Maine resulting from the regulation, oversight, and enforcement of insurer billing practices for compliance with the Rule. In addition to the potential for increased requests for agency administrative hearings, the Bureau of Insurance Consumer Health Care Division (CHCD) inevitably will receive more consumer inquiries. CHCD staff, under the direction of the Superintendent of Insurance, will need to consider allocating resources to develop and implement consumer outreach efforts about the separate billing and payment requirements of the Rule.

141.     In Maine, there are only three issuers participating in the individual marketplace: Anthem Healthplans of Maine, Maine Community Health Options, and Harvard Pilgrim Health Care. The separate billing and payment requirements of the Rule will require these issuers to make structural changes to their billing and payment reconciliation processes, accounting systems, and internal controls resulting in costs that they will be forced to absorb mid-term beginning June, 2020 (insurer rates are locked-in for the one-year policy period). Thereafter, in subsequent policy periods, these issuers must decide whether to continue absorbing these costs or to pass them on to consumers through increased premiums. Alternatively, one or more of the

---

[12] Discussion of Maine's marketplace refers specifically to the state's ACA individual marketplace for purposes of this complaint.

three issuers could make the unfortunate decision simply to leave the state due to the uncertainty of the system impacts and increased costs of offering abortion coverage in compliance with the Rule.

142.   In Maine, this concern is not theoretical.  For example, due to the uncertainty of sufficient premium rate recovery for cost sharing reductions (CSRs) under the ACA, for plan year 2018 Anthem Maine withdrew from the Maine ACA market.  Anthem Maine's absence was temporary, and it returned to the Maine ACA market for plan years 2019 and 2020.  The prolonged departure from the market of one or more of the three remaining issuers currently offering ACA coverage in the state is a troubling prospect.  Any destabilization of the individual market resulting from the departure of one or more issuers could harm Maine consumers through higher premiums that often result from decreased competition.

143.   The Maryland Insurance Administration, which oversees all of the qualified health plans impacted by the Rules, will similarly experience an increase in administrative burden and incur costs to ensure compliance with the new Rule and to handle an increase in consumer complaint volume.  All carriers in Maryland already submit to the Maryland Insurance Administration annual filings with respect to the premium segregation plans, complete with a reconciliation of all segregated account activity, and an annual attestation of compliance, including accounting documentation and internal controls, of the segregated account.  MIA Bulletin 13-24, Segregation of Funds for Certain Abortion Services Covered under Qualified Health Plans Sold on the Individual Exchange (July 31, 2013), https://tinyurl.com/vqvrkof.  The Maryland Insurance Administration will have to update the regulatory guidance provided to impacted carriers and update the legal reviews of the annual compliance filings.

144.   Like other State regulators, the Maryland Insurance Administration will experience an increase in costs due to an increase in call volume to their call center, complaints regarding coverage terminations, and appeals hearings contesting plan terminations.  The Maryland Insurance Administration will also incur costs to engage in consumer education about the Rule change.

145.     Oregon's insurance regulator, the Division of Financial Regulation, similarly anticipates the Rule change will result in additional administrative burdens, such as increased calls to its consumer advocacy unit.

146.     In Vermont, billing issues are a primary source of qualified health plan customer complaints.  In addition, if a customer underpays a premium payment, their plan will be cancelled after a one- to three-month grace period, unless the customer makes up the underpayment.  A customer who has been disenrolled for nonpayment generally may not re-enroll in an insurance plan until the annual open enrollment period, absent certain limited exceptions.  The confusion created by the Rule will cause customers to needlessly lose health insurance coverage, resulting in consumers facing high out-of-pocket costs for care and foregoing necessary medical treatment, including but not limited to abortion care and contraception coverage.  Vermont will receive consumer questions and complaints as a result of the confusion generated by the new rule, and expects increased administrative burdens in responding to these complaints.

147.     The administrative difficulties imposed on health plans, exchanges, and regulators demonstrate the Rule's true aim—to make it impossible for carriers to provide women full and comprehensive healthcare coverage by penalizing issuers individually, and unnecessarily disrupting the state agencies regulatory schemes.

148.     HHS admits that this Rule will significantly increase the administrative burdens for qualified health plans providing abortion coverage.  84 Fed. Reg. 71,696-97.  HHS identified the types of burdens imposed on insurance carriers, now required to invest time and resources to oversee the process of sending separate bills, review the accuracy of receipt of separate payments, process additional payments, and add functionalities to operating systems to develop new and separate automated payments.  83 Fed. Reg. at 56028.  And if carriers want to provide abortion coverage, the Rule will force companies to pay, on average, $1.07 million dollars annually to provide comprehensive healthcare to women.  *See* 84 Fed. Reg. 71,698.

149.     Once again, HHS acknowledged these costs and ignored them, setting an effective date within six months after the Rule's publication and in the middle of a plan year, with no possibility of accounting for any potential changes in costs.

43

150.    HHS also failed to adequately consider the impact of the significant increase in administrative costs that issuers must bear in 2020, amounts it cannot recoup in 2020 premiums, on its Medical Loss Ratio calculation. Medical loss ratio involves the share of premiums that issuers pay on claims, with the remainder going to administrative expenses, other costs, and profits. The ACA set the medical loss ratio as a mechanism to protect consumers from dramatic premium increases; currently the medical loss ratio threshold for the individual market is set at 80%; meaning that 80% of premium charges must be used for direct coverage of medical service costs or quality improvement expenses. *See generally* 42 U.S.C. § 300gg-18 (LexisNexis 2019). If issuers use less than 80% of premium charges for medical claims or quality improvement expenses (with some exceptions), issuers are required to issue rebates to consumers. Consequently, an issuer's rise in administrative costs is an important factor in establishing premium amounts to assess whether they will be responsible for high consumer rebates.

151.    HHS suggests in the preamble that issuers would be able to use funds from the allocation account attributable to abortion premiums to cover any administrative burdens resulting from not being able to update individual market rates prior to the 2021 plan year, in order to mitigate the excessive financial consequences of the Rule discussed above. *See id.* at 71,690. HHS plainly ignores that these funds are to be "used exclusively to pay for [abortion] *services*" not an issuer's administrative costs of providing that service. 42 U.S.C. 18023(b)(2)(C)(ii)(II) (emphasis added). HHS not only ignores the statutory limitations assigned to the allocation account attributable to abortion premiums, but simply states that it does not anticipate that the rule will "measurably increase" medical loss ratio rebates because it believes issuers have a simple option: "issuers would either cease offering [abortion] coverage," unless required by state law, in the plan year 2020 to avoid issuing additional medical loss ratio rebates, "or would pay for the increased administrative costs from a different revenue source," mainly the segregated account. 84 Fed. Reg. 71,704.

152.    Simply put, the Rule has been designed to penalize and discriminate against issuers participating in states requiring coverage of abortion services, and to coerce issuers in states

where it is not mandated to drop such coverage altogether; there is no other plausible explanation. This in itself is capricious agency action.

**2.    The Rule Disrupts the Robust Administration of the States' Exchanges, Imposing Unnecessary Cost to Its Enrollment System**

153.    The Rule's unnecessary change in abortion coverage billing will disrupt the States' administration of exchanges and cost millions of dollars to come into compliance within six months.  Compliance could require unnecessary restructuring of the exchanges, particularly those which conduct their own premium billing and collection functions, and has the potential to disrupt current and future marketing and enrollment campaigns, requiring significant allocation of resources to consumer outreach efforts for all exchanges.

154.    Covered California, California's state-based exchange, has created a robust health insurance system that provides for a competitive marketplace, and has maintained strong relationships with insurance carriers while empowering consumers to choose the plans that give them the best value.  Its extensive investments in outreach allowed the exchange to raise consumer awareness of the value of health insurance coverage and the availability of federal financial assistance, through exchange subsidies.  These efforts have led to healthy enrollment and retention rates across the California.  In fact, California's uninsured rate dropped considerably, from 17% in 2013 to 6.8% in 2017.  Today, over 1.5 million enrollees receive health insurance coverage purchase through the state's individual market exchange.

155.    As discussed in *Section III.D* above, the costs of implementing the new Rule on the States' exchanges are unnecessary and ongoing.  Covered California anticipates that the Rule has the potential to increase consumer calls to Service Centers, leading to longer wait times.  Covered California will have to develop talking points for Service Center and contracted enrollers, such as agents, amounting to 40 hours of personnel time and costing $1,225.  In addition, the exchange will have to change materials educating the public on the Rule's policy changes, potentially requiring the diversion of consumer outreach and marketing funds.  Moreover, Covered California will need to evaluate operational changes to mitigate the Rule's adverse impacts, such

as amending the contracts with the state's health plans to prohibit them from terminating policy holders for failing to pay the separate $1 premium.

156.    Additionally, the exchange would need to assess how best to disseminate education and information over any required changes to binder payments made to issuers, the initial payments made after enrollment that control whether or not a new enrollee's policy is initiated (discussed below).  Because California law prohibits Covered California from issuing two policy transactions (all health benefits must be included in a single policy), it is likely that the exchange will be forced to pass on these costs to issuers participating in the Covered California exchange.

157.    The cost of implementing this Rule could risk Covered California's important annual enrollment gains.  Covered California has fixed sums for marketing but would now need to redirect funds to consumer outreach and education to explain the policy changes and mitigate against consumer confusion and termination of coverage.  Covered California has adopted a marketing, outreach, and sales budget for 2019-2020 that allocates $121 million, an increase of $13.6 million from the 2018-2019 budget, and accounts for almost a third of its total operating budget of $379 million.

158.    Marketing matters because outreach drives enrollment on and off the exchange. Specifically, the marketing, outreach and sales budget of 2019-2020 includes $6.5 million for a navigator program and $55 million for paid media ads, which aid in informing Californians about the value of insurance and the availability of financial assistance for many, encouraging retention of those already enrolled, and maintaining a favorable mix of enrollees for the health insurance risk pool.  Covered California's navigator program is especially important, as it is a partnership with community organizations across the state that has experience in reaching and assisting California's diverse populations and has proven successful in enrolling more consumers annually. Of that $55 million, $10 million has been added to the originally proposed budget for the development and implementation of new creative media that will target audiences and advance the effort in educating consumers about the new state subsidy and California's individual mandate.  These funds are critically important and necessary, as these aggressive efforts have demonstrably improved the State's coverage rates.

159.     Attaining compliance with HHS's new Rule by June 27, 2020 places significant additional costs on the State.  For example, in January 2019, only 26% (377,700) of Covered California's consumers selected email as their preferred method of communication, 49% (705,000) selected mail, and about 20% have unspecified responses, which defaulted to mail as the preferred method of communication.  Due to the limited number of exchange enrollees subscribed to email, together with barriers many subscribers still face in accessing the internet, outreach could be costlier through more aggressive mass mailing and on-the-ground marketing campaigns during the mid-plan year.  This Rule would cost Covered California unnecessary resources to implement, in addition to the reallocation of marketing funds that currently provide critical consumer outreach that drives its success.

160.     New York State of Health (NYSoH), established within the New York State Department of Health, is New York State's health exchange.  Like other state exchanges, NYSoH forecasts a significant increase in consumer calls to its call center as a consequence of the Rule's requirement of separate billing and payments.  Such an increase in call volume will place administrative burdens on the call center and will increase contract costs by an estimated $600,000.  NYSoH will likely be required to develop materials for call center staff to delineate how to advise consumers, and train staff to be prepared for the calls.  In addition, overly burdensome administrative requirements will drive up issuer costs, which could then be passed onto consumers in the form of higher premiums.

161.     Connect for Health Colorado operates Colorado's state-based exchange.  Connect for Health Colorado anticipates the Rule will cost at least an estimated $30,000 to respond to consumer issues, including confusion about the separate billing and payment requirements, and to proactively engage in consumer education and outreach regarding payment of premiums and impact to coverage.  Connect for Health Colorado also expects it will need to expend additional resources to train staff to address issues involving the separate payments and to train brokers and navigators regarding the changes.  Connect for Health Colorado also may need to devote additional resources to systematic changes to assist issuers in compliance with the Rule.

162.    The District of Columbia Health Benefit Exchange Authority (DC Exchange) operates the District's state-based exchange. The DC Exchange estimates that it will incur approximately $3.93 million annually in FY20 and FY21 in costs directly related to the Rule. Of this amount, $1.45 million is required to staff increased consumer calls to its contact center, inquiring about the separate billing and separate payment requirements, its ramifications, and how to properly make payment. Increased staff will also be required to address increased churn and non-pay terminations resulting from consumer and carrier confusion regarding payment and application of dual payment for single policies as described in paragraph 185. The costs associated with the increased staffing and training required of call center workers and internal staff by the DC Exchange's legal and policy staff to understand the Rule, its interactions with District law, and any new DC Exchange policies will be approximately $265,499 per year. Additionally, the marketing department must engage in a comprehensive campaign to educate consumers on the existence of the Rule, their rights, and how to avoid losing coverage. This marketing campaign is expected to cost $1.15 million annually in FY20 and FY21 in staff and media costs. This campaign is particularly crucial because of the District's requirement for individuals to maintain health coverage; the District needs consumers to know that the separate billing and separate payment requirements may cause them to lack coverage and thus not comply with the District's coverage requirement and may subject them to tax penalties.

163.    The anticipated increase in wrongful terminations based on carrier errors or misinformation will cost the DC Exchange an estimated $391,449 annually in FY20 and FY21 to process special enrollment period requests, reinstatements, and associated administrative appeals related to these requests. The DC Exchange will also experience an estimated $243,937 annually in FY20 and FY21 in additional expenses for enrollment transactions caused by the unnecessary disenrollment and re-enrollment churning caused by the Rule.

164.    In order to comply with the Rule by June 27, 2020, the DC Exchange will need to engage in off-cycle review of carrier notices and plan documentation, which normally only occurs at annual plan re-certification. The separate billing and payment requirements are new requirements that must be reviewed annually, making it an ongoing expense for the DC

Exchange's plan management team. These burdens will increase costs for the DC Exchange by an estimated $78,412 annually in FY20 and FY21. Beyond the new federal requirements on issuer certification, the DC Exchange is likely to develop new policies, either on its own or in conjunction with the District of Columbia Council and District of Columbia Department of Insurance, Securities, and Banking, in an attempt to mitigate the negative effects of the Rule. The DC Exchange's executive, legal, and policy staff time associated with this work is expected to cost approximately $185,541 annually in FY20 and FY21.

165. The Maryland Health Benefit Exchange, Maryland's state-based exchange has, through innovation and accomplishment, created a robust marketplace that offers Marylanders affordable and comprehensive health insurance options. As a result of a State reinsurance program, individual market premiums decreased by an average of 13% in 2019 and another 10% for 2020. MHBE's extensive investments in technology through its website, mobile application and call center, and in outreach and marketing to consumers have led to healthy enrollment and retention rates in Maryland, increasing the State insured rate to 94% in 2019.[13]

166. The Maryland Health Benefit Exchange anticipates that it will incur significant cost increases as a result of the Rule, including at a minimum, one-time costs of $16,000 to staff a special stakeholder workgroup to determine how best to educate consumers, consumer assistance workers and others about the Rule's premium billing and payment changes. The costs of effectuating the educational plan have yet to be determined. MHBE anticipates it will incur $240,000 in annual costs to handle the increase in call volume to its customer service call center regarding the billing and payment changes and foreseeable plan terminations. MHBE is currently assessing the costs it will incur to handle the increased complaint volume to its Appeals and Constituent Services department by consumers who have questions or concerns about the billing and payment changes, or whose plans are terminated for premium nonpayment - and the increase in hearings contesting the terminations.

---

[13] https://www.marylandhbe.com/wp-content/uploads/2019/MHC_Annual_Report%202019.pdf

49

167. MHBE's marketing and outreach efforts will be impacted by the Rule. Marketing and outreach drives enrollment on and off the exchange. MHBE has fixed sums for marketing but will need to redirect funds to explain the Rule's policy changes and to mitigate against consumer confusion and termination of coverage. MHBE's marketing and outreach budget for fiscal year 2020 includes $ 3.2 million for full service communications and marketing used to inform Marylanders about the value of insurance and the availability of financial assistance for most Marylanders, encouraging retention of those already enrolled, and to maintain a favorable risk pool. These funds are critically important and necessary for a stable marketplace. As the budget cycle for Maryland runs July 1st through June 30th, most of the FY2020 funds have already been expended on open enrollment and there are little funds left for any new, unplanned initiative. MHBE is assessing how much of the remaining budget will need to be diverted to create and execute a marketing plan to educate consumers about how health insurance premiums, unlike any other insurance premiums, will now be billed and collected. Attaining compliance with HHS's new Rule by June 27, 2020 significantly increases the costs. For example, as of January 2020, 41% of MHBE's consumers selected paper mail as their preferred method of communication. As a result, the marketing and outreach that is necessitated by the Rule change will have to be conducted through aggressive mass mailings and on-the-ground campaigns during the middle of the plan year.

168. This Rule is likely to risk MHBE's important annual enrollment gains and put at risk market stabilization efforts made the State. The stability of Maryland's marketplace is also tied to other factors, including renewals and the State's reinsurance program. Renewing enrollees made up 74% of the individual qualified health plan enrollments on the Exchange for 2019 and 76% for 2020. New enrollments become harder to acquire each year as the State continues to trim its uninsured rate and the remaining uninsured population increasingly consists of the hardest to reach. Renewals are at risk by the Rule's separate billing, separate payment requirement because MHBE will have to reacquire members who are terminated for nonpayment of premiums. This will significantly increase administrative costs.

169.     In 2018, Maryland established the State Reinsurance Program, under a State Innovation Waiver, to increase premium affordability and foster stability in the individual market. Because of the waiver, Maryland has experienced two successive years of double-digit premium decreases, resulting in 2020 premiums that are 23% lower than 2018 premiums.  MHBE will need to assess and quantify the additional costs that will be incurred to apply a new actuarial analysis to the State Reinsurance Program based on a projected loss of enrollment due to foreseeable plan terminations.  Because the number of enrollees determines federal pass-through dollars allocated under the reinsurance program, insurance premiums, and the amount of state funding needed for the State Reinsurance program, any reduction in enrollment destabilizes Maryland's reinsurance funding and the marketplace as a whole.

170.     The Oregon Health Insurance Marketplace is State-Based Exchange on the Federal Platform; the state-based health insurance marketplace is operated by the Oregon Department of Consumer and Business Services (DCBS), but utilizes the federal enrollment platform, Healthcare.gov.  The Oregon exchange estimates it will need one additional full time employee to handle the increased call volume resulting from consumer confusion and concern over missed payments.  This cost would be in the range of approximately $36,000 - $52,000 per year. Production and updating marketplace consumer education materials would cost approximately $1300, and the cost of distributing those consumer education materials would cost approximately $23,000 per mailing.

171.     The Department of Vermont Health Access has performed billing functions in the qualified health plan market along with issuers, but it is in the process of transitioning these functions completely to the issuers for plan year 2021.  It would be operationally and financially impossible for the Department of Vermont Health Access to make major changes to its billing procedures at this stage.

172.     Moreover, the ACA grants states the option of performing premium collection services for the individual insurance market's sale of qualified health plans.  In states that perform all premium billing and collection functions for individual market consumers, the costs of

1    implementing the Rule's changes will be even more significant, and similar to the costs borne by

2    issuers in other exchanges.

3        173.    While HHS reconsidered the "greatly underestimated" cost analysis in the proposed

4    regulation, and determined that the total costs to implement the Rule would reach almost $550

5    million in 2020 alone, the final Rule remained largely unchanged.  84 Fed. Reg. 71,699.  In

6    effect, HHS dismissed a key aspect of the problem relating to the Rule—the excessive costs—and

7    ultimately ignored the many commenters' concerns and *the agency's own accounting* of the

8    unconscionably high costs of implementation.

9        174.    Instead, HHS reminds "states concerned about enforcement and oversight of these

10   requirements that, under section 1321(c), states may elect not to establish and operate an

11   Exchange, thereby deferring those responsibilities to HHS."  84 Fed. Reg. 71,694.  In fact, in the

12   preamble, HHS assures state-based exchanges, "the Secretary may step in to enforce the

13   requirement against the non-compliant issuer."  84 Fed. Reg. 71,692.

14               **3.    The Rule Puts at Risk the State's New Coverage Gains**

15       175.    As discussed above, the many problems with the Rule put at risk the healthcare

16   coverage of millions of individuals already enrolled in qualified health plans, and place

17   individuals newly enrolled in a delicate position.

18       176.    First, commenters explained to HHS that insurance bills, as is the case for "auto,

19   homeowners, and liability insurance policies," have inculcated in consumers that only one bill is

20   required for the entire premium for any set time period, and the Rule is therefore contrary to well-

21   established industry practice.  (Comments submitted by the District of Columbia's Health Benefit

22   Exchange).  This is a key aspect of the insurance industry, where additional invoices are

23   generated "only if there is a late payment or a change to the policy, like adding dependents or new

24   employees."  *Id.*  But HHS failed to even discuss the radical departure from entire industry

25   practice.  84 Fed. Reg. 71,684.

26       177.    Second, Covered California, among other exchanges, submitted comments to HHS

27   warning that the Rule would leave consumers confused by the need to pay an additional bill of a

28   nominal amount ($1), and therefore run the risk of losing out on critical health insurance coverage

1    due to inadvertently failing to pay the initial premium payment in full. Specifically, new policy

2    subscribers who have yet to make their initial "binder" payments would effectively lose their

3    coverage before it even begins. This is different from risks of coverage termination.

4    178. As explained by Access Health CT to HHS, "[w]ithout a binder payment, an

5    enrollment is often not effectuated by a carrier" and exchanges work aggressively "through

6    several channels to ensure consumers understand their responsibility for making the first month's

7    payment, and monthly payments throughout the year thereafter." (Comments submitted by

8    Access Health CT). Similarly discussed in the Attorneys General comment letter, submitted on

9    January 8, 2019, the Rule's separate billing requirements put a significant number of enrollees at

10   risk of termination—or in other words, policy non-initiation. But the Rule fails to consider that

11   additional costs of updating internal operations, such as binder payment processing, will require

12   exchanges to redirect vital funds from other programs to additional consumer outreach and

13   marketing. (Comments submitted by Covered California).

14   179. In California, this has the potential to leave large numbers of new enrollees without

15   coverage and risks hurting California's success in bring down uninsured rate from the historic

16   high discussed above (from 17% in 2013 to 6.8% in 2017). In addition, in 2018, California

17   experienced a 3% growth in enrollment numbers, gaining 423,484 enrollees who signed up for

18   coverage through Covered California for the first time.[14] By 2019, Covered California reported

19   more than 1.5 million enrollees had gained coverage on the exchange's individual market. In

20   addition, in 2020, more than 318,000 consumers have newly signed up for health insurance

21   through Covered California during the current open-enrollment period (which continues through

22   January 31), and that surpassed last year's total of 295,000 enrollees. This is in part because new

23   state law requires Californians to have health insurance in 2020 or face a penalty when they file

24   their taxes with the Franchise Tax Board in 2021. Under the Rule, all new enrollees would be at

25   risk of policy non-initiation if they failed to make both billing payments on time. Added to this

26

27   [14] News Release, Covered California (Feb. 7, 2018),
     https://www.coveredca.com/newsroom/news-releases/2018/02/07/Covered-California-Finishes-
28   Fifth-Open-Enrollment-Strong-New-Sign-ups-of-423-484-up-3-Percent-Over-Last-Year/.

1    are the difficulties and confusion of having to re-navigate the process for coverage re-instatement,

2    seek additional coverage, or procure enough time and resources to secure alternative medical

3    services in the face of an emergency.

4         180.    In New York, since opening in 2013, NYSoH has transformed New York's individual

5    insurance market, offering New Yorkers access to affordable health insurance options.  NYSoH

6    assists New Yorkers in determining whether financial assistance through federal subsidies is

7    available.  Through offering affordable health options on its exchange, New York experienced an

8    unprecedented increase in individual health insurance enrollment.  In just seven years — from the

9    opening of NYSoH in 2013 to present — the rate of uninsured New Yorkers has declined from

10    10% to 4.7%.  There are currently 12 plans participating on NYSoH.

11         181.    NYSoH enrolled 253,102 individuals in a QHP (59 percent received financial

12    assistance to lower the cost of their coverage) in January of 2018.[15]  A year later in January of

13    2019, the number of individuals enrolled in a QHP rose to 271,873, with more than half (58%) of

14    those people receiving financial assistance to lower the cost of their coverage.[16]  As of January

15    27, 2020, there were 260,513 people enrolled in a QHP (the deadline to enroll in a QHP does not

16    close until February 7, 2020), with approximately 60 percent receiving financial assistance.

17         182.    Colorado has made significant gains in enrollment in qualified health plans through

18    its exchange. Connect for Health Colorado has created and fostered a robust and innovative

19    individual market for qualified health plans in Colorado. In 2018, Connect for Health Colorado

20    enrolled over 165,000 individuals in qualified health plans; in 2019, that number grew to 170,741

21    Coloradans, 76 percent of whom receive financial assistance to reduce monthly premiums. There

22    are currently 124 individual plans offered on Colorado's exchange by eight different issuers.

23         183.    Moreover, in May of 2019, Colorado established a two-year reinsurance program for

24    2020 and 2021, through a State Innovation Waiver. In July of 2019, CMS approved Colorado's

25

26        [15] https://info.nystateofhealth.ny.gov/2018openenrollmentreport - NYSOH 2018 Open
Enrollment Report

27        [16] https://info.nystateofhealth.ny.gov/2019openenrollmentreport - NYSOH 2019 Open

28    Enrollment Report.

Amended Complaint for Declaratory and Injunctive Relief (Case no. 3:20-cv-00682-LB)

**73**

application for the State Innovation Waiver to run its state-based reinsurance program. Colorado's reinsurance program is operated by CO DOI and will result in more consumers having coverage and lower premiums, utilizing pass-through funding from the federal government to help offset a substantial portion of Colorado's costs for the reinsurance program. Colorado's reinsurance program is expected to reduce premiums by 16 percent in its first year of operation and result in a 2.9 percent increase in enrollment in Colorado's individual market. Because the number of enrollees in Colorado's reinsurance program determines the amount of federal funding received for the program, insurance premiums, and the amount of other funding needed to supplement the program, any reduction in enrollment in the individual market as a result of the Rule's separate billing and payment requirements could adversely impact Colorado's reinsurance program, and the state generally.

184.    The Rule is likely to cause confusion, loss of coverage, and cancellation of policies. All of these effects undermine the significant gains Colorado has achieved in individual enrollment in qualified health plans through its effective operation of its exchange and its reinsurance program.

185.    The DC's Exchange enrollment experience demonstrates that the Rule will substantially increase payment confusion issues.  In plan years 2018 and 2019, 197 special enrollment period requests requiring manual review were approved due to carrier errors, carrier misinformation, or other carrier issuers that caused plan terminations based on non-payment of premiums.  The DC Exchange anticipates the Rule will result in a 50% increase in wrongful terminations because the separate payments are not paid or applied correctly.  As described above, customers who are unable to initiate their policies would then need to seek re-instatement and re-navigate the enrollment process, all the while being without coverage and experiencing the stress and risk of non-coverage.  In the District's experience, a substantial portion of these customers would just forego coverage once terminated.

186.    In Maine, the state's total individual market enrollment reached 70,987 in 2019.  Because the overwhelming majority of individual health plans in Maine are secured through the marketplace, the Rule's separate billing and payment requirements will likely have a

significant adverse effect on Maine consumers. In addition, in 2019 there were nearly 14,000 new enrollees. Under the Rule, any new gains in enrollment would be at risk of termination, or non-initiation, of their individual health plans if they failed to make both billing payments on time. The confusion created by the Rule's separate billing and separate payment requirements is likely to result in more cancellations of policies, more questions directed to the Bureau of Insurance and requests for administrative hearings, and additional administrative burden and expense.

187.    Moreover, in 2018, CMS approved Maine's application for a State Innovation Waiver, for 2019 through 2023, to run a state-based reinsurance program. Maine's reinsurance program is operated by the Maine Guaranteed Access Reinsurance Association (MGARA). As a result of the waiver approval, more consumers in Maine may have coverage, consumers will see lower premiums, and the state will receive pass-through funding to help offset a substantial portion of state costs for MGARA. MGARA is expected to reduce premiums by about 9 percent each year beginning in 2019. Enrollment is expected to increase by about 1.1 percent in 2019, 0.9 percent in 2020, and between 0.3 to 0.8 percent after that. Overall, Maine expects enrollment of an additional 300 to 1,100 individual market enrollees annually. MGARA will be funded by multiple sources, including reinsurance premiums paid by issuers and an assessment on all health coverage sold in Maine. Because the number of enrollees determines the amount of federal dollars for MGARA, insurance premiums, and the amount of state dollars needed for MGARA, any reduction in enrollment in the individual market as a result of the Rule's separate billing and separate payment requirements could adversely affect MGARA to the detriment of the state.

188.    Maryland, in 2019, gained more than 40,000 enrollees who signed up for individual coverage through the Maryland Health Benefit Exchange ("MHBE') for the first time—all of whom would be at risk of termination if they failed to make both billing payments on time.[17] This constituted a 2.2% growth in enrollment in 2019, but would now also represent new enrollees who would be at risk of termination, or non-initiation, under the Rule.

[17] Maryland Health Benefit Exchange, 2019 Annual Report 4, 22, https://tinyurl.com/tdrfkeo.

189.     In Oregon, the Oregon Health Insurance Marketplace reached a total enrollment of 148,180 for the 2019 plan year, gaining 35,617 new enrollees.  As in other states, new enrollees who fail to make the premium payment in full would risk coverage non-initiation.  As indicated by the numbers of new enrollees for 2019, tens of thousands of new enrollees could potentially be impacted simply because they failed to pay a nominal portion of their insurance coverage.  This is at odds with Oregon's goal of comprehensive, quality health insurance for all its residents.

190.     In Vermont, there are over 25,000 individuals enrolled in qualified health plans in the individual market.  In 2019, there were 3,884 new enrollees who purchased qualified health plans through Vermont Health Connect.  The Rule's separate billing and separate payment requirements will create customer confusion, and are likely to result in unnecessary dis-enrollments or cause new enrollees from effectuating new policies.

### 4.     The Rule Will Increase Consumer Confusion, and Lead to Coverage Termination

191.     The added confusion imposed by the separate billing and separate payment requirements will likely result in more consumers losing healthcare coverage entirely, as the Rule does not prohibit issuers from terminating coverage for failure to pay the separate $1 premium for abortion coverage.

192.     The Rule's resulting confusion is significant because it reveals HHS's lack of due diligence and awareness of most consumers' experience with healthcare insurance.  Often, consumers wary of financial deception may intentionally disregard a second bill suspecting that the bill for a nominal amount is a scam since the consumer may have already paid the first bill. (Comment by Planned Parenthood Federation of America (citing a study reporting consumers described the separate billing process as "a scam," "super confusing," "an unnecessary hassle," "inconvenient," and "frustrating"[18]).  The frustration of failing to make sense of health insurance programs or bills can force some consumers into blindly paying excessive charges, or ignore them and risk losing coverage and incurring more debt in fees.

---

[18] Comment cites Motivate Design, *Usability Study on Nelson Amendment Implementation Report* (2011) (on file with Planned Parenthood Federation of America).

193.     Any loss of private healthcare coverage will harm the most vulnerable residents (as discussed above in paragraph 123), relegating the uninsured and underinsured and largely low-income communities to public services or emergency care.  Despite comments submitted by Physicians for Reproductive Health raising these facts, the final Rule failed to account for the harms incurred from any inadvertent loss of healthcare coverage, the resulting increased premiums, higher out-of-pocket and uncompensated care costs, and the rise of unintended pregnancies from loss of access to abortion services.

194.     The risk of coverage termination applies to all qualified health plan enrollees.  Under the Rule, while issuers are not required to terminate coverage for failure to pay the separate $1 bill, the Rule does not prohibit issuers from choosing to terminate the entire policy instead of spending additional resources relating to ongoing consumer outreach and debt collection.  In fact, issuers will nonetheless "still be required to collect the premium for the...abortion coverage." 84 Fed. Reg. 71,705.  And while HHS's professed reason for granting issuers the ability to implement opt out mechanisms for policy holders to modify their plans is to mitigate the risk of coverage termination, this non-enforcement policy is discretionary and not mandatory.  *Id.* at 71,706.  Thus, qualified health plans in states without abortion coverage mandates could nevertheless decide not to implement the discretionary policy, and simply choose to terminate the policy holder's coverage for having failed to pay the $1 premium.  This largely leaves the risk of termination unaltered.  Loss of coverage due to a mere billing technicality could be a matter of life or death for consumers dealing with sensitive medical procedures and ongoing treatments.

195.     In addition, the Rule will leave consumers—both men and women already beyond their reproductive years—more confused after they receive a separate monthly bill for abortion coverage, a health service they no longer need.  This could prompt policy subscribers, under the Rule's new opt-out discretion now afforded to some issuers, to decline the benefit of abortion coverage, without understanding that this inadvertently triggers the termination of such coverage for any other enrollees under the policy who may still require such services themselves.

**5.    The Rule Is Contrary to State Policy, Will Increase Uncompensated Costs and Hurt the States' Fiscs**

196.     As discussed above, the confusion imposed by the Rule's separate billing and separate payment requirements is likely to result in consumers losing their health coverage entirely.  Ultimately, any lapse or loss of coverage, abortion or otherwise, could result in more unplanned births, an increase in uncompensated care costs, and consumers foregoing preventative care and medically necessary but unaffordable health care.

197.     If residents in need of medically necessary care do not have insurance coverage, they will turn to state-funded public programs, such as welfare or emergency room care.  Yet, HHS wholly failed to consider the full costs and the risks that come from arbitrarily complicating or restricting access to healthcare coverage, which will undeniably costs residents and the States' fiscs.

198.     As an example, HHS's final Rule heightens the risk that women will end up without abortion coverage.  Given the costs of abortions, many of these women will not have the financial means of obtaining one, which increases the likelihood of women falling into cycles of poverty and reliance on public assistance programs.  Women whose healthcare coverage is terminated or non-initiated, and do not have knowledge, time, or resources to obtain or reinstate that coverage, will turn to state-funded programs.

199.     In California, women and individuals in need of healthcare services but left without coverage could turn to the state-funded Family Planning, Access, Care, and Treatment (Family PACT) program, or emergency care for their reproductive healthcare needs.  An increase in unplanned births due to loss of coverage will raise State costs.  In 2010, for example, 64.3% of unplanned births in California were publicly funded.  That year, in California, the federal and state governments spent $1.8 billion on unintended pregnancies; $1.062 billion was paid by the federal government and $689.3 million was paid by the State.  In 2010, Maryland paid for 19,000 unplanned births.[19]

200.     Importantly, the Rule puts all residents are at risk of such coverage loss, which will likely further increase the hospital and the States' uncompensated care costs.  According to a

---

[19] https://www.guttmacher.org/sites/default/files/factsheet/md_8_0.pdf

1    recent estimate, the loss of insurance coverage and associated uncompensated costs would lead to

2    an exorbitantly high financial loss for the States.[20]

3        201.    In California, between 2010 and 2015, an estimated 3,826,000 people gained

4    coverage. From 2019 to 2028, a rise in uninsured rates could lead to a loss of federal marketplace

5    spending and Medicaid spending, risking $61.1 and $99.1 billion respectively—a total loss of

6    $160.2 billion. If California's coverage gains were put at risk, it is estimated that California

7    hospitals could lose $64.1 billion and physicians could lose $24.7 billion. Uncompensated care

8    costs in California would increase by $140.1 billion over this period.

9        202.    Similarly, since the implementation of the Affordable Care Act the number of

10   uninsured New Yorkers decreased by approximately 1 million. A rise in uninsured rates due to

11   the Rule could increase the fiscal and human costs of uncompensated care across the state. New

12   York hospitals have reported a dramatic decrease in self-pay hospital utilization because patients

13   have gained insurance—a usual source of payment. New York State Institutional Cost Reports

14   show a 23% reduction in self-pay hospital emergency room visits, a 40% reduction in self-pay

15   inpatient services and a 17% reduction in self-pay outpatient visits. Having a usual source of

16   payment for patients reduces the risk of uncompensated care costs.[21]

17   ───────────────

18       [20] Decl. of Henry J. Aaron in Supp. Of Mot. To Intervene, *Texas v. United States*, No. 4:18-cv-00167-O (N.D. Tex., filed Apr. 9, 2018) at 32-34, 46-48, 52-54, 56-58, 64-66. *See also*

19   Office of the Assistant Secretary of Planning and Evaluation, Compilation of State Data on the Affordable Care Act (Dec. 2016), https://aspe.hhs.gov/compilation-state-data-affordable-care-act.

20   Note that some estimates are not available for all states due to small sample size; Linda J. Blumberg et al., *Implications of Partial Repeal of the ACA through Reconciliation*, Urban Inst.

21   (Dec. 2016), https://www.urban.org/sites/default/files/publication/86236/2001013-the-implications-of-partial-repeal-of-the-aca-through-reconciliation_1.pdf; Trust for America's

22   Health, *Updated Prevention and Public Health Fund (PPHF) State Funding Data* (FY10-FY17) (March 2018), https://www.tfah.org/health-issues/news/updated-prevention-and-public-health-

23   fund-pphf-state-funding-data-fy10-fy17/; Ctrs. for Medicare & Medicaid Serv's, *2017 Effectuated Enrollment Snapshot* (June 2017), https://downloads.cms.gov/files/effectuated-enrollment-

24   snapshot-report-06-12-17.pdf; Ctrs. for Medicare & Medicaid Serv's, Nearly 12 Million People with Medicare Have Saved over $26 Billion on Prescription Drugs since 2010, Press Release

25   (Jan. 2017), https://www.cms.gov/Newsroom/MediaReleaseDatabase/Press-releases/2017-Press-releases-items/2017-01-13.html.

26

27       [21] Declaration of Dr. Howard A. Zucker ISO Motion to Intervene of State of California, et al., (18-cv-167), April 6,

28

203.     In Colorado, since the implementation of the Affordable Care Act, approximately 600,000 more Coloradans have obtained insurance coverage.  As of 2019, women comprised approximately 51 percent of people who signed up for individual coverage through Connect for Health Colorado.  The Rule threatens enrollment in qualified health plans in Colorado thereby increasing the fiscal and human costs of uncompensated care across Colorado.  As costs of uncompensated care rise, so do rates charged by providers and hospitals, costs that are eventually passed onto all payers.  Additionally, any increase in the uninsured population in Colorado and subsequent increase in uncompensated care rates directly injure Colorado financially as a payer of hospital and provider costs through Colorado's Medicaid program.

204.     In the District of Columbia between 2010 and 2015, an estimated 25,000 people gained coverage.  From 2019 to 2028, a rise in uninsured rates could lead to a loss of federal marketplace spending and Medicaid spending, risking $100 million and $1.7 billion respectively—a total loss of $1.7 billion.  If these gains were put at risk, it is estimated that District of Columbia hospitals could lose $700 million and physicians could lose $200 million. Uncompensated care costs in the District of Columbia would increase by $1.7 billion over this period.

205.     In Maine, from 2010 to 2018, the rate of uninsured people dropped from 11% to 8%, resulting in 37,000 fewer uninsured people – mostly attributable to the private coverage improvements in the ACA, since the consequences from the MaineCare (Medicaid) expansion were not fully realized until 2019.  Uncompensated care costs in Maine fell by $44 million from 2013 to 2015 alone.  The number of people insured through the individual market more than doubled, rising from approximately 32,000 in 2013 to over 70,000 in 2019, according to the Maine Bureau of Insurance.  In the 2019 open enrollment period, women comprised 54 percent of people who signed up for individual coverage through HealthCare.gov in Maine.

---

2018.

**80**

206.     In Maryland, 156,963 residents have obtained private health insurance and more than 1,000,000 are covered by Medicaid as of 2019, cutting the overall rate of the uninsured to just 6%.[22]  Uncompensated care costs in the state decreased by an estimated $354 million from 2013 to 2016.[23]  In Maryland, under current agency policy, uncompensated care for all Maryland hospitals is funded by a statewide pooling system in which regulated Maryland hospitals draw funds from the pool if they experience a greater-than-average level of uncompensated care and pay into the pool if they experience a less-than-average level of uncompensated care.  This policy ensures that the cost of uncompensated care is shared equally across all the hospitals within the system.  Thus, when uncompensated care increases, hospital rates increase accordingly, and payers must pay increased rates.

207.     Because Maryland is a payer of hospital rates, Maryland is directly injured by any increase to the uncompensated care rate that will occur if the uninsured population in Maryland increases.  And, any increase in hospital rates will undermine and put at risk Maryland's unique Total Cost of Care Model Agreement with CMS, an Agreement to achieve fixed amounts of savings to Medicare per capita total cost of care during each model year between 2019 and 2023.  The Models financial targets are structured to obtain a total of over $1 billion in Medicare total cost of care savings by the fifth performance year of the Model.

208.     In Oregon, between 2010 and 2015, an estimated 403,000 people gained coverage.  From 2019 to 2028, a rise in uninsured rates could lead to a loss of federal marketplace spending and Medicaid spending, risking $3.3 and $35.1 billion respectively—a total loss of $38.4 billion.  If these gains were put at risk, it is estimated that Oregon hospitals could lose $17.5 billion and physicians could lose $5.7 billion.  Uncompensated care costs in Oregon would increase by $15.2 billion over this period.

---

[22] Maryland Health Benefit Exchange, 2019 Annual Report 4, 19, https://tinyurl.com/tdrfkeo.

[23] Matt Broadus, *ACA Medicaid Expansion Drove Large Drop in Uncompensated Care*, Ctr. on Budget and Policy Priorities (Nov. 9, 2019), https://www.cbpp.org/blog/aca-medicaid-expansion-drove-large-drop-in-uncompensated-care.

209.     In Vermont, between 2010 and 2015, an estimated 26,000 people gained coverage. From 2019 to 2028, a rise in uninsured rates could lead to a loss of federal marketplace spending and Medicaid spending, risking $1 and $1.9 billion respectively—a total loss of $2.9 billion.  If these gains were put at risk, it is estimated that Vermont hospitals could lose $500 million and physicians could lose $300 million.  Uncompensated care costs in Vermont would increase by $2.4 billion over this period.

### 6.     The Rule Harms Women and Creates Unreasonable Burdens on Abortion Care

210.     Indisputably, the Rule disproportionally impacts the States, which are committed to protecting women's access to the full range of reproduction options and allow or require qualified health plans to include abortion coverage as part of the qualified health plan's benefits.

211.     The Rule primarily seeks to create barriers to access to women's healthcare by targeting coverage of a service unique to women—and protected by federal and state laws—abortion care.

212.     While the Rule directs issuers to separately bill policy holders without regard to sex, abortion coverage and services are unique to women's reproductive health.  84 Fed. Reg. 71,694. Contrary to nondiscrimination protections provided by the ACA, the Rule has a disparate impact on women because it conditions their access to comprehensive reproductive healthcare on the onerous regulatory burdens requiring separate billing and payments and seeks to eliminate legal abortion coverage entirely in states that do not require it.

213.     As discussed in *Subsection F(4)* above, the Rule creates unnecessary confusion, and if separate bills are not paid at the onset of enrollment, women run the risk of being left without any coverage at all.  Failing to comply with the Rule impacts women differently than men.

214.     The risk of losing coverage of abortion services naturally falls heaviest on women who may require it, potentially resulting in irreversible harm in the form of delayed care, unintended pregnancies, or health complications.  Without insurance coverage, a woman must procure the necessary funding to cover the out-of-pocket expenses in time to obtain a needed abortion, placing unreasonable obstacles in her attempt to exercise a legal right.

215.    For example, if an issuer terminates a woman's healthcare coverage when she requires abortion services, a time-sensitive matter, she would find herself in the difficult position of having to pay out-of-pocket or endure additional risk while attempting to secure alternative coverage, which may or may not be available.  Ultimately, delays in reaching and obtaining care can push women later into their pregnancies, even up to the point that they might not be able to obtain a wanted abortion, depending on the gestational limits on abortion in their state.[24]  Those forced to delay abortion care often experience negative mental health outcomes, and consider ending the pregnancy on their own, either with medications (misoprostol, herbs or home remedies) or by blunt-force physical trauma.[25]

216.    HHS is aware the Rule's risk of coverage loss could leave women to pay higher out-of-pocket costs for abortion care.  84 Fed. Reg. 71,705.  HHS also received many comments expressing "concern that when legal abortion becomes inaccessible, women who seek to end their pregnancy turn to unsafe and illegal methods, risking arrest, serious injury, or even death." *Id.* But HHS simply concludes that "any additional burden these enrollees experience related to understanding" the Rule or inadvertently failing to submit payments in full due to confusion, "is unrelated to whether [enrollees] actually do access coverage" for abortion services. *Id.* at 71,695. HHS's statement fails to meaningfully consider to the pivotal importance of healthcare coverage that enables women to obtain lawful, necessary healthcare services—and in this case—for women to exercise their constitutionally protected right to abortion.  HHS even disregards commenters who stressed, in their professional opinion, that access to comprehensive reproductive healthcare "is one of the few means of regaining self-esteem and a sense of bodily autonomy" for women experiencing partner abuse, reproductive coercion, and sexual assault.  (Comment submitted by University of California, Irvine, School of Nursing, Assistant Professor Candace W. Burton, RN, PhD).

---

[24] Alice Cartwright et al., *Identifying National Availability of Abortion Care and Distance from Major US Cities: Systematic Online Search* (2018), https://www.jmir.org/2018/5/e186/.

[25] Jenna Jerman et al., *Barriers to Abortion Care and Their Consequences for Patients Traveling for Services: Qualitative Findings from Two States*, Perspectives on Sexual and Reproductive Health (2017), https://onlinelibrary.wiley.com/doi/full/10.1363/psrh.12024.

217. This unnecessary burden applies to no other healthcare service or benefit. The Rule's sole function is to make it more burdensome and more confusing for women to pay for health plans that include legal abortion services, and frustrate the receipt of such coverage in states that require or allow it. Further, for many women, access to a health plan that includes abortion coverage is a necessary antecedent to the ability to exercise the legal right to obtain the procedure. Forcing women to adapt to onerous and nonsensical billing practices in order to maintain abortion coverage is discriminatory.

218. The receipt of separate monthly bills, and the costs and labor of having to submit or mail separate payments for abortion coverage is plainly unnecessary, and only serves to remind women that their constitutional right to abortion services is one that is heavily regulated. This can potentially stigmatize abortion and shame women for exercising their constitutional right to choose when and whether to become mothers. Women forced to carry an unwanted pregnancy to term risk postpartum hemorrhage and eclampsia, and report a need to limit physical activity for a period three times longer than women who obtain abortions.[26] Women unable to plan pregnancies and who have pregnancies too close together face an increased health risks, such as premature birth, low birth weight, congenital disorders, and schizophrenia.[27] Carrying an unwanted pregnancy to term can also result in a greater risk of domestic violence.[28]

219. Importantly, communities of color are most harmed when abortion access is undermined. (*See* comments submitted by the Public Health and Insurance Committee of the Connecticut General Assembly, California Latinas for Reproductive Justice (CLRJ), and PPFA). The Rule has failed to consider the disproportionate effect these changes will have on women

---

[26] Caitlin Gerdts et al., *Side Effects, Physical Health Consequences, and Mortality Associated with Abortion and Birth after an Unwanted Pregnancy*, 26 Women's Health Issues 55, 58 (2016), https://www.sciencedirect.com/science/article /pii/S1049386715001589.

[27] *Family Planning: Get the Facts About Pregnancy Spacing*, Mayo Clinic, https://www.mayoclinic.org/healthy-lifestyle/getting-pregnant/in-depth/family-planning/art-20044072.

[28] Sarah C.M. Roberts et al., *Risk of Violence from the Man Involved in the Pregnancy after Receiving or Being Denied an Abortion*, 12:144 BMC Medicine at 5 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4182793/.

1  with limited incomes, women of color, those with limited English proficiency and people in states

2  where abortion is not required.

3      220.     It has been well documented that low-income women who lack insurance coverage

4  for abortion often struggle to pay for the procedure out-of-pocket, and these same financial

5  hardships drive families further into poverty.  Abortion procedures are expensive, costing on

6  average between $500 and $1,500.  And most enrollees obtaining advanced premium tax credits

7  or cost-sharing reductions, already have limited incomes—which is often a requirement to meet

8  eligibility thresholds.

9      221.     Lack of access to abortion also results in poorer socioeconomic outcomes, including

10  lower rates of full-time employment and increased reliance on public programs.[29]  Conversely,

11  increased availability of abortion results in *increased* women's participation in the workforce,

12  especially for women of color.[30]  As the Supreme Court recognized, women's control of their

13  reproductive healthcare ensures that they can participate "equally in the economic and social life

14  of the Nation." *Casey*, 505 U.S. at 856; *see also Priests for Life v. U.S. Dep't of Health and*

15  *Human Services*, 808 F.3d 1, 22-23 (2015) (Kavanaugh, J., dissenting) ("It is commonly accepted

16  that reducing the number of unintended pregnancies would further women's health, advance

17  women's personal and professional opportunities, reduce the number of abortions, and help break

18  a cycle of poverty.").  Ultimately, women who want an abortion but are unable to afford one

19  without insurance coverage are more likely to spend years living in poverty than women who are

20  able to receive an abortion.

21      222.     Control over family planning and reproductive healthcare are fundamental to gender

22  equality and women's empowerment, as it is a key driver in reducing poverty.  Thus, restrictions

23  that prevent women from obtaining abortion coverage can have negative lifelong consequences,

24      [29] Diana Greene Foster et al., *Socioeconomic Outcomes of Women Who Receive and*

25  *Women Who are Denied Wanted Abortions in the United States*, 103 Am. J. Pub. Health 407, 409
    (2018), https://www.ncbi.nlm.nih.gov/pmc/ articles/PMC5803812/.

26      [30] *See* Anna Bernstein et al., *The Economic Effects of Abortion Access: A Review of the*

27  *Evidence*, Ctr. for Economics of Reproductive Health, Institute for Women's Policy Research
    (2019), at v., https://iwpr.org/wp-content/uploads/2019/07/B379_Abortion-Access_rfinal.pdf.

28

resulting in reductions in full-time employment, limited educational opportunities, and increased incidences of poverty.[31]

223.    The potential impacts of the Rule, namely the loss of healthcare coverage and having to carry an unwanted pregnancy to term, accentuate the struggles already present for women across the Nation, and run contrary to the States' efforts to safeguard women's reproductive freedom.

## FIRST CAUSE OF ACTION

### (Violation of APA; 5 U.S.C. § 706—Exceeds Statutory Authority)

224.    Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

225.    The APA requires courts to "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

226.    The Rule exceeds Defendants' authority under Section 1303, which prohibits the use of federal subsidies to pay for abortion coverage and services, not the collection of a single payment or the use of a single billing statement.

227.    The Rule creates a significant change in policy that cannot be reconciled with the text and purpose of Section 1303, the authorizing statute.

228.    Defendants illegally attempt to redefine subsections of the statute, expanding the requirement for the collection of separate payments and injecting new notice requirements that are directly contrary to the limitations in Section 1303.

229.    By promulgating this Rule, Defendants have acted in excess of their authority granted to them by the ACA. In doing so, Defendants have taken action in violation of the APA. The Rule is therefore invalid.

## SECOND CAUSE OF ACTION

### (Violation of APA; 5 U.S.C. § 706(2)(A)—Contrary to Law)

230.    Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

---

[31] *Supra* Foster et al.

231. The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

232. The Rule conflicts with Section 1554 of the Affordable Care Act, which prohibits the Secretary of HHS from promulgating any regulation that limits access to healthcare services. 42 U.S.C. § 18114. Among other key provisions, Section 1554 prohibits agency actions that (1) unreasonably inhibit access to "appropriate medical care;" (2) prevent "timely" access to care; or (3) would prevent a patient from obtaining treatment "for the full duration of [their] medical needs." *Id.*

233. As addressed previously, the Rule's separate abortion billing and collection requirements leave everyone at risk of coverage termination and will unreasonably inhibit access to appropriate and timely medical care, including abortion, in violation of Section 1554.

234. Additionally, the Rule is also in direct conflict with Section 1557 of the ACA, which provides anti-discrimination protections in health programs based on any ground listed under four different federal civil rights statutes, including Title VI of the Civil Rights Act of 1964 (race, color, national origin, and sex), including sex under Title IX of the Education Amendments of 1972. 42 U.S.C. § 18116.

235. Defendants' Rule specifically targets a healthcare service unique to women— abortion. HHS recognizes, as it must, that coverage for abortion services is primarily sought by "women who may ultimately access such services." 84 Fed. Reg. 71,694. The Rule, if implemented, will result in a disparate impact on women's access to comprehensive medical care.

236. The likely impact of this Rule is the loss of insurance coverage, which will lead to increased healthcare costs for consumers that no longer have insurance. This is in complete contravention of the widely recognized core purposes of the ACA, which are to "increase the number of Americans covered by health insurance and decrease the cost of health care". *Nat'l Fed'n Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

237. By promulgating this Rule, Defendants have acted contrary to the Affordable Care Act in violation of the APA. The Rule is therefore invalid.

## THIRD CAUSE OF ACTION

### (Violation of APA; 5 U.S.C. § 706—Arbitrary, Capricious, and Abuse of Discretion)

238.     Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

239.     The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion…." 5 U.S.C. § 706(2)(A).

240.     In issuing the Rule, Defendants have failed to provide a "satisfactory explanation" and "rational connection between the facts found and the choice made." *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 42 (1983).

241.     Defendants ignored critical impacts of the Rule as a whole that the States and others raised in public comments.  Defendants have offered an explanation for their decision that "runs counter to the evidence before the agency" and is "so implausible that it could not be ascribed to a difference of view or the product of agency expertise." *State Farm Ins.*, at 43.

242.      By promulgating this new Rule, Defendants have acted arbitrarily and capriciously and have abused their discretion in violation of the APA.  The Rule is therefore invalid.

## FOURTH CAUSE OF ACTION

### (Violation of APA; 5 U.S.C. § 553—Procedural Rulemaking Violation)

243.     Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

244.     The APA generally requires agencies to provide the public notice and an opportunity to be heard before promulgating a regulation.  An agency wishing to promulgate a regulation must publish in the Federal Register a notice of proposed rulemaking that includes "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b).  After the notice has issued, "the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. § 553(c).

245.     In narrow circumstances, the APA exempts agencies from this notice and comment process where they can show "good cause" that the process would be either "impracticable, unnecessary, or contrary to the public interest." *Id*. § 553(b)(B). The burden is on the agency to demonstrate good cause, and courts have interpreted the exception narrowly. *See*, *e.g.*, *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 6 (D.C. Cir. 2011).

246.     Defendants have not and cannot demonstrate good cause for failing to give notice to the public or allowing for public comment prior to instituting a policy of non-enforcement against issuers that allow consumers to opt-out of the otherwise applicable and substantive requirement to include abortion coverage as a benefit in their qualified health plan.

247.     Notice and comment is particularly important in legally and factually complex circumstances like those presented here. Notice and comment allows affected parties—including States—to explain the practical effects of a rule before it is implemented, and ensures that the agency proceeds in a fully informed manner, exploring alternative, less harmful approaches. In the area of women's health care, it is particularly important to have an adequate notice and comment given that women are relying on having plans that contain abortion coverage.

248.     Because Defendants failed to follow section 553's notice and comment procedures, promulgating a final rule that was not prefigured nor contemplated by the proposed rule, the public and the States did not have an opportunity to comment upon it, as required by the APA. Therefore, the regulation is invalid.

## FIFTH CAUSE OF ACTION

### (Violation of the Tenth Amendment—Federalism)

249.     Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

250.     The Tenth Amendment to the United States Constitution provides, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

251.     States have "the power to create and enforce a legal code, both civil and criminal." *Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982); V*irginia ex rel. Cuccinelli v. Sebelius*,

656 F.3d 253 (4th Cir. 2011). Congress may not infringe on the States' sovereign authority to enforce its own laws. "[W]hen a federal law interferes with a state's exercise of its sovereign 'power to create and enforce a legal code' [ ] it inflict[s] on the state the requisite injury-in-fact." *Cty. of Santa Clara v. Trump*, No. 17-CV-00485-WHO, 2017 WL 1459081, at *17 (N.D. Cal. Apr. 25, 2017), reconsideration denied, No. 17-CV-00485-WHO, 2017 WL 3086064 (N.D. Cal. July 20, 2017), quoting *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th Cir. 1985).

252. HHS' disregard for the States' laws and policies violates the Tenth Amendment's federalism principles.

253. The Rule penalizes the States for requiring and allowing qualified health plans to provide abortion coverage in its state-based exchanges. The States of California, New York, Colorado, District of Columbia, Maine, Maryland, Oregon, and Vermont all require or encourage the provision of abortion coverage in qualified health plans. This represents the States' policy priorities related to safeguarding women's reproductive freedom by securing abortion coverage to ensure that individuals have access to all the services they may need and have the option of exercising constitutionally protected rights.

254. The ACA authorizes the States' insurance commissioners as the entities primarily responsible for monitoring, overseeing, and enforcing the provisions in Section 1303 related to qualified health plans segregation of funds for abortion services. 42 U.S.C. § 18023(b)(2)(E)(i); 45 C.F.R. § 156.280(e)(5). This in itself demonstrates that the ACA contemplated state-flexibility that state-based exchanges were designed to retain.

255. HHS simply runs past this, instead threatening to step in and enforce these unreasonable changes in the State's place, or worse, short-change the States due HHS federal funding for failing to bend to their regulatory scheme.

256. First, the Rule states that "if HHS determines that a state (or State Exchange) has failed to substantially enforce a federal requirement related to Exchanges and the offering of QHPS through Exchanges, including section 1303 of the PPACA's separate payments

Amended Complaint for Declaratory and Injunctive Relief (Case no. 3:20-cv-00682-LB)

1    requirement (or other requirements), the Secretary may step in to enforce the requirement against

2    the non-compliant issuer."  84 Fed. Reg. at 71,692 (citing 42 U.S.C. § 18041(c)(2)).

3        257.    Second, under 42 U.S.C. § 18033(a)(4) (2018), HHS may conclude that the States'

4    inability to comply, or allow issuers to comply, with the Rule amounts to a "pattern of abuse"

5    regarding compliance with HHS standards related to Title I of the ACA.  If "the Secretary

6    determines that an Exchange has engaged in serious misconduct with respect to compliance with

7    the requirements of, or carrying out of activities required" under the ACA, HHS has the authority

8    to rescind up to one percent (1%) of the federal funding dollars due to a state *under any program*

9    *administered by HHS*.  84 Fed. Reg. 71,678.

10       258.    This is significant, because 1% of annual HHS funds amounts to substantial federal

11   dollars at risk for the States.  Therefore, noncompliance with the Rule risks millions of federal

12   dollars paid to the States for the administration of health programs such as Medicaid.

13       259.    In addition, HHS and CMS recent actions demonstrate the administration's

14   commitment to impeding abortion access and interfering with state sovereignty.  On January 24,

15   2020, the Office of Civil Rights of HHS issued a "Notice of Violation to California for its

16   Abortion Coverage Mandate," which at its core implicates California's police powers over its

17   regulation of healthcare, "notifying California that it cannot impose universal abortion coverage

18   mandates on health insurance plans and issuers in violation of federal conscience laws."[32]  The

19   letter indicates that if California does not receive sufficient assurance that the state will come into

20   compliance with federal law within 30 days, the "action may ultimately result in limitations on

21   continued receipt of certain HHS funds."  This puts California, and the States at large, in a

22   vulnerable position, fearing HHS will seek extreme enforcement actions or penalties merely for

23   choosing to protect their public health interests.

24       260.    The Rule runs parallel with this recent CMS action, and is a powerful use of coercion

25   to induce the States to change their sovereign laws—properly promulgated under its police

26   powers—and accept federally imposed policy changes with respect to access to abortion

_____

27            [32] *See* https://www.hhs.gov/about/news/2020/01/24/hhs-issues-notice-of-violation-to-
28   california-for-its-abortion-coverage-mandate.html.

coverage. *See Nat'l Fed'n Indep. Bus. v. Sebelius* 567 U.S. 519, 578 ("The Constitution simply does not give Congress the authority to require the States to regulate."). Complying with the Rule's onerous and excessive changes could in effect cause issuers to leave the States' exchanges, putting at risk the viability of a strong insurance market in the jurisdictions that require or allow abortion coverage.

261. Accepting these changes not only threatens the States' sovereignty but would require the States to incur significant administrative costs to implement efforts that actually increase risks to its public health and their marketplaces. Compliance with this Rule will undermine our States' police powers over healthcare, and require extensive diversion of resources, interfering with enrollment rates and the insurance risk pool.

262. The Rule will impermissibly impose burdens on the States' sovereignty.

263. By promulgating the Rule, Defendants have violated the Tenth Amendment of the U.S. Constitution. Defendants' violation in itself causes ongoing harm to the States and their residents. The Rule violates the U.S. Constitution and is therefore invalid.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff States respectfully requests that this Court:

1. Issue a declaratory judgment that the Rule is an unreasonable interpretation of the law;

2. Issue a declaratory judgment that the Rule is arbitrary, capricious, an abuse of discretion, not in accordance with law, and contrary to the States' constitutional rights, powers, privileges and immunities, in violation of the Administrative Procedure Act because HHS failed to justify reasons for the change in policy and respond adequately to the public comments it received;

3. Issue a declaratory judgment that the Rule engaged in improper procedural rulemaking in violation of the Administrative Procedure Act;

4. Issue a declaratory judgment that the Rule violates the Tenth Amendment;

5. Postpone the effective date of the Rule, pending judicial review, pursuant to 5 U.S.C. § 705;

Amended Complaint for Declaratory and Injunctive Relief (Case no. 3:20-cv-00682-LB)

1    6.    Hold unlawful and set aside the Rule, pursuant to 5 U.S.C. § 706(2);

2    7.    Award the States costs, expenses, and reasonable attorneys' fees;

3    8.    Award such other relief as the Court deems just and proper.

4

5    Dated:  February 26, 2020                    Respectfully submitted,

6                                                XAVIER BECERRA
                                                Attorney General of California
7                                                KATHLEEN BOERGERS
                                                Supervising Deputy Attorney General
8                                                KETAKEE R. KANE
                                                MICHAEL GOLDSMITH
9

10

11                                              */s/ Brenda Ayon Verduzco*

                                                BRENDA AYON VERDUZCO
12                                               Deputy Attorneys General
                                                *Attorneys for Plaintiff State of California*
13

14

15                                              LETITIA JAMES
                                                Attorney General of New York
16                                               MATTHEW COLANGELO
                                                Chief Counsel for Federal Initiatives
17                                               BRANT CAMPBELL
                                                COLLEEN K. FAHERTY
18                                               Assistant Attorneys General
19

                                                /s/ *Lisa Landau*
20                                               LISA LANDAU
                                                Chief, Health Care Bureau
21                                               28 Liberty Street
                                                New York, NY 10005
22                                               Phone: (212) 416-8542
                                                Lisa.landau@ag.ny.gov
23                                               *Attorneys for Plaintiff the State of New York*

24

25

26

27

28

PHILIP J. WEISER
Attorney General of Colorado

/s/ Abby L. Chestnut
ABBY L. CHESTNUT*
Assistant Attorney General
1300 Broadway, 8th Floor
Denver, Colorado 80203
Telephone: 720-508-6353 (Chestnut)
Fax: 720-508-6032
Abby.chestnut@coag.gov
*Attorneys for Plaintiff State of Colorado*
*pro hac vice pending*

KARL A. RACINE
Attorney General for the District of Columbia
KATHLEEN KONOPKA
Deputy Attorney General
Public Advocacy Division

/s/ Alacoque Hinga Nevitt
ALACOQUE HINGA NEVITT
Assistant Attorney General
441 4th Street, N.W.
Washington, DC 20001
Tel (202) 724-6532
Fax (202) 730-1900
alacoque.nevitt@dc.gov
*Attorneys for Plaintiff District of Columbia*

AARON M. FREY
Attorney General of Maine

/s/ Susan P. Herman
SUSAN P. HERMAN*
Chief Deputy Attorney General
6 State House Station
Augusta, ME 04333-0006
Telephone: (207) 626-8814
susan.herman@maine.gov
*Attorneys for Plaintiff State of Maine*
* admitted pro hac vice

75

1

BRIAN E. FROSH
Attorney General of Maryland
2
STEVEN M. SULLIVAN
Solicitor General
3

4
/s/ *Kimberly S. Cammarata*
KIMBERLY S. CAMMARATA
5
Director, Health Education and Advocacy
200 St. Paul Place
6
Baltimore, MD 21202
Telephone: (410) 576-7038
7
kcammarata@oag.state.md.us
*Attorneys for Plaintiff the State of Maryland*
8
*admitted pro hac vice*

9

10
ELLEN F. ROSENBLUM
Attorney General of Oregon
11
MICHAEL C. KRON
Special Counsel
12
DEANNA J. CHANG
13

14
/s/ *Nicole DeFever*
J. NICOLE DEFEVER
15
Senior Assistant Attorneys General
100 SW Market Street
16
Portland, OR 97201
nicole.defever@doj.state.or.us
17
*Attorneys for Plaintiff the State of Oregon*

18

19
THOMAS J. DONOVAN, JR.
Attorney General of Vermont
20

21
/s/ *Eleanor Spottswood*
Eleanor Spottswood*
22
Assistant Attorney General
Office of the Attorney General
23
109 State Street
Montpelier, VT 05609-1001
24
(802) 828-5500
eleanor.spottswood@vermont.gov
25
*Attorneys for Plaintiff the State of Vermont*
*admitted pro hac vice*
26

27
SA2018103397

28

76

Reset Form

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

State of California, et al.

Case No. C 3:20cv682

Plaintiff(s)

CONSENT OR DECLINATION
TO MAGISTRATE JUDGE
JURISDICTION

v.

U.S. Dep't of Health & Human Servs., et al

Defendant(s).

**INSTRUCTIONS:** Please indicate below by checking **one** of the two boxes whether you (if you are the party) or the party you represent (if you are an attorney in the case) choose(s) to consent or decline magistrate judge jurisdiction in this matter. Sign this form below your selection.

☑ **Consent to Magistrate Judge Jurisdiction**

In accordance with the provisions of 28 U.S.C. § 636(c), I voluntarily **consent** to have a United States magistrate judge conduct all further proceedings in this case, including trial and entry of final judgment. I understand that appeal from the judgment shall be taken directly to the United States Court of Appeals for the Ninth Circuit.

**OR**

☐ **Decline Magistrate Judge Jurisdiction**

In accordance with the provisions of 28 U.S.C. § 636(c), I **decline** to have a United States magistrate judge conduct all further proceedings in this case and I hereby request that this case be reassigned to a United States district judge.

DATE: _02/13/2020_

NAME: Brenda Ayon Verduzco

COUNSEL FOR
(OR "PRO SE"): State of California, et al.

_____
*Signature*

United States District Court
Northern District of California

96

1   XAVIER BECERRA
    Attorney General of California
2   KATHLEEN BOERGERS
    Supervising Deputy Attorney General
3   KETAKEE R. KANE
4   MICHAEL GOLDSMITH
    BRENDA AYON VERDUZCO
5   Deputy Attorneys General
    State Bar No. 315117
6     1515 Clay Street, 20th Floor
7     P.O. Box 70550
      Oakland, CA  94612-0550
8     Telephone:  (510) 879-0981
      Fax:  (510) 622-2270
9     E-mail:  Brenda.AyonVerduzco@doj.ca.gov
    *Attorneys for Plaintiff State of California*
10

11

12                  IN THE UNITED STATES DISTRICT COURT

13                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15   **STATE OF CALIFORNIA, STATE OF NEW**
     **YORK, DISTRICT OF COLUMBIA, STATE**
16   **YORK, DISTRICT OF COLUMBIA, STATE**
     **OF MAINE, STATE OF MARYLAND,**          **COMPLAINT**
17   **STATE OF OREGON,** and the **STATE OF**
     **VERMONT,**                              **FOR DECLARATORY RELIEF**
18
                                               Administrative Procedure Act Case
19                              *Plaintiffs,*

20              **v.**

21
     **U.S. DEPARTMENT OF HEALTH AND**
22   **HUMAN SERVICES; ALEX M. AZAR, II,**
     in his official capacity as Secretary of Health
23   and Human Services; **THE CENTERS FOR**
     **MEDICARE & MEDICAID SERVICES;**
24   **SEEMA VERMA**, in her official capacity as
     Administrator of Centers for Medicare and
25   Medicaid Services,

26                              *Defendants.*

27

28

                                    1

**INTRODUCTION**

1.     Plaintiffs the States of California, New York, District of Columbia, Maine, Maryland, Oregon, and Vermont (collectively, the States), bring this action to challenge the unlawful agency action by Defendants, the U.S. Department of Health and Human Services (HHS) and Secretary Alex M. Azar, II (collectively, Defendants), that threatens to undermine access to healthcare coverage, specifically safe and legal abortion, and the States' sovereign laws enacted to protect women's constitutional rights.  Defendants have unlawfully reinterpreted Section 1303 of the Patient Protection and Affordable Care Act (ACA) and issued an onerous and unnecessary regulation designed to restrict women's constitutionally protected reproductive rights by creating barriers to abortion coverage.  In doing so, Defendants seek to frustrate the States' sovereignty by coercing the States to change their policies relating to the protection of abortion care.

2.     A central feature of the ACA is the requirement that every state establish a "health insurance exchange."  Exchanges are marketplaces in which consumers and small businesses can shop for and purchase private health insurance coverage.  The ACA gave states the flexibility to develop and host their own exchanges, or let the federal government establish and run exchanges for them.  An exchange established by the state itself is a state-based exchange (SBE) and those operated by HHS are federally facilitated exchanges (FFE).  In states with FFEs, the exchange may be operated by HHS alone or in conjunction with the state.  And some states have exchanges that are SBE-FPs, meaning they are SBEs but use the federal information technology platform, including the federal exchange website www.Healthcare.gov.[1]

3.     States that choose to implement their own exchanges may tailor the exchanges to their state's unique public health priorities, such as ensuring coverage for services required by state laws for its residents.  An important aspect of developing its own insurance exchange is a state's ability to define standards for and selecting plans that qualify for participation in its

---

[1] In Plaintiff States, California, the District of Columbia, Maryland, New York, and Vermont, operate state-based exchanges (SBEs), while Oregon operates a state-based exchange on the federal platform (SBE-FP), and Maine operates a federally facilitated exchange (FFE). The States represent the diversity contemplated by the ACA, which authorized significant state flexibility in the operation of the States' health insurance markets.

2

1  exchange. State exchanges are responsible for annually certifying or recertifying plans to be sold

2  on their exchanges as qualified health plans (also known as QHPs), plans that cover the essential

3  health benefits (EHB) required under the ACA, as well as any benefits mandated by state law

4  (e.g. abortion coverage).

5      4.    States have historically retained general police powers to promote and regulate public

6  health. Since states regulate their own healthcare markets and the ACA intentionally respects the

7  power of the States to govern the individual market, the States of California, New York, Maine,

8  Oregon, and Vermont each require all qualified health plans to provide abortion coverage, while

9  the State of Maryland and the District of Columbia allow and encourage the provision of such

10  coverage.

11      5.    The States require or allow abortion coverage because it is critical to ensuring that *all*

12  residents have access to comprehensive healthcare services including coverage for abortion. In

13  the States, more than half a million women[2] are enrolled in, and benefit from, private qualified

14  health plans that offer coverage for abortion services in the States' individual health insurance

15  exchanges. As such, the Rule threatens the States' policy priorities and flexibility authorized by

16  the ACA.

17      6.    On December 27, 2019, HHS issued a final rule titled, "Patient Protection and

18  Affordable Care Act: Exchange Program Integrity" (hereinafter Rule) which contains changes to

19  how State Exchanges and health insurance plans segregate consumers' premium payments for

20  abortion coverage under 45 C.F.R. §156.280. Patient Protection and Affordable Care Act;

21  Exchange Program Integrity, 84 Fed. Reg. 71,674 (December 27, 2019) (to be codified at 45

22  C.F.R. pt. 155, 156). HHS contends the Rule is required to better align implementing regulations

23

24      [2] This total represents 2019 enrollment data, identifying women of reproductive age,

25  between the ages of 15-49 years old who participate in a qualified health plan that provide abortion coverage, and reaches a total of 509,014 women potentially impacted by the Rule. In the State of California 388,661 women of reproductive age would be at risk of abortion coverage

26  loss; approximately 56,000 in the State of New York; 8,148 in the District of Columbia;

27  approximately 20,000 in the State of Maine; and 36,205 in the State of Maryland. This total does not include the States of Oregon and Vermont, for which data was not readily available at the

28  time of filing of this complaint.

3

of Section 1303 of the ACA with other extraneous federal restrictions on the use of federal funds for abortion services. However, issuers have been in compliance with those restrictions by creating segregated accounts that could be used only for abortion services. And in prior guidance, HHS endorsed the practice of billing policy holders in a single transaction as a way to comply with the segregated-use requirements. But nearly after a decade since the ACA became law, the Rule would now require issuers (insurance companies) to send separate bills—and collect separate payments from policy holders—of an amount no less than $1, for the portion of the insurance premium attributable to abortion coverage. These changes violate key provisions of the ACA, the Administrative Procedure Act, and the U.S. Constitution, and could potentially cost the States significant federal matching funds for noncompliance.

7. Once implemented, the Rule will require health issuers selling qualified health plans in states that offer abortion coverage to comply with the onerous requirements of sending two separate bills to each policy holder. Similarly, HHS presumes that these changes will also apply to the three State exchanges that currently perform premium billing and payment processing for issuers participating in the individual market. Operationally, the Rule penalizes issuers for doing business in the States—where access to comprehensive reproductive care is protected by state laws that mandate or allow abortion coverage, and in states which have heavily invested in the administration of their own exchange. Further, the Rule disincentivizes issuers from providing abortion coverage in states that do not yet have specific laws restricting it, by creating barriers to doing so. In addition, the Rule will require costly changes to the States' coverage and enrollment policies, imposing new oversight responsibilities on the States' agencies, including state regulators and insurance commissioners.

8. In the end, the Rule will create significantly more problems than those HHS purportedly seeks to solve. Contrary to the ACA's requirement of equitable access to healthcare, the Rule complicates access to care. The Rule will increase consumer confusion because those who do not understand the purpose of the two separate bills and payments may inadvertently fail to make complete premium payments on time, putting their coverage at risk of termination. Indeed, HHS concedes the Rule will likely increase consumer confusion. 84 Fed. Reg. 71,686.

4

9.      This confusion may result in premium increases or loss of coverage, affecting almost 2.6 million enrollees who receive abortion coverage through a qualified health plan in the 11 impacted state-based exchanges.  84 Fed. Reg. 71,698.  In the States alone, the Rule puts the coverage of over 2.2 million enrollees in the individual market at risk of coverage termination.[3] The Rule will have a disparate impact on women and their access to abortion care—a critically time-sensitive and women-specific procedure.

10.     This is precisely the type of rulemaking that Congress prohibited when it enacted Section 1554 of the ACA.  Section 1554 prohibits the Secretary from promulgating any regulation that creates unreasonable barriers to the ability of individuals to obtain appropriate medical care. 42 U.S.C. § 18114 (2019).  Now, a decade after the passage of the ACA, HHS's onerous new Rule threatens to rescind a cornerstone of the statute's enactment—the authority and flexibility granted to states to operate their state-based exchanges to meet the state's policy priorities.

11.     Moreover, HHS's Rule threatens the States' public fiscs, as noncompliance with the Rule risks millions of federal dollars paid to the States for the administration of health programs. Under the ACA's financial integrity section, 42 U.S.C. § 18033(a)(4) (2018), HHS may conclude that the States' inability to comply, or allow issuers to comply, with the separate billing requirements amounts to a "pattern of abuse" from compliance with HHS standards related to Title I of the ACA.  If "the Secretary determines that an Exchange has engaged in serious misconduct with respect to compliance with the requirements of, or carrying out of activities required" under the ACA, HHS has the authority to rescind up to one percent (1%) of the federal funding dollars due to a state *under any program administered by HHS*.  84 Fed. Reg. 71,678.

12.     HHS acknowledges that the ACA "designate[s] the state insurance commissioners as responsible for monitoring, overseeing, and enforcing the provisions in section 1303."  *Id.* at 71,691-692 (citing § 18023 and the implementing regulations at § 156.280(e)(5)).  Nevertheless,

---

[3]  Collectively the Plaintiff States reported a total enrollment of 2,205,144 in 2019.  This includes 1,513,883 enrollees in the state of California; 271,873 in the state of New York; 18,035 in the District of Columbia; 70,987 in Maine's ACA individual market; 156,963 in the state of Maryland; 148,180 in the state of Oregon; and 25,223 in the State of Vermont.  *See* CMS 2019 OEP State-Level Public Use File, accessible at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Marketplace-Products/2019_Open_Enrollment.

1    HHS asserts that states do not have "exclusive enforcement authority with respect to all

2    provisions in Section 1303" and warns state-based exchanges, that under the authority granted to

3    it by 42 U.S.C. § 18041(c)(2), "the Secretary may step in to enforce the requirement against the

4    non-compliant issuer," in place of the exchange itself. *Id.* And HHS hints at now restricting

5    previously afforded state flexibility, reminding "states concerned about enforcement and

6    oversight of these requirements that, under section 1321(c), states may elect not to establish and

7    operate an Exchange, thereby defer[] those responsibilities to HHS." 84 Fed. Reg. 71,694.

8         13.    The States stand to lose millions of dollars annually for the administration of

9    healthcare programs, which depend on federal dollars. Jeopardizing these federal matching

10   dollars would significantly harm the States' residents and families, as they support critical

11   healthcare programs and public health initiatives. Thus, through the Rule's onerous requirements

12   and the resulting personal and societal costs, HHS seeks to thwart the States' laws and policies

13   long committed to women's reproductive freedom.

14        14.    Further, the Rule exacerbates these harms, by imposing these new requirements on an

15   administratively and operationally infeasible timetable that will cause excessive burdens on the

16   States' health insurance exchanges and health insurance markets. Numerous state-based

17   exchanges commented, including Covered California, Connect for Health Colorado,

18   Connecticut's Access Health CT, District of Columbia Health Benefit Exchange Authority, New

19   York State of Health, as well as the Attorneys General of California, New York, Oregon,

20   Pennsylvania, and Washington, explaining to HHS that the Rule involved significant

21   administrative complexities, and many raised that "mid-year implementation" of the proposed

22   changes would be "unworkable and burdensome on both states and issuers." (Comment of

23   Connect for Health Colorado on Proposed Rule (Jan. 08, 2019)). Blue Shield of California, one

24   of the largest issuers in California, submitted comments estimating that it would take at least 18

25   months to put these changes into place. (Comment of Blue Shield on Proposed Rule (Nov. 09,

26   2018), Jan. 08, 2019).

27        15.    Even after acknowledging commenters' implementation challenges, HHS's final Rule

28   requires compliance with these changes by June 27, 2020—after open enrollment has been

1    finalized and mid-plan year.  HHS simply states that, "we believe 6 months is sufficient…to

2    implement the administrative and operational changes to billing processes necessary to

3    comply[,]" while acknowledging that some issuers "may seek to exit the individual market in a

4    state" as a result of the Rule.  84 Fed. Reg. at 71,689, 71,690.  Ostensibly, "such a short time

5    period to implement the new regime is further evidence that the [Rule] is meant to coerce insurers

6    into dropping abortion coverage."  (Comment of Positive Women's Network-USA (PWN-USA)

7    on Proposed Rule (Nov. 09, 2018)).

8         16.    The States have each taken crucial steps to safeguard women's access to reproductive

9    healthcare and have made this a policy priority.  As mentioned, the States of California, New

10   York, Maine, Oregon, and Vermont all require that qualified health plans provide abortion

11   coverage.  The State of Maryland and the District of Columbia allow for the provision of abortion

12   coverage in health plans.  This commitment to women's reproductive freedom captures the

13   importance of securing coverage to ensure that individuals have access to all the services they

14   may need and have the option of exercising constitutionally protected rights.

15        17.    California has a long history of protecting women's access to comprehensive

16   reproductive health, including abortion care.  The fundamental right to choose to bear a child or

17   choose to obtain an abortion is the official public policy of the State, protected in both the State's

18   constitution and by statute.  *See* Cal. Const., art. I, § 1; Cal. Health & Saf. Code § 123462(b)

19   (Dering 2019).  In furtherance of these rights, state law requires that all health plans regulated by

20   the State offer abortion coverage as part of their basic healthcare services.  California's Governor

21   recently issued the California Proclamation on Reproductive Freedom in 2019, reaffirming the

22   State's commitment to "uphold women's equality and liberty by protecting their reproductive

23   freedom, educating Californians about their rights to reproductive freedom," reaffirming

24   reproductive rights "and acting as a model for other states that want to ensure full reproductive

25   freedom for women."[4]

26

27
        _____

28       [4] *See* https://www.gov.ca.gov/wp-content/uploads/2019/05/Proclamation-on-
         Reproductive-Freedom.pdf.

                                             7

18. New York has also enacted some of the strongest protections for women's access to comprehensive healthcare. New York first legalized abortion in 1970, three years before the Supreme Court established the constitutional protections of *Roe v. Wade*. In 2019, New York enacted the Reproductive Health Act, to align state law further with federal law, explicitly providing that comprehensive reproductive healthcare is a fundamental component of every individual's health, privacy, and equality. N.Y. Pub. Health L. § 2599-aa (2019). Consequently, it is the policy of the state that every individual who becomes pregnant has the fundamental right to choose to carry the pregnancy to term, to give birth to a child, or to have an abortion. *Id.* Thus, New York state law requires that health insurance plans must include abortion coverage, and with the exception of high-deductible plans, must cover abortion care without any cost-sharing.

19. The District of Columbia's laws do not restrict abortion rights and allow issuers participating in the District's state exchange to offer qualified health plans that provide abortion coverage. All health plans offered on the District's individual insurance Marketplace cover abortion.

20. Maine enacted the Reproductive Privacy Act in 1993, which declares that "[i]t is the public policy of the State that the State not restrict a woman's exercise of her private decision to terminate a pregnancy before viability." Me. Rev. Stat. tit. 22, § 1598(1). Maine law requires carriers offering health plans in Maine to provide coverage for maternity services, which is designated as part of an "essential health benefits package." Me. Rev. Stat. tit. 24-A, § 4320-D (effective March 19, 2019). Maine law further requires a carrier offering a health plan in Maine that provides maternity services to also provide coverage for abortion services. *Id.* § 4320-M (effective September 19, 2019). Maine's laws thus require all carriers offering health plans on the Marketplace to provide coverage for abortion services.

21. Maryland law provides that the state "may not interfere with the decision of a woman to terminate a pregnancy" before viability of the fetus, to protect the woman's life or health, or if the fetus bears a genetic defect. Md. Code Ann., Health - Gen. § 20-209(b). In addition, Maryland's Medicaid program covers abortion services for eligible individuals with state-only

8

1     funds. Md. Cod. Regs. Tit. 10, § 09.02.04(G). Although Maryland does not have a law that

2     requires private health plans to cover abortion services, all health plans offered on the state's

3     individual insurance marketplace cover abortion.

4         22.     Oregon has long been a leader in enacting policies and programs that support access

5     to high-quality reproductive health services. In 2017, Oregon passed the Reproductive Health

6     Equity Act (House Bill 3391), which requires private health insurance plans to cover abortions

7     with no out-of-pocket costs. Specifically, the law requires all health benefit plans offered in the

8     state to provide coverage for abortions and prohibits imposition of "a deductible, coinsurance,

9     copayment or any other cost-sharing requirement on the coverage required by this section." Or.

10     Rev. Stat. Ann. § 743A.067(2)-(3).

11        23.     Vermont passed a Freedom of Choice Act in 2019, *See* 2019 Vt. Laws No. 47,

12     codifying that, "[t]he State of Vermont recognizes the fundamental right of every individual who

13     becomes pregnant to choose to carry a pregnancy to term, to give birth to a child, or to have an

14     abortion." Vt. State. Ann. tit. 18, § 9493(b). Consistent with Vermont state policy, Vermont has

15     selected an essential health benefit benchmark plan, since 2013, that includes coverage of

16     abortion services. All individual and small group health plans in Vermont are therefore required

17     to offer coverage for abortion services. As a result, the final rule impacts not a subset of the

18     market, but the entirety of Vermont's merged individual and small group market.

19        24.     The States seek declaratory relief on the grounds that the Rule violates the

20     Administrative Procedure Act (APA), 5 U.S.C § 706, because it is contrary to law, exceeds

21     Defendants' authority, and is arbitrary and capricious. Additionally, the Rule is unlawful under

22     the Constitution's Tenth Amendment.

23                            **JURISDICTION**

24        25.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a

25     civil action arising under the Constitution and laws of the United States. Further, the Court has

26     jurisdiction under 28 U.S.C. § 1361 because this is an action to compel officers or agencies of the

27

28

United States to perform a duty owed to Plaintiffs. Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. § 702.

26.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ § 1361, 2201-2202, 5 U.S.C. §§ 705-706, and the Court's equitable powers.

27.     Defendants' issuance of the Rule on December 27, 2019, constitutes a final agency action and is therefore judicially reviewable within the meaning of the APA.  5 U.S.C. §§ 704, 706.

### VENUE

28.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e) because the State of California and its Attorney General have offices in Oakland, California, and this action seeks relief against the United States, agencies of the United States, and officials acting in their official capacities.

### INTRADISTRICT ASSIGNMENT

29.     Pursuant to Civil Local Rules 3-5(b) and 3-2(c), assignment to the Oakland Division or San Francisco Division is appropriate because Plaintiff the State of California and its Attorney General maintain offices therein.

### PARTIES

30.     Plaintiff the State of California, by and through Attorney General Xavier Becerra, brings this action.  California is a sovereign state in the United States of America.  The Attorney General is the chief law enforcement officer of the State and has the authority to file civil actions in order to protect the health and welfare of Californians and advance the State's interest in protecting women's access to reproductive healthcare.  Cal. Const., art. V, § 13; Cal. Bus. & Prof. Code § 321.  This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to represent the public interest.

10

31.     Plaintiff the State of New York, by and through its Attorney General Letitia James, brings this action.  New York is a sovereign state in the United States of America.  The Attorney General is New York State's chief law enforcement officer and is authorized to advance the State's interest in protecting women's access to reproductive healthcare services.

32.     Plaintiff the District of Columbia (the District), by and through its Attorney General Karl A. Racine, brings this action.  The District is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government.  The Attorney General is the Chief Legal Officer for the District and possesses all powers afforded the Attorney General by the common and statutory law of the District.  The Attorney General is responsible for upholding the public interest and has the authority to file civil actions in order to protect the public interest.  D.C. Code § 1-301.81.

33.     Plaintiff the State of Maine, by and through its Attorney General Aaron M. Frey, brings this action.  Maine is a sovereign state of the United States of America.  The Attorney General of Maine is a constitutional officer with the authority to represent the State of Maine in all matters and serves as its chief legal officer with general charge, supervision, and direction of the State's legal business.  Me. Const. art. IX, Sec. 11; Me. Rev. Stat. tit. 5, §§ 191 *et seq.*  The Attorney General's powers and duties include acting on behalf of the State and the people of Maine in the federal courts on matters of public interest.  The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

34.     Plaintiff the State of Maryland, by and through its Attorney General Brian E. Frosh, brings this action.  Maryland is a sovereign state in the United States of America.  The Attorney General is Maryland's chief legal officer with general charge, supervision, and direction of the State's legal business.  The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern.  Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens

1  the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md.

2  Laws, Joint Resolution 1.

3      35.    Plaintiff the State of Oregon, by and through its Attorney General Ellen Rosenblum,

4  brings this action. The State of Oregon is a sovereign state of the United States of America.

5  Attorney General Rosenblum is the Chief Law Officer of Oregon and is empowered to bring this

6  action on behalf of the State of Oregon and its affected state agencies. Or. Rev. Stat. §§ 180.060,

7  180.210, 180.220.

8      36.    Plaintiff the State of Vermont, by and through its Attorney General, Thomas J.

9  Donovan, brings this action. Vermont is a sovereign state in the United States of America. The

10  Attorney General is the state's chief law enforcement officer and is authorized to pursue this

11  action pursuant to Vt. Stat. Ann. tit. 3, §§ 152 & 157.

12      37.    The States have an interest in ensuring women's reproductive healthcare is both

13  available and accessible. Healthcare is one of the primary powers of the States. Moreover, under

14  Section 1303, states are primarily responsible, through their insurance commissioners and

15  regulating bodies, for the regulation of health insurance. Defendants' actions interfere with this

16  authority.

17      38.    The States rely on Defendants' compliance with both procedural and substantive

18  requirements of the APA so they can meaningfully participate in an impartial and public decision-

19  making process that is consistent with the ACA's requirements of equitable access to healthcare.

20  This is especially true in matters related to federal regulatory schemes and agency activities that

21  may have significant adverse impacts on access to comprehensive healthcare, including access to

22  abortion coverage.

23      39.    Each State is aggrieved by the actions of Defendants and has standing to bring this

24  action because of the injury to its state sovereignty caused by Defendants' issuance of the illegal

25  Rule, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and

26  proprietary interests. In particular, the States will suffer concrete and substantial harm because

27  the Rule frustrates the States' public health interests by encumbering women's access to abortion

28  services made available through qualified health plans.

40.　　Further, the States are aggrieved by the actions of Defendants and have standing to bring this action because of the injuries that will be caused to the States by the implementation and enforcement of Defendants' Rule creating unnecessary and costly requirements that will likely limit women's ability to obtain abortion services.  The States will suffer concrete and substantial harm because they will incur unnecessary administrative costs caused by the Rule's onerous burdens on the States' exchanges and regulatory agencies.  The Rule will also cause the States additional injuries associated with resulting unwanted pregnancies and the related attendant harms and increasing uncompensated care costs for entire families stemming from the inadvertent loss of healthcare coverage for failure to pay the separate bill.

41.　　Defendant, Alex M. Azar, II, is Secretary of HHS and is sued in his official capacity. Secretary Azar has responsibility for implementing and fulfilling HHS's duties under the Constitution and the APA.

42.　　Defendant, Seema Verma, is Administrator of the Centers for Medicare and Medicaid Services (CMS) and is sued in her official capacity.  Administrator Verma has responsibility for implementing and fulfilling CMS's duties under the Constitution and the APA.

43.　　Defendant, HHS, is a federal agency of the United States government and bears responsibility, in whole or in part, for the acts complained of in this Complaint.  CMS is a federal agency and an entity within HHS.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.　THE ACA AND SECTION 1303 ABORTION FUNDING RESTRICTIONS

44.　　In 2010, Congress enacted the ACA, landmark legislation that enabled more than 20 million Americans to gain health coverage.  The ACA vastly increased coverage by expanding the traditional Medicaid program, providing subsidies to lower the cost of coverage, and created effective health insurance exchanges to allow consumers a marketplace with choices for private health insurance coverage.  Among its many reforms, the ACA prohibited issuers from charging people with pre-existing health conditions, such as pregnancy, more for care based on their health status, charging women more than men, or denying people the coverage they need.  The law

13

1    created consumer protections in the private insurance market, limiting issuers' ability to set

2    annual lifetime limits on total benefits or rescind coverage, except in cases of fraud.  And issuers

3    were required to cover dependents up to age 26 under their parents' health plans, include annual

4    out-of-pocket limits, and provide rebates to the insured if total benefits do not exceed statutory

5    shares of premiums received.  The ACA improved the quality, accessibility, and affordability of

6    health insurance coverage both for people who were already insured and for the previously

7    uninsured.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (*NFIB*); 42 U.S.C §

8    18091(2)(C), (F) & (G) (2019).

9         45.    To ensure even more broad-based access to health insurance, the ACA included key

10   provisions, primarily Section 1554 and Section 1557, to create and safeguard parity in healthcare

11   access.  Among other things, the ACA's Section 1554 prohibits the Secretary of HHS from

12   promulgating any regulation that creates unreasonable barriers to the ability of individuals to

13   obtain appropriate medical care, impedes timely access to healthcare, or limits the availability of

14   treatment for the full duration of a patient's medical needs.  42 U.S.C. § 18114.

15        46.    Section 1557 of the ACA established the first federal law to prohibit a broad range of

16   health programs or activities—including the growing health insurance exchange—from

17   discriminating against individuals on the basis of any classification listed under different federal

18   civil rights statutes, such as race, color, national origin, and sex.  42 U.S.C. § 18116 (2019).

19        47.    These provisions were designed to guarantee that the benefits of the ACA—expanded

20   healthcare coverage, patient protections, and reductions to rising healthcare costs—were

21   attainable by all.  Together, Sections 1554 and 1557 specifically addressed the numerous ways in

22   which regulatory schemes might deny these opportunities and protections to certain vulnerable

23   groups, such as women, those with preexisting conditions, and low-income communities of color.

24        48.    The ACA's comprehensive transformation of the country's healthcare system

25   contemplated the important issue of abortion coverage.  In enacting the ACA, Congress struck a

26   balance between maintaining restrictions on federal funding for abortion, while ensuring that

27   states had flexibility to permit coverage in the private market.  Most relevant to these restrictions

28   is the Hyde Amendment, a restriction on the use of federal Medicaid funds for abortion services,

14

in the annual appropriations legislation that funds the activities and services provided by HHS. The Hyde Amendment allows for certain, limited exceptions for the termination of pregnancies that are the result of rape or incest, or if a woman suffers from a life-threatening physical condition caused by or arising from the pregnancy itself, as certified by a physician. *See* 42 C.F.R. §§ 441.202, 441.203, and 441.206.

49.     The ACA's implementing regulations, 45 C.F.R. Parts 155 and 156, established certain standards for the creation and regulation of exchanges and participating health issuers. These regulations authorized HHS to oversee exchange program compliance with quality standards related to Title I of the ACA to ensure their financial integrity, including the authority to conduct investigations and annual audits.

50.     And through Section 1303, Congress included additional standards that prohibited using federal funds, specifically federal advance premium tax credits (APTCs) or cost-sharing reductions (CSRs), to pay for abortion coverage. In Executive Order No. 13535, President Obama established that the ACA maintains current Hyde Amendment restrictions governing abortion policy and extends those restrictions to the newly created health insurance exchanges. 75 Fed. Reg. 15,599 (Mar. 29, 2010). Since its inception, Section 1303 has required separate accounting and transparency requirements for coverage of abortion services (for which federal funding is prohibited), provided by qualified health plans sold through the individual health insurance exchanges.

51.     Section 1303 grants significant latitude to state and private issuers. First, the section recognizes states' sovereignty in the regulation of healthcare and provides flexibility for states to make the decision about abortion coverage provided through their respective exchanges. Second, the section sets special rules to allow participating issuers the option of offering such coverage in qualified health plans, but prohibits the use of federal funds to pay for abortion services, "based on the law as in effect as of the date that is six months before the beginning of the plan year involved," unless the pregnancy is a result of rape, incest, or would endanger a woman's life. *See* Patient Protection and Affordable Care Act, Pub. L. 111-148, § 1303, 124 Stat. 119, 896; 42 U.S.C. § 18023 (2019).

52.     Consequently, since the implementation of health insurance exchanges under the ACA, qualified health plan issuers may not use federal exchange subsidies, specifically APTCs or CSRs, to pay for otherwise legal abortion services for which federal funding is prohibited.  42 U.S.C. § 18023(b)(2)(A).

53.     Section 1303 provides that if a qualified health plan includes—or is required to include—coverage of abortion services, issuers must charge all policy holders at least one dollar ($1) per month for the premium attributable to abortion services, which must then be deposited and maintained in a separate allocation amount.  The remainder of the insurance premium not related to abortion services must be deposited and maintained in a separate account. 42 U.S.C. § 18023(b)(2)(B)(i)-(ii) and (b)(2)(C)-(b)(2)(D).  Further, issuers are required to provide notice to enrollees of the qualified health plan's inclusion of abortion coverage, "only as part of the summary of benefits and coverage explanation, at the time of enrollment, of such coverage." *Id.* § 18023(b)(3)(A).  Finally, the statute assigns State health insurance commissioners the task of ensuring that issuers of qualified health plans comply with requirements to segregate exchange plan funds. *Id.* § 18023(b)(2)(E).

54.     In 2014, only a few months after the implementation of Section 1303 in the individual market, and amid the ongoing development of state-based and federally facilitated exchanges, a Government Accountability Office (GAO) report identified some inconsistencies regarding the implementation of Section 1303.  The GAO conducted a national review of state with no laws restricting abortion coverage, and rested its report on an examination of a sample of only eighteen qualified health plan issuers in ten states where qualified health plans cover abortion.  Of these, the report found that two failed to collect the statutory minimum of $1 per enrollee per month, four failed to include notices of abortion coverage, and most did not collect payments as regulations then allowed—by sending a bill itemizing the separate payments or by sending separate bills for the coverage.

55.     In 2015, HHS responded to the GAO report with a final rule, which identified several alternatives issuers could pursue to satisfy the statutory requirements of Section 1303.  HHS Notice of Benefit and Payment Parameters for 2016, 80 Fed. Reg. 10,750, at 10,840 (Feb. 27,

2015).  Issuers were either to (1) send the enrollee a single monthly bill that separately itemizes the premium amount for abortion services; (2) send a separate monthly bill for these services; or (3) send the enrollee a notice at or soon after the time of enrollment that the monthly bill includes a separate charge for such services and specify the charge.  *Id*.  In October 2017, CMS's Center for Consumer Information and Insurance Oversight (CCIIO) issued a bulletin that again listed these same options as ways for issuers to comply with the segregated funding requirements.[5]

56.     To date, HHS and CMS have issued no reports of complaints regarding any violations of Section 1303 or the misuse of federally appropriated funds for abortion services or coverage.

57.     More broadly, the enactment of the ACA, Sections 1554, 1557, and 1303 maintain current federal restrictions governing abortion policy, but nevertheless preserve the longstanding flexibility afforded to the States related to women's reproductive freedom and sets national goals for expanding access to affordable healthcare coverage.

## II.    THE STATES HAVE ENACTED LAWS AND POLICIES PROTECTING ACCESS TO ABORTION CARE

58.     The States have a sovereign interest in the creation and enforcement of a legal code. Pursuant to these interests, the States have grounds to challenge HHS's actions because the Rule undermines their sovereignty and threatens their authority to regulate matters that the States control by frustrating enforcement of state laws and policies aimed at protecting access to abortion care.

### A.    California

59.     California laws protect a woman's right to healthcare and specifically protect a woman's right to abortion.  In 1972, California voters amended the state Constitution to include a right of privacy among the inalienable rights protected in the State.  Cal. Const. Art. I, § 1*; Chico Feminist Women's Health Ctr. v. Butte Glenn Med. Soc'y*, 557 F. Supp. 1190, 1201-1202 (E.D. Cal. 1983) (citing *White v. Davis*, 13 Cal. 3d 757 (1975)).  The right to privacy under article I, section 1, provides "all women in this state rich and poor alike possess a fundamental

---

[5] https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Section-1303-Bulletin-10-6-2017-FINAL-508.pdf

constitutional right to choose whether or not to bear a child." *Comm. to Defend Reprod. Rights v. Myers*, 29 Cal. 3d 252, 262 (1981). Accordingly, state law confirms that private parties cannot interfere with the right to procreative choice under article I, section 1. *Chico*, 557 Supp. at 1202-03; *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 20 (1994). In addition, the constitutional right of a woman to decide whether to bear a child or terminate a pregnancy, guaranteed under article I, section 1, is also protected from State interference. *Chico*, 557 F. Supp. at 1202; *Myers*, 29 Cal. 3d at 284.

60. Additional state laws track these constitutional protections. The Reproductive Privacy Act of 2002 (RPA) declared as state public policy that, "[e]very woman has the fundamental right to choose to bear a child or to choose and to obtain an abortion." Cal. Health & Saf. Code § 123462(b). The Reproductive Privacy Act expressly provides that "[t]he state may not deny or interfere with a woman's right to choose or obtain an abortion …." Cal. Health & Saf. Code § 123466. As a result, in California, all health plans are required to cover abortion services. *See Missionary Guadalupanas of Holy Spirit Inc. v. Rouillard*, 38 Cal. App. 5th 421, 427–28 (Ct. App. 2019), review denied (Nov. 20, 2019) (finding that "[b]ecause California law guarantees every woman the right to choose whether to bear a child or obtain an abortion, the only legally tenable interpretation of the law is that abortions are basic health care services, which health care service plans are required to cover.").

**B.    New York**

61. On January 22, 2019, New York State signed into law the Reproductive Health Act, which legalizes abortion at any time "when necessary protect the woman's life or health."[6] The Act updates New York State law to address "constitutional flaws and recognize a woman's fundamental right to access safe, legal abortion. The bill moved abortion from the Penal Law to the Public Health Law, which removes longstanding harmful and burdensome barriers to accessing reproductive healthcare and protects New Yorkers against future Federal intrusion." *Id.* The Reproductive Health Act is codified in N.Y. Pub. Health L. § 2599-aa (2019). Additionally, New York Insurance Law §§ 3216(l), 4304(l), 4306-h, 4328(b)(1) provides that plans, including

---

[6] https://nyassembly.gov/Press/files/20190122.php

those participating on the New York State of Health, New York's health plan exchange, cover ambulatory patient services and prescription drugs. New York regulation prohibits health plans from excluding coverage by type of illness, accident, treatment, or medical condition except as expressly permitted in the regulation. *See* N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16(c). Medically necessary abortion services are not listed in the regulation and therefore cannot be excluded as further clarified in § 52.16(o).

### C. District of Columbia

62.     Although the District does not have a law that requires private health plans to cover abortion services, the District's laws do not restrict abortion coverage and allow issuers participating in the District's state exchange to offer qualified health plans that provide abortion coverage. In fact, all health plans offered on the District's individual insurance marketplace cover abortion.

63.     Moreover, the District of Columbia protects a woman's right to abortion. A 1901 law that criminalized abortion except to preserve the life or health of the mother (D.C. Code § 22-101) was repealed in 2003 along with other outdated statutes. The Committee Report on Bill 15-79, the "Elimination of Outdated Crimes Amendment Act of 2003," noted that the law was "outdated and unnecessary because abortion is not appropriate for criminal sanction, particularly in light of the U.S. Supreme Court's decision in *Roe v. Wade*."

### D. Maine

64.     Maine's Reproductive Privacy Act declares that "[i]t is the public policy of the State that the State not restrict a woman's exercise of her private decision to terminate a pregnancy before viability." Me. Rev. Stat. tit. 22, § 1598(1). Consistent with this state policy, all health plans as defined in Maine's Insurance Code are required to cover abortion services. Me. Rev. Stat. tit. 24-A, §§ 4320-D & 4320-M.

65.     Maine has taken recent action to support women's reproductive freedom, by enacting a new law to protect insurance coverage of all forms of reproductive healthcare. In 2019, Maine enacted a requirement that the State pay for abortion services for Medicaid eligible women, which services are not federally approved Medicaid services. Me. Rev. Stat. Ann. tit. 22, § 3196

19

1  (effective September 19, 2019). In the same legislative vehicle, the state enacted a requirement

2  that all health plans offering maternity services shall also provide coverage for abortion services,

3  with a possible exemption for a religious employer as defined in 26 U.S.C. § 3121(w)(3)(A). Me.

4  Rev. Stat. Ann. tit. 24-A, § 4320-M.

5      **E.  Maryland**

6      66.  Maryland has long offered strong protections for women's rights to access healthcare.

7  Women's abortion rights have been firmly protected under Maryland law since voters in 1992

8  overwhelmingly passed a referendum question protecting a woman's right to abortion. Richard

9  Tapscott, *MD Backs Measure on Abortion Rights*, Washington Post (Nov. 4, 1992)[7]; Md. Code

10  Ann., Health Gen. § 20-209. The State of Maryland may not interfere with the decision of a

11  woman to terminate a pregnancy: (1) before the fetus is viable; or (2) at any time during the

12  pregnancy if the termination is necessary to protect the life or health of the woman; or the fetus is

13  affected by genetic defect or serious deformity or abnormality. Md. Code Ann., Health Gen. § 2-

14  209(b). Maryland's recognition of a woman's right to abortion is further reflected by Maryland's

15  decision to voluntarily provide state-funded abortion coverage for eligible women in its Medicaid

16  program. Md. Code Regs. 10.09.02.04G. Maryland also offers abortion services to incarcerated

17  women. Md. Code Ann., Correctional Srvs. § 9-601(j)(2)(v).

18      67.  In Maryland abortion coverage is part of the essential health benefits package,

19  required of all non-grandfathered individual and small group plans sold on Maryland's Health

20  Benefit Exchange, and all individual qualified health plans cover abortions.

21      **F.  Oregon**

22      68.  Oregon also recognizes the critical nature of access to comprehensive, high quality

23  reproductive health care for its residents. In 2017, Oregon passed the Reproductive Health Equity

24  Act (House Bill 3391), which requires private health insurance plans to cover abortions with no

25  out-of-pocket costs and bans discrimination in the delivery of reproductive health services. The

26  law prohibits a public body, including any state or local government agency or employee of the

[7] https://www.washingtonpost.com/archive/politics/1992/11/04/md-backs-measure-on-abortion-rights/cb000417-7fed-430a-be69-79203fcd2de2/.

20

agency from interfering with or restricting benefits, facilities, services or information regarding a woman's right to choose to terminate a pregnancy. Or. Rev. Stat. Ann. § 659.880. Specifically, the Reproductive Health Equity Act requires all health benefit plans offered in the state to provide coverage for abortions and prohibits the imposition of "a deductible, coinsurance, copayment or any other cost-sharing requirement on the coverage required by this section." Or. Rev. Stat. Ann. § 743A.067(2)-(3).

### G. Vermont

69. Vermont also moved to protect abortion rights by enacting the Freedom of Choice Act in 2019. *See* 2019 Vt. Laws No. 47. As the legislature explained its intent: "Currently Vermont does not impose legal restrictions on the right to abortion. . . . The General Assembly intends this act to safeguard these existing rights to access reproductive health services in Vermont by ensuring those rights are not denied, restricted, or infringed by a governmental entity." *Id.* § 1. And, as codified: "The State of Vermont recognizes the fundamental right of every individual who becomes pregnant to choose to carry a pregnancy to term, to give birth to a child, or to have an abortion." Vt. State. Ann. tit. 18, § 9493(b).

70. The act further provides: "A public entity shall not . . . interfere with or restrict, in the regulation or provision of benefits, facilities, services, or information, the choice of a consenting individual to terminate the individual's pregnancy." Vt. Stat. Ann. tit. 18, § 9497(2). Likewise, "A public entity shall not . . . interfere with or restrict, in the regulation or provision of benefits, facilities, services, or information, the choice of a health care provider acting within the scope of the health care provider's license to terminate or assist in the termination of a patient's pregnancy." *Id.* § 9497(4). The statute further provides a private right of action against a public entity for any "individual injured as a result of a violation of this chapter," including costs and attorney's fees as well as injunctive relief. *Id.* § 9498.

71. Vermont also aims to protect women's reproductive freedom through its healthcare exchange. As such, since 2013, Vermont has selected an essential health benefit benchmark plan that includes coverage of abortion. All individual and small group health plans in Vermont are therefore required to offer coverage of abortion services.

21

**III.  HHS's ILLEGAL RULE RESTRICTS ACCESS TO ABORTION COVERAGE AND HARMS THE STATES AND THEIR RESIDENTS**

72.     Defendants' new Rule represents a capricious intent to frustrate the status quo by imposing upon issuers and state exchanges unnecessary separate billing requirements.  Section 1303 of the ACA prohibits the use of federal funds for abortion services, and current implementing regulations provided issuers with various methods of complying with the statute's requirements by providing appropriate notice, sending single bills with itemized amounts, and creating segregated accounts that could only be used to pay for abortion services.  As discussed above, both in 2015 and 2017, HHS guidance specifically allowed issuers either to: (1) send the enrollee a single monthly bill that separately itemizes the premium amount for abortion services; (2) send a separate monthly bill for these services; or (3) send the enrollee a notice at or soon after the time of enrollment that the monthly bill includes a separate charge for such services and specify the charge.  *See* ¶55.

**A.     Summary of the Rule's Separate Billing Requirements**

73.     The Rule changes the statute's implementing regulations, 45 C.F.R. § 156.280, in two significant ways.  First, the Rule requires issuers to separately bill for the portion of the premium attributable to abortion services (an amount no less than $1).  Second, the Rule requires a separate payment from consumers.  Issuers can no longer send a single monthly invoice or bill that itemizes the separate amount for abortion services, or notify enrollees as part of the summary of benefits and coverage explanation at the time of enrollment.  Instead, issuers will need to send a separate monthly bill, either by mail (in an envelope containing two separate bills) or electronically (in two separate emails), to each policy subscriber.  And consumers would be instructed to no longer pay the premium total in one payment but must pay each bill separately, either by separate paper checks or by two electronic transactions.

74.     If implemented and enforced, HHS's new Rule will unnecessarily disrupt the way in which issuers that provide abortion coverage bill for healthcare coverage in the States, by forcing an irrational and onerous regulatory scheme that singles out and limits access to a critical women's healthcare procedure—abortion.

22

75.     Further, the final Rule will allow issuers to modify the benefits of their qualified health plan, either at the time of enrollment or during a plan year, to effectively allow enrollees to opt out of abortion coverage by not paying the separate bill for such services.  This opt out policy was neither included in the proposed rule, nor made available for notice-and-comment prior to its inclusion in the final Rule.  And unlike the accelerated six-month compliance grace period for separate billing changes to § 156.280(e)(2), this change will become effective on February 25, 2020.  84 Fed. Reg. 71,687.

76.     HHS is essentially *expediting* the Rule's end goal of circumscribing access to abortion, by instituting a policy of non-enforcement against issuers that allow policy holders to opt out of the otherwise applicable and substantive requirement to include abortion coverage as a benefit in their qualified health plan.  HHS intends to disincentivize abortion coverage by encouraging issuers to permit policy holders to modify the benefits *required* in their qualified health plan and remove the abortion coverage benefit by simply choosing not to pay the separate bill of $1.  84 Fed. Reg. 71,686.  No other health benefit can be excised from the policy in this manner.  This non-enforcement policy demonstrates HHS's capriciousness and disregard for state laws that require abortion coverage.  It prompts unnecessary consumer confusion about what they are opting out of and leaves many affected issuers in states that require abortion coverage with an illusory option not available to them unless issuers choose to violate their respective state laws.

77.     While HHS indicates that issuers must take appropriate measures to ensure that non-payment is not accidental due to unfamiliarity with the Rule's changes, by providing a policy holder with the opportunity to check a box on their bill, or pushing a button on their online bill—confusion as to why this is necessary or an option will nevertheless result.  *Id.* at 71,687.  Additionally, "an opt-out [by a policy holder] would be effective for the remainder of the benefit year," because they "would not be allowed to retract their opt-out decision and reinstate coverage" by similarly choosing to simply opt back in and pay $1.  *Id.* at 71,687.  The policy holder's decision to opt out of that coverage would apply to all persons in the enrollment group under the policy, including dependents (such as adult children up to the age of 26) and spouses. *Id.*

78.     This represents an assault on the States' right to prioritize and mandate procreative choice and infringes on the enrollee's ability to obtain comprehensive health services.  The States could have voiced such concerns with HHS's new non-enforcement policy related to the discretionary opt out alternative granted to issuers, but none were presented the opportunity for notice-and-comment during the proposed rule's comment period.  In fact, the States could have raised that this policy is irrational, as it is not mandatory, and it is not a viable option for states with abortion coverage mandates.  Nor could this be a logical outgrowth of the proposed rule's changes or submitted comments, because the States could not have seriously contemplated this as a viable option for issuers in their states, much less mid-plan year.  At bottom, the Rule serves to actively impede the provision of abortion services in the States.

79.     HHS's stated goal in promulgating this Rule is to "better align with the intent of section 1303 of the PPACA."  84 Fed. Reg. 71,685.  But, HHS wholly fails to provide an adequate justification for this change.  Nowhere in the Rule does HHS identify any evidence or reports demonstrating that federal funds, through advance premium tax credits, cost-sharing reductions or otherwise, have been inappropriately used to pay for the provision of abortion services in violation of Section 1303.  And nowhere does HHS indicate that the department has conducted any due diligence in renewing or revisiting the five-year old GAO findings of 2014.  HHS simply states that the Rule will address remaining issuer compliance issues, "if any, previously identified" in the GAO report, and that "regardless of whether there are ongoing compliance issues," its primary goal is to "better align" regulatory requirements with the statute.  *Id.* at 71,692.

80.     The real misalignment lies with HHS's unsupported justification for the changes in the Rule.  HHS even offers up—after-the-fact—numerous commenters' concerns regarding the transparency of qualified health plans and coverage of abortion services as evidence to justify implementation of the Rule in only six months.  Instead, HHS claims additional delay would be "imprudent," "given that [HHS is] now aware of these consumer concerns."  *Id.* at 71,690.

81.     Abating consumers' speculative concerns about transparency is yet another purported basis for HHS's opt out policies that issuers could develop as early as February 25, 2020, and

24

flatly constitutes capricious rulemaking.  Indeed, the Rule represents unreasonable agency action in search of a problem to implement regulatory burdens that solely frustrate the provision of abortion services.

**B.    The Rule Exceeds Statutory Authority by Imposing Unreasonable Burdens on the Provision of Abortion Coverage**

82.    Established canons of statutory interpretation render the Rule an unreasonable exercise of authority by HHS.  The Rule seeks to amend the implementing regulations of Section 1303, by adding § 156.280 (e)(2)(ii)-(iii), requiring qualified health plans to:

> (A) *Send to each policy holder* of a QHP [qualified health plan] monthly bills for each of the amounts specified in paragraphs (e)(2)(i)(A) and (B) of this section, *either by sending separate paper bills which may be in the same envelope or mailing, or by sending separate bills electronically, which must be in separate emails or electronic communications*; and

> (B) Instruct the policy holder to pay each of the amounts specified in paragraphs (e)(2)(i)(A) and (B) of this section through separate transactions. Notwithstanding this instruction, if the policy holder fails to pay each of these amounts in a separate transaction as instructed by the issuer, the issuer may not refuse the payment and initiate a grace period or terminate the policy holder's QHP coverage on this basis.

> (iii) Deposit all such separate payments into separate allocation accounts as provided in paragraph (e)(3) of this section. In the case of an enrollee whose premium for coverage under the QHP is paid through employee payroll deposit, the separate payments required under paragraph (e)(2)(i) of this section shall each be paid by a separate deposit.

84 Fed. Reg. 71,710 (italicized for emphasis).

83.    The Rule cannot be reconciled with either the text or purpose of Section 1303.

84.    The statute's plain text is clear.  Section 1303(a) provides that any state may elect to prohibit or authorize abortion coverage.  42 U.S.C. § 18023(a).  Subsection (b) establishes "special rules relating to coverage of abortion services" that involve the "prohibition on the use of Federal funds" in state-based and federally facilitated exchanges.  § 18023(b)(1)-(2).  While Section 1303(B) requires that payments be collected and deposited in separate accounts to ensure separate allocation, it does not concern itself with *how* the payments are collected from enrollees. The import of Section 1303 is rather, how federal funds (attributable to essential health benefits

25

and possibly subsidized by premium tax credits) are spent, because these are prohibited from being commingled or *spent* on abortion services.

85.     In addition, by statute, qualified health plans that provide abortion services are required to notify enrollees "*only* as part of the summary of benefits and coverage explanation, *at the time of enrollment* of such coverage." 42 U.S.C. § 18023(b)(3)(A).  In spite of the statutory limitation, the Rule requires issuers to provide additional notice related to the provision of abortion coverage within a qualified health plan.  Under the new Rule and contrary to the statute's instruction, issuers are required to notify enrollees on an on-going monthly basis of their abortion coverage through the separate bills.  The 2015 final regulations observed that section 1303 did not mandate a monthly notice, explaining that section 1303 allows, but does not require a qualified health plan issuer to identify the separate premium for abortion services *on the monthly premium bill* in order to comply with the separate payment requirement.  80 Fed. Reg. 10750, at 10840 (Feb. 27, 2015).

86.     Moreover, Section 1303's notice provision states that notice "*shall* provide information *only* with respect to *the total amount of the combined payments* for services." 42 U.S.C. § 18023(b)(3)(B) (emphasis added).  It does not state that separate amounts for each service covered by the plan shall identified.  Therefore, not only is notice required only at the time of enrollment, but it is also limited to the total amount of the combined premium payments for services.

87.     The purpose of the statute is clear:  to ensure that funds collected are directed to, and maintained in, segregated accounts to guarantee that any payment for abortion services are made explicitly with premium payments collected for such services.

88.     Plainly put, the Rule's new provisions requiring separate billing and separate payments for abortion coverage do little to mitigate the risk of how issuers treat abortion and non-abortion related funds.  Rather, the purpose of Section 1303 lies in the establishment of the segregated accounts and funds that are used to pay for abortion services.  HHS's new Rule will merely increase the costs of abortion coverage for issuers, State exchanges, and individuals.

89. The Rule, if implemented, would expand the requirement that issuers "collect" separate payments beyond statutory requirements. Section 1303 of the ACA and § 156.280 do not specify—and need not specify—the method an issuer must use to comply with the separate payment requirement. The previous regulations make clear that Section 1303 may be satisfied in a number of ways, discussed above in paragraph 55.

90. Section 1303 itself confirms this. The provision relevant to the Rule's promulgation is titled, "[p]rohibition *on the use* of [f]ederal funds" which specifies that "the issuer of the plan shall not *use* any amount attributable to" federal dollars, specifically in the form of ACA subsidies like advanced premium tax credits or cost-sharing reductions to pay for abortion services. 42 U.S.C. § 18023(b)(2)(A) (emphasis added). Section 1303 is primarily concerned with the use of these funds, not the method of collecting premium payments, and such added requirements fall outside of the agency's authority. Moreover, the changes to the implementing regulations at § 156.280(e)(2) are related to the provision in the statute concerned with the "[e]stablishment of allocation accounts," under § 18023(b)(2)(B)(i), which is meant to ensure that premiums are segregated to pay for corresponding services.

91. A faithful reading of Section 1303 demonstrates that Congress's principal goal was the segregation of accounts to ensure that federal funds are not used to pay for otherwise legal abortion services. The means by which the issuer acquires these premium payments from the plan enrollee or the policy subscriber is irrelevant.

92. HHS's Rule is contrary to the text, the history, and purpose of Section 1303, because it imposes additional requirements in a manner that plainly exceeds Section 1303's statutory authority.

### C. The Rule is Contrary to the ACA

93. The Rule is in direct conflict with key provisions of the ACA. The Rule creates unreasonable and unnecessary barriers to access healthcare coverage and unjustifiably restricts women's access to reproductive healthcare—directly undermining the ACA itself.

### 1. The Rule is Contrary to Section 1554 of the ACA

94.     The Rule also conflicts with Section 1554, which explicitly prohibits the Secretary of HHS from promulgating "any regulation" that limits access to healthcare services.  HHS may not, unless expressly authorized in the ACA, promulgate any regulations that "(1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; … or (6) limits the availability of health care treatment for the full duration of a patient's medical needs."  42 U.S.C. §18114.  Section 1303 contains no express authorization to limit access to healthcare services, as explained above, its only function is to ensure payment for certain abortion services is appropriately segregated and tracked.

95.     This prohibition extends to any health program or activity, any part of which is receiving Federal financial assistance.  HHS has failed to examine the Rule's inconsistency with Section 1554, despite the fact that numerous commenters pointed to HHS' limitations under Section 1554.  The Rule's onerous requirements, "would clearly create new, unreasonable barriers to obtaining health care by causing people to lose insurance coverage," and thus access to actual services.  (Comments submitted by the American Civil Liberties Union (ACLU), Planned Parenthood Federation of America (PPFA), and the Attorneys General Multistate letter).  And HHS is well aware of its own limitations and statutory authority.  HHS analyzed Section 1554 in its recent rulemaking regarding the contraceptive coverage mandate—yet another regulation impacting a women-specific healthcare issue.  *See* Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act, 83 Fed. Reg. 57552 (Nov. 15, 2018) (to be certified as 29 C.F.R. Pt. 2590).  HHS has a basic obligation to examine its legal authority to act.  *See Sierra Club v. Pruitt*, 293 F.Supp.3d 1050, 1061 (N.D. Cal. 2018) (rejecting agency's waiver argument where agency was presented with sufficient challenges to its behavior and still failed to fulfill its "obligation to examine its own authority").

### 2.     The Rule is Contrary to the Section 1557 of the ACA

96.     The Rule is similarly in conflict with, and undermines, the anti-discrimination protections provided by the ACA.  The ACA is the first federal law to prohibit discrimination, setting forth in Section 1557 a clear prohibition against discrimination in a broad range of health programs and activities, against individuals on the basis of any classification listed under four

different federal civil rights statutes, including Title VI of the Civil Rights Act of 1964 (race, color, national origin, and sex), and Title IX of the Education Amendments of 1972 (sex). 42 U.S.C. § 18116. Section 1557 seeks to advance healthcare outcomes and reduce health disparities by protecting groups vulnerable to discrimination in the healthcare context, including women.

97. HHS's Rule discriminates against women by imposing unnecessary burdens and challenges to obtaining a healthcare service unique to women—abortion. Section 1303 authorizes issuers participating in the ACA's health insurance exchange to choose whether to offer abortion in qualified health plans. HHS recognizes, as it must, that coverage for abortion is utilized and sought out only by women, as it is "women who may *ultimately access* such services." 84 Fed. Reg. 71,694 (emphasis added). HHS does not deny the disparate impact the Rule will have on women, since women are more likely the enrollees who "would be most likely to intentionally enroll in a [qualified health plan] with [abortion] coverage." *Id.* at 71, 695.

98. Unilaterally increasing the barriers to access healthcare services by targeting qualified health plans with healthcare benefits accessed only by women is discriminatory. If the Rule is implemented, men who are enrolled in qualified health plans that do not offer abortion and are not subject to separate abortion billing requirements, may continue to access the full range of healthcare services available to them without risk of confusion, delay, and ultimate denial of services because of this Rule's statutorily unauthorized administrative requirements. In contrast, women will be exposed to increased barriers to access to care, which ultimately will result in greater health risks to some women, who, without full abortion coverage, are subjected involuntarily to the increased health risks of pregnancy (discussed in detail in *Subsection F(6)*).

**D.    The Rule's Unnecessary Changes Require Extreme Costs**

99. While HHS updated the cost estimates in the final Rule, it failed to meaningfully consider the weight of this burden on the States, issuers, and consumers. In doing so, HHS discounted commenters' serious concerns about the Rule's costs and impacts. On December 9, 2019, the States of California and Oregon met with the Office of Management and Budget to reiterate the significant financial burden the Rule would cause on the states and the issuers that

1    several states previously raised in comments.[8]  California and Oregon requested that HHS

2    accurately label the Rule "economically significant," thereby requiring the agency to perform an

3    appropriate cost-benefit analysis and assess the costs and benefits of "reasonably feasible

4    alternatives" to the proposal, because, among other impacts, the Rule clearly has an effect on the

5    economy of far more than $100 million in any single year.  *See* Exec. Order 12866 §3(f); 58 Fed.

6    Reg. 51,735 (Oct. 4, 1993).  Still, HHS's insistence that the Rule only clarifies the statute and

7    does not directly impose *new* requirements is contradicted by the cost-benefit analysis HHS was

8    forced to update "for accuracy" after numerous commenters showed that the agency greatly

9    underestimated its burdens.  The updated analysis, reflects that an unreasonable amount of money

10   is required to implement these changes.  *See generally* 84 Fed. Reg. 71,698.

11       100.    The Rule's impact reaches multiple states and millions of enrollees.  The Rule itself

12   estimates that in 12 state-based exchanges alone, 71 qualified health plan issuers will offer 1,129

13   plans that include abortion coverage and will be subject to the Rule.  84 Fed. Reg. 71,696.  To

14   become compliant, issuers will need to take several steps, including but not limited to,

15   restructuring budgets, planning, contracting, building IT-systems, creating billing-related

16   outreach, and providing new call center training.

17       101.    HHS estimates that one-time costs to bring all affected issuers (94 total) across the

18   country into compliance and implement the technical changes required would cost $2.7 million

19   per issuer.  Moreover, HHS's unreasonable push to accomplish this billing change in only six

20   months, during the middle of the plan year, would cost each issuer about $4.1 million in higher

21   contracting costs for system changes and overtime personnel payments.  This would bring the

22   total one-time costs for all 94 issuers to $385 million.  84 Fed. Reg. 71,697.

23       102.    In addition to hefty one-time costs, there are substantial ongoing annual costs.  For

24   instance, issuers must absorb economic burdens from hiring additional personnel, enrollee

25   outreach, billing accuracy and reconciliation processes, quality assurance, and recordkeeping.  By

26

27       [8] *See* Office of Information and Regulatory Affairs, EO 12866 Meetings Dashboard,
     https://www.reginfo.gov/public/do/viewEO12866Meeting?viewRule=true&rin=0938-
28   AT53&meetingId=4927&acronym=0938-HHS/CMS.

**126**

HHS's own estimate, this would cost approximate $1.07 million per issuer. The annual burden for all impacted issuers would reach about $100.2 million. *Id.* at 71,698.

103.    To accomplish its Rule, HHS estimates that, on average, annual materials and printing costs for all issuers sending paper bills to the 2.6 million enrollees over three years alone (2020 to 2022), would be approximately $887,721—not counting the costs associated with electronic transactions and IT changes.[9] *Id.* at 71,699.

104.    The costs to state exchanges are equally alarming. The Rule estimates that on average, each state exchange, will incur in 2020 one-time costs of $750,000, and ongoing annual costs of approximately $200,000 for the six months of implementation in 2020, and $400,000 in 2021—costs HHS anticipates will decrease in following years. *Id.* at 71,705. The total ongoing costs for all 12 state-based exchanges that permit the sale of qualified health plans offering abortion coverage is expected to be $2.4 million in 2020 alone. *Id.*

105.    HHS itself acknowledges, that compliance with the Rule could force issuers to (a) drop coverage of abortion altogether, (b) absorb excessive costs themselves in states that require coverage by law or policy (such as Plaintiff States of California, Maine, New York, Oregon, and Vermont), or (c) pass on these costs to consumers in the form of increased premiums. In fact, in the preamble of the Rule, HHS states that, "[s]ubject to applicable state law, it is ultimately at the issuer's discretion whether to cover…abortion services in their [qualified health plans], and thus to incur any associated burden" imposed by the Rule. 84 Fed. Reg. 71,688. And while HHS recognizes that these changes have the potential to increase out-of-pocket costs for enrollees seeking abortion services or in effect leave enrollees without healthcare coverage, HHS fails to fully account for these costs to consumers, the impact on women specifically, and by extension, the harms to the States' public health and increased costs to their fiscs.

106.    Notably, HHS admitted that maintaining the status quo would promote stability for issuers and the evolving exchanges. 84 Fed. Reg. 71,708. However, choosing instead to pursue

---

[9] This cost assumes that more consumers will increasingly opt to receive electronic bills over time, e.g., 90 percent in 2020, 88 percent in 2021, and 86 percent in 2022.

its stated purpose to "better align" the Rule with Section 1303, HHS declined to withdraw its proposals.

107.    HHS instead purports to consider alternatives to the final Rule, though it is clear that they did not meaningfully consider these alternate options.  The Rule runs through several options that are as unreasonable as the final Rule.

108.    First, HHS considered eliminating the requirement that issuers must provide instruction to consumers who fail to make payments separately, but concluded that consumer education is important to achieve better alignment with section 1303.  *Id.* at 71,708.  However, this option lacks common sense, because while issuers are required to spend additional resources tracking down consumers who mistakenly fail to pay the two bills in separate transactions, policy holders are free to continue paying their premiums in a single transaction.

109.    Second, the agency admits to having considered further expediting the effective implementation of the Rule, up three months from the date of publication, increasing one-time costs by 100% and driving up total estimated costs for issuers, exchanges, and consumers, up to $740 million in 2020.  *Id.*  But considering an alternative that exorbitantly increases the costs and burdens for all parties involved, such that in relation it seemingly makes the initial proposal's costs seem modest by comparison, is hardly representative a viable option.  Particularly given the agencies last and final consideration, which concerned the proposed rule's excessive costs.

110.    In this final alternative, HHS claims to have considered following through with the separate mailing requirement (requiring two envelopes) as initially proposed.  *Id.*  HHS calculates that after updating its deep underestimation of the costs of requiring issuers to send separate envelopes, the costs would have been resulted in an additional $11 million in 2021 for all issuers.  *Id.*  However, this alternative only scratches at the surface of the excessive costs that the Rule itself estimates compliance will require.  To say HHS "mitigated" the costs by eliminating the two-envelope mailing requirement does little to acknowledge the serious problems with the excessive cost of this unnecessary Rule, particularly when as finalized, the total one-time costs for all 94 issuers reaches $385 million, and the annual ongoing burdens $100.2 million.  *Id.* at 71,697-698.

111.    However, without any evidentiary support at all, HHS decided that "better alignment" with HHS's new, and unsupported, interpretation of Section 1303 simply outweighs the Rule's drastic costs and financial burdens described above.

112.    The Rule never discusses or considers attainable alternatives that target the primary purpose of the statute.  For example, there is no discussion or consideration of the verification requirements or processes currently in effect.  Nor is there any discussion of the account segregation plans submitted and reported by issuers to state regulators that certify the back-end reconciliation and verification of the abortion billing process and segregation of funds.  Judicious rulemaking would have at a minimum addressed the relevant transactions that already occur after abortion services are obtained, including the maintenance of the plans' segregated accounts, to provide assurance that issuers pay for abortion services with segregated funds that do not include federal subsidies.

### E.    The Rule is Illogical and the Final Modifications Cannot Cure its Deficiencies

113.    The Rule is illogical because it fails to accomplish HHS's purported goal.  The Rule's changes do nothing to achieve HHS's stated objective of compelling consumers to pay separate bills.  While the Rule requires that issuers send out separate bills (either in one envelope or two electronic transmissions), consumers who are policy holders are seemingly free to ignore the Rule and continue to pay a monthly bill in a single transaction.  Specifically, the final Rule requires that issuers must instruct policy holders to pay each bill through separate transactions, but are prohibited from refusing a combined payment, and cannot initiate either a grace period or terminate the policy holder's coverage on the basis that the policy holder did not send two separate payments as requested by the issuer.  § 156.280(e)(2)(ii)(B); 84 Fed. Reg. 71,685.

114.    As HHS itself acknowledges, it is common and likely for a policy holder to pay one payment, rather than two payments.  HHS agrees that requiring two payments could, in spite of expensive and "fulsome outreach and education efforts to explain the billing scheme to the policy holder, consumer confusion could still lead to inadvertent coverage losses." *Id.* at 71,686.

33

115.     These problematic features of the Rule not only demonstrate inadequate rulemaking considerations and capricious rulemaking, but its unworkability further provides evidence that Congress did not intend for these burdens to result by instructing how issuers should collect separate—physical or transactional—payments from policy holders.  Rather, Congress wanted to ensure that issuers placed payments in segregated accounts and did not use federal subsidies to pay for abortion services.

116.     Even the final Rule's modifications underscore the senselessness of the new billing requirements.  For example, the final Rule eliminated the excessive mailing costs (estimated by HHS at $11 million) by allowing issuers to send separate monthly bills in one single envelope to each policy holder, as opposed to the previous proposal of separate bills in two separate envelopes.  This change was made despite the position taken in the proposed regulation, that sending two separate bills will reduce consumer confusion because consumers may "inadvertently miss or discard a second paper bill included in a single envelope."  Patient Protection and Affordable Care Act; Exchange Program Integrity, 83 Fed. Reg. 10750, at 56023 (Nov. 9, 2018).  However, issuers must still send separate monthly bills when transmitting bills through email or other electronic means.

117.     The final Rule's modification—now allowing single envelope mailing—still largely ignores the evidence before HHS.  This includes comments submitted by, among others, Blue Shield of California, Covered California, Access Health CT, and the District of Columbia' Health Benefit Exchange Authority pointing to the excessive administrative costs—beyond its mailing burdens—that are associated with redesigning billing systems, processing invoices and "binder payments" for new enrollments, and additional customer service support required to facilitate these changes.  All of these expenses will likely lead to increased premiums for consumers.  And despite inserting language notifying policy holders they will receive a separate email with another bill, the separate email might more easily be missed by policy subscribers clearing their inbox believing they have already paid their premium.

118.     Moreover, the Rule fails to quantify—at all—the disproportionate costs and personal burdens that will befall policy holders, States' low-income and rural residents who do not have

34

easy access to the internet (raised by comments submitted by the National Women's Law Center), or do not have active checking accounts, debit and credit cards. In light of these circumstances, other preferences for hard mail communication, and despite encouragement to "opt into email as... [the method of] preferred communication ... 70% of enrollees continue to receive communications via standard mail" in California alone. (Comments to Proposed Rule submitted by Covered California). HHS itself estimates that approximately 90% of policy holders will receive paper bills in 2020. 84 Fed. Reg. 71,699. HHS claims to "understand that many enrollees face barriers to accessing the internet and have little choice but to receive paper bills," yet it fails to consider the resulting costs to low-income individuals. *Id.* Specifically, the Rule does not fully account for the increased personal administrative expense to enrollees. *Id.* at 71,706-707 (only addressing the costs to "read and understand the separate bills received.").

119. These problematic features of the Rule demonstrate inadequate rulemaking considerations and resulting in capricious agency action.

**F.    HHS Failed to Consider Key Problems with the Proposed Rule**

120. HHS ignored numerous comments from individuals, states, issuers, and private organizations that warned against complicating the administrative burdens already imposed on the healthcare markets and exchanges and the potential for those burdens to result in harm to the states' fiscs, consumers, and public health.

**1.    The Rule Illegally Imposes Administrative Burden on the States' Regulators by Penalizing Issuers for Offering Abortion Coverage**

121. Defendant's Rule penalizes issuers for doing business in the States. The Rule's excessive regulatory burdens unfairly and disproportionately target the States that choose to invest in women's access to comprehensive healthcare, particularly in Plaintiff States that mandate or allow health plans to cover abortion services as part of the essential health benefits. By extension, the Rule seeks to further disincentivize issuers from providing abortion coverage in those states that do not yet have specific laws restricting it, by creating barriers to doing so.

122. While the Rule creates onerous requirements for issuers to abide by, these changes contemplate and necessarily demand from the States' equally burdensome and costly adjustments

35

1    to the way in which the States' regulate their health insurance markets and administer their health

2    exchanges. To comply and respond to the changes issuers are subject to, the States will have to

3    make unnecessary structural changes that only add administrative costs and divert funds from

4    other critical aspects of the States' insurance market and exchange operations.

5         123.    To begin, the Rule will add unnecessary burdens requiring issuers to expend time and

6    money to alter budgets and allocate resources for the technical build of their systems. Issuers will

7    need to account for various changes, including changes to enrollment processes; generating

8    multiple billing statements; automating separate invoices (mail or electronic communication);

9    adding electronic communications and payment links; processing separate payment collections;

10   restructuring response processes and call center training; conducting billing-related outreach and

11   interactive voice response (IVR) technology; updating enrollee notifications related to non-

12   payment and grace periods; updating Health Insurance Casework System (HICS) and Department

13   of Insurance (DOI) complaint processes; restructuring grievance/appeals processes; and conduct

14   testing to ensure billing accuracy. This long list of added burdens will likely cause issuers to

15   spend more in resources to deal with the resulting consumer confusion from multiple bills, missed

16   payments, system errors, and delinquent notices. But these changes are not appropriate,

17   economically sound, or necessary.

18        124.    Therefore, if implemented, the Rule will place participating issuers in the difficult

19   position of having to comply with state laws that require or allow abortion coverage by absorbing

20   significant costs and passing these costs on to consumers in the form of increased premiums,

21   dropping abortion coverage in states without an abortion coverage mandate, or leaving the

22   insurance market altogether. Any increase in premiums risks denying consumers—who cannot

23   afford the premium increase—critical health coverage. And the same could result if issuers

24   choose to drop coverage or leave the state due to the cost of offering abortion coverage under this

25   Rule.

26        125.    In addition, responding to these changes required by the Rule also places the States'

27   in a bind. For example, to be able to bill separately, some issuers like Blue Shield in California,

28   will need to issue two separate insurance policies per enrollee, one exclusively for coverage of

1   abortion services, and another for coverage of the remaining health benefits. Covered California,

2   the state's exchange, cannot accommodate this need for separate transactions, because state law

3   mandates that all insurance policies they produce include abortion coverage in a *single policy*.

4   *See* Cal. Health & Safety Code §1340 *et seq*. To comply then, the Rule will force Blue Shield to

5   absorb the costs of the structural changes discussed above, and will incur additional costs for its

6   weekly and monthly reconciliation of separate insurance billings with Covered California's single

7   policies. The Rule would impose these unreasonable requirements despite the fact that all issuers

8   already comply with section 1303's segregation requirements.

9        126.    Moreover, under the Rule, the separate billing and separate payment requirements

10  will also increase the administrative costs of the States' insurance regulators.

11       127.    In California, Department of Managed Health Care (DMHC) and the California

12  Department of Insurance (CDI), are two of the state agencies that regulate health insurance plans.

13  DMHC primarily regulates health maintenance organizations (HMOs), while CDI has jurisdiction

14  over traditional health insurance. In California, issuers already submit to these respective

15  agencies annual filings with regarding their premium segregation plans, complete with separate

16  financial accounting systems, monthly reconciliation processes, and internal controls to ensure

17  that they are in accordance with federal regulations.[10] Every carrier does this differently, and

18  Covered California would have to work independently with the State's 11 insurance carriers to

19  determine a synchronized approach that is appropriate for both agencies.

20       128.    First, the California Department of Managed Health Care, which oversees a majority

21  of the qualified health plans impacted estimates that compliance with the new Rule will

22  unnecessarily increase the state agency's administrative burden of over one million dollars. This

23  includes: (1) $200,000 related to the increase in call volumes to deal with consumer complaints

24  and confusion over premium bills; (2) $150,000 for additional "segregation of funds plans" legal

25  reviews submitted by issuers; (3) $400,000 for enacting new regulatory packages clarifying

26  ─────────────────────

27  [10] 45 C.F.R. 156.280(e)(5)(ii). California Dep't of Managed Health Care "segregation plan" filings: Kaiser, Anthem, Blue Shield, Molina, Oscar, Chinese Community Health Plan, HealthNet, L.A. Care, Santa Clara County, Sharp, and Western Health Advantage (documenting

28  current compliance with segregation accounts).

safeguards and cancellation dollar thresholds for issuers; and (4) $300,000 for additional analysis required to be conducted by its Office of Plan Licensing related to issuer filings and disclosures for compliance with the Rule. All of these costs are unnecessary, as all the plans currently comply the California's segregation policies involving abortion coverage in qualified health plans.

129.     A second impacted California regulator is the California Department of Insurance, which is the largest consumer protection agency in the state. The department estimates the implementation of the Rule will bring about significant administrative burdens totaling about $156,390 initial costs for plan year 2020, and ongoing costs of $247,620. These costs include: (1) $151,900 for the 2020 plan year and $141,120 in ongoing costs due to increases in call volumes to their consumer services call center (and additional full-time personnel); (2) $2,130 for consumer services training; (3) $1,233 for consumer education materials; (4) $1,127 for additional legal review of the Rule's policy changes; (5) and $106,500 in annual costs of additional hearings regarding wrongful termination of coverage that will require legal evaluation and handling.

130.     Similarly, New York State Department of Financial Services ("NYS DFS"), will face a range of administrative burdens, including having to field a significant increase in calls and other inquiries from consumers regarding the receipt of multiple bills and the requirement for separate payments for health plan premiums. In addition, NYS DFS expects to receive calls and inquiries about the potential loss of coverage for medical services. Consequently, NYS DFS will need to direct resources to respond to the increased number of consumer calls and inquiries related to this Rule, including but not limited to development of Q&A's for NYS DFS staff, and consumer education materials for distribution on the NYS DFS' website and potentially other outlets.

131.     In addition, NYS DFS, as New York's primary regulator of health insurance plans, will need to respond to insurers' inquiries about the Rule's effects and will be required to provide regulatory guidance on the Rule. NYS DFS will need to devote resources to developing and implementing circular letters and other forms of guidance for the health plan industry in New

38

1    York State. Multiple stakeholder groups would be required to be convened, and staff would have

2    to be directed to oversee these groups – plans, consumers, and providers. NYS DFS would

3    ultimately have to expend additional resources to draft and review, and finally publish a circular

4    letter.

5         132.    In the District of Columbia, the Department of Insurance, Securities and Banking

6    (DISB) protects the interests of District consumers by ensuring that insurers and individuals

7    presenting insurance products in the District are qualified, appropriately licensed, and meet and

8    act in accordance with all requirements of the insurance laws. DISB estimates the

9    implementation of the Rule will bring about significant administrative burdens and costs, which

10   include: (1) an increase in call volume and AskTheCommissioner email requests about the Rule;

11   (2) an increase in formal complaints to DISB's Consumer Services Division; (3) an increase in

12   operational costs associated with training the Consumer Services Division and Forms Examiners;

13   and (4) an increase in costs for drafting and distributing consumer education materials.

14        133.    Maine operates a Federally-facilitated Marketplace (FFM) and conducts plan

15   management activities to support certification of qualified health plans by CMS. Administration

16   of Maine's individual marketplace,[11] including premium billing and collection functions, is

17   handled at the federal level through the FFM and not by the State. Maine law, however, requires

18   carriers seeking to cancel an individual health insurance policy for nonpayment of premium to

19   provide notice prior to cancellation. Me. Rev. Stat. tit. 24-A, §2707-A; 02-031 C.M.R., Ch. 580.

20   Insurers further must provide a grace period (of 7, 10, or 31 days) for the payment of premium,

21   during which grace period the policy shall continue in force. *Id.* § 2707. Consumers whose

22   health insurance coverage has been cancelled without being provided the required notice or grace

23   period upon a failure to pay the separate premium contemplated by the Rule may request a

24   hearing before the Maine Superintendent of Insurance. Me. Rev. Stat. tit. 24-A, § 229. The

25   Rule's unique separate billing and payment requirements, nowhere comparable in any other line

26   of insurance, are likely to result in consumer confusion and result in more cancellations of

27   ───────────────────────

28   [11] Discussion of Maine's marketplace refers specifically to the state's ACA individual
     marketplace for purposes of this complaint.

policies for nonpayment of premiums. This will result in additional administrative burden and expense for Maine resulting from the regulation, oversight, and enforcement of insurer billing practices for compliance with the Rule. In addition to the potential for increased requests for agency administrative hearings, the Bureau of Insurance Consumer Health Care Division (CHCD) inevitably will receive more consumer inquiries. CHCD staff, under the direction of the Superintendent of Insurance, will need to consider allocating resources to develop and implement consumer outreach efforts about the separate billing and payment requirements of the Rule.

134.    In Maine, there are only three issuers participating in the individual marketplace: Anthem Healthplans of Maine, Maine Community Health Options, and Harvard Pilgrim Health Care. The separate billing and payment requirements of the Rule will require these issuers to make structural changes to their billing and payment reconciliation processes, accounting systems, and internal controls resulting in costs that they will be forced to absorb mid-term beginning June, 2020 (insurer rates are locked-in for the one-year policy period). Thereafter, in subsequent policy periods, these issuers must decide whether to continue absorbing these costs or to pass them on to consumers through increased premiums. Alternatively, one or more of the three issuers could make the unfortunate decision simply to leave the state due to the uncertainty of the system impacts and increased costs of offering abortion coverage in compliance with the Rule.

135.    In Maine, this concern is not theoretical. For example, due to the uncertainty of sufficient premium rate recovery for cost sharing reductions (CSRs) under the ACA, for plan year 2018 Anthem Maine withdrew from the Maine ACA market. Anthem Maine's absence was temporary, and it returned to the Maine ACA market for plan years 2019 and 2020. The prolonged departure from the market of one or more of the three remaining issuers currently offering ACA coverage in the state is a troubling prospect. Any destabilization of the individual market resulting from the departure of one or more issuers could harm Maine consumers through higher premiums that often result from decreased competition.

136.    The Maryland Insurance Administration, which oversees all of the qualified health plans impacted by the Rules, will similarly experience an increase in administrative burden and

40

1   incur costs to ensure compliance with the new Rule and to handle an increase in consumer

2   complaint volume. All carriers in Maryland already submit to the Maryland Insurance

3   Administration annual filings with respect to the premium segregation plans, complete with a

4   reconciliation of all segregated account activity, and an annual attestation of compliance,

5   including accounting documentation and internal controls, of the segregated account. MIA

6   Bulletin 13-24, Segregation of Funds for Certain Abortion Services Covered under Qualified

7   Health Plans Sold on the Individual Exchange (July 31, 2013), https://tinyurl.com/vqvrkof. The

8   Maryland Insurance Administration will have to update the regulatory guidance provided to

9   impacted carriers and update the legal reviews of the annual compliance filings.

10      137. Like other State regulators, the Maryland Insurance Administration will experience

11   an increase in costs due to an increase in call volume to their call center, complaints regarding

12   coverage terminations, and appeals hearings contesting plan terminations. The Maryland

13   Insurance Administration will also incur costs to engage in consumer education about the Rule

14   change.

15      138. Oregon's insurance regulator, the Division of Financial Regulation, similarly

16   anticipates the Rule change will result in additional administrative burdens, such as increased

17   calls to its consumer advocacy unit.

18      139. In Vermont, billing issues are a primary source of qualified health plan customer

19   complaints. In addition, if a customer underpays a premium payment, their plan will be cancelled

20   after a one- to three-month grace period, unless the customer makes up the underpayment. A

21   customer who has been disenrolled for nonpayment generally may not re-enroll in an insurance

22   plan until the annual open enrollment period, absent certain limited exceptions. The confusion

23   created by the Rule will cause customers to needlessly lose health insurance coverage, resulting in

24   consumers facing high out-of-pocket costs for care and foregoing necessary medical treatment,

25   including but not limited to abortion care and contraception coverage. Vermont will receive

26   consumer questions and complaints as a result of the confusion generated by the new rule, and

27   expects increased administrative burdens in responding to these complaints.

28

140. The administrative difficulties imposed on health plans, exchanges, and regulators demonstrate the Rule's true aim—to make it impossible for carriers to provide women full and comprehensive healthcare coverage by penalizing issuers individually, and unnecessarily disrupting the state agencies regulatory schemes.

141. HHS admits that this Rule will significantly increase the administrative burdens for qualified health plans providing abortion coverage. 84 Fed. Reg. 71,696-97. HHS identified the types of burdens imposed on insurance carriers, now required to invest time and resources to oversee the process of sending separate bills, review the accuracy of receipt of separate payments, process additional payments, and add functionalities to operating systems to develop new and separate automated payments. 83 Fed. Reg. at 56028. And if carriers want to provide abortion coverage, the Rule will force companies to pay, on average, $1.07 million dollars annually to provide comprehensive healthcare to women. *See* 84 Fed. Reg. 71,698.

142. Once again, HHS acknowledged these costs and ignored them, setting an effective date within six months after the Rule's publication and in the middle of a plan year, with no possibility of accounting for any potential changes in costs.

143. HHS also failed to adequately consider the impact of the significant increase in administrative costs that issuers must bear in 2020, amounts it cannot recoup in 2020 premiums, on its Medical Loss Ratio calculation. Medical loss ratio involves the share of premiums that issuers pay on claims, with the remainder going to administrative expenses, other costs, and profits. The ACA set the medical loss ratio as a mechanism to protect consumers from dramatic premium increases; currently the medical loss ratio threshold for the individual market is set at 80%; meaning that 80% of premium charges must be used for direct coverage of medical service costs or quality improvement expenses. *See generally* 42 U.S.C. § 300gg-18 (LexisNexis 2019). If issuers use less than 80% of premium charges for medical claims or quality improvement expenses (with some exceptions), issuers are required to issue rebates to consumers. Consequently, an issuer's rise in administrative costs is an important factor in establishing premium amounts to assess whether they will be responsible for high consumer rebates.

144.   HHS suggests in the preamble that issuers would be able to use funds from the allocation account attributable to abortion premiums to cover any administrative burdens resulting from not being able to update individual market rates prior to the 2021 plan year, in order to mitigate the excessive financial consequences of the Rule discussed above. *See id.* at 71,690. HHS plainly ignores that these funds are to be "used exclusively to pay for [abortion] *services*" not an issuer's administrative costs of providing that service. 42 U.S.C. 18023(b)(2)(C)(ii)(II) (emphasis added). HHS not only ignores the statutory limitations assigned to the allocation account attributable to abortion premiums, but simply states that it does not anticipate that the rule will "measurably increase" medical loss ratio rebates because it believes issuers have a simple option: "issuers would either cease offering [abortion] coverage," unless required by state law, in the plan year 2020 to avoid issuing additional medical loss ratio rebates, "or would pay for the increased administrative costs from a different revenue source," mainly the segregated account. 84 Fed. Reg. 71,704.

145.   Simply put, the Rule has been designed to penalize and discriminate against issuers participating in states requiring coverage of abortion services, and to coerce issuers in states where it is not mandated to drop such coverage altogether; there is no other plausible explanation. This in itself is capricious agency action.

## 2. The Rule Disrupts the Robust Administration of the States' Exchanges, Imposing Unnecessary Cost to Its Enrollment System

146.   The Rule's unnecessary change in abortion coverage billing will disrupt the States' administration of exchanges and cost millions of dollars to come into compliance within six months. Compliance could require unnecessary restructuring of the exchanges, particularly those which conduct their own premium billing and collection functions, and has the potential to disrupt current and future marketing and enrollment campaigns, requiring significant allocation of resources to consumer outreach efforts for all exchanges.

147.   Covered California, California's state-based exchange, has created a robust health insurance system that provides for a competitive marketplace, and has maintained strong relationships with insurance carriers while empowering consumers to choose the plans that give

43

them the best value.  Its extensive investments in outreach allowed the exchange to raise consumer awareness of the value of health insurance coverage and the availability of federal financial assistance, through exchange subsidies.  These efforts have led to healthy enrollment and retention rates across the California.  In fact, California's uninsured rate dropped considerably, from 17% in 2013 to 6.8% in 2017.  Today, over 1.5 million enrollees receive health insurance coverage purchase through the state's individual market exchange.

148.    As discussed in *Section III.D* above, the costs of implementing the new Rule on the States' exchanges are unnecessary and ongoing.  Covered California anticipates that the Rule has the potential to increase consumer calls to Service Centers, leading to longer wait times.  Covered California will have to develop talking points for Service Center and contracted enrollers, such as agents, amounting to 40 hours or personnel time and costing $1,225.  In addition, the exchange will have to change materials educating the public on the Rule's policy changes, potentially requiring the diversion of consumer outreach and marketing funds.  Moreover, Covered California will need to evaluate operational changes to mitigate the Rule's adverse impacts, such as amending the contracts with the state's health plans to prohibit them from terminating policy holders for failing to pay the separate $1 premium.

149.    Additionally, the exchange would need to assess how best to disseminate education and information over any required changes to binder payments made to issuers, the initial payments made after enrollment that control whether or not a new enrollee's policy is initiated (discussed below).  Because California law prohibits Covered California from issuing two policy transactions (all health benefits must be included in a single policy), it is likely that the exchange will be forced to pass on these costs to issuers participating in the Covered California exchange.

150.    The cost of implementing this Rule could risk Covered California's important annual enrollment gains.  Covered California has fixed sums for marketing but would now need to redirect funds to consumer outreach and education to explain the policy changes and mitigate against consumer confusion and termination of coverage.  Covered California has adopted a marketing, outreach, and sales budget for 2019-2020 that allocates $121 million, an increase of

1  $13.6 million from the 2018-2019 budget, and accounts for almost a third of its total operating

2  budget of $379 million.

3      151.    Marketing matters because outreach drives enrollment on and off the exchange.

4  Specifically, the marketing, outreach and sales budget of 2019-2020 includes $6.5 million for a

5  navigator program and $55 million for paid media ads, which aid in informing Californians about

6  the value of insurance and the availability of financial assistance for many, encouraging retention

7  of those already enrolled, and maintaining a favorable mix of enrollees for the health insurance

8  risk pool. Covered California's navigator program is especially important, as it is a partnership

9  with community organizations across the state that has experience in reaching and assisting

10  California's diverse populations and has proven successful in enrolling more consumers annually.

11  Of that $55 million, $10 million has been added to the originally proposed budget for the

12  development and implementation of new creative media that will target audiences and advance

13  the effort in educating consumers about the new state subsidy and California's individual

14  mandate. These funds are critically important and necessary, as these aggressive efforts have

15  demonstrably improved the State's coverage rates.

16      152.    Attaining compliance with HHS's new Rule by June 27, 2020 places significant

17  additional costs on the State. For example, in January 2019, only 26% (377,700) of Covered

18  California's consumers selected email as their preferred method of communication, 49%

19  (705,000) selected mail, and about 20% have unspecified responses, which defaulted to mail as

20  the preferred method of communication. Due to the limited number of exchange enrollees

21  subscribed to email, together with barriers many subscribers still face in accessing the internet,

22  outreach could be costlier through more aggressive mass mailing and on-the-ground marketing

23  campaigns during the mid-plan year. This Rule would cost Covered California unnecessary

24  resources to implement, in addition to the reallocation of marketing funds that currently provide

25  critical consumer outreach that drives its success.

26      153.    New York State of Health (NYSoH), established within the New York State

27  Department of Health, is New York State's health exchange. Like other state exchanges, NYSoH

28  forecasts a significant increase in consumer calls to its call center as a consequence of the Rule's

1   requirement of separate billing and payments.  Such an increase in call volume will place

2   administrative burdens on the call center and will increase contract costs by an estimated

3   $600,000.  NYSoH will likely be required to develop materials for call center staff to delineate

4   how to advise consumers, and train staff to be prepared for the calls.  In addition, overly

5   burdensome administrative requirements will drive up issuer costs, which could then be passed

6   onto consumers in the form of higher premiums.

7       154.    The District of Columbia Health Benefit Exchange Authority (DC Exchange)

8   operates the District's state-based exchange.  The DC Exchange estimates that it will incur

9   approximately $3.93 million annually in FY20 and FY21 in costs directly related to the Rule.  Of

10  this amount, $1.45 million is required to staff increased consumer calls to its contact center,

11  inquiring about the separate billing and separate payment requirements, its ramifications, and how

12  to properly make payment.  Increased staff will also be required to address increased churn and

13  non-pay terminations resulting from consumer and carrier confusion regarding payment and

14  application of dual payment for single policies as described in paragraph 174.  The costs

15  associated with the increased staffing and training required of call center workers and internal

16  staff by the DC Exchange's legal and policy staff to understand the Rule, its interactions with

17  District law, and any new DC Exchange policies will be approximately $265,499 per year.

18  Additionally, the marketing department must engage in a comprehensive campaign to educate

19  consumers on the existence of the Rule, their rights, and how to avoid losing coverage.  This

20  marketing campaign is expected to cost $1.15 million annually in FY20 and FY21 in staff and

21  media costs.  This campaign is particularly crucial because of the District's requirement for

22  individuals to maintain health coverage; the District needs consumers to know that the separate

23  billing and separate payment requirements may cause them to lack coverage and thus not comply

24  with the District's coverage requirement and may subject them to tax penalties.

25      155.    The anticipated increase in wrongful terminations based on carrier errors or

26  misinformation will cost the DC Exchange an estimated $391,449 annually in FY20 and FY21 to

27  process special enrollment period requests, reinstatements, and associated administrative appeals

28  related to these requests.  The DC Exchange will also experience an estimated $243,937 annually

1    in FY20 and FY21 in additional expenses for enrollment transactions caused by the unnecessary

2    disenrollment and re-enrollment churning caused by the Rule.

3        156.    In order to comply with the Rule by June 27, 2020, the DC Exchange will need to

4    engage in off-cycle review of carrier notices and plan documentation, which normally only occurs

5    at annual plan re-certification.  The separate billing and payment requirements are new

6    requirements that must be reviewed annually, making it an ongoing expense for the DC

7    Exchange's plan management team.  These burdens will increase costs for the DC Exchange by

8    an estimated $78,412 annually in FY20 and FY21.  Beyond the new federal requirements on

9    issuer certification, the DC Exchange is likely to develop new policies, either on its own or in

10   conjunction with the District of Columbia Council and District of Columbia Department of

11   Insurance, Securities, and Banking, in an attempt to mitigate the negative effects of the Rule.  The

12   DC Exchange's executive, legal, and policy staff time associated with this work is expected to

13   cost approximately $185,541 annually in FY20 and FY21.

14       157.    The Maryland Health Benefit Exchange, Maryland's state-based exchange has,

15   through innovation and accomplishment, created a robust marketplace that offers Marylanders

16   affordable and comprehensive health insurance options.  As a result of a State reinsurance

17   program, individual market premiums decreased by an average of 13% in 2019 and another 10%

18   for 2020.  MHBE's extensive investments in technology through its website, mobile application

19   and call center, and in outreach and marketing to consumers have led to healthy enrollment and

20   retention rates in Maryland, increasing the State insured rate to 94% in 2019.[12]

21       158.    The Maryland Health Benefit Exchange anticipates that it will incur significant cost

22   increases as a result of the Rule, including at a minimum, one-time costs of $16,000 to staff a

23   special stakeholder workgroup to determine how best to educate consumers, consumer assistance

24   workers and others about the Rule's premium billing and payment changes.  The costs of

25   effectuating the educational plan have yet to be determined.  MHBE anticipates it will incur

26   $240,000 in annual costs to handle the increase in call volume to its customer service call center

27   ────────────────

28       [12] https://www.marylandhbe.com/wp-content/uploads/2019/MHC_Annual_Report%202019.pdf

47

1  regarding the billing and payment changes and foreseeable plan terminations. MHBE is currently

2  assessing the costs it will incur to handle the increased complaint volume to its Appeals and

3  Constituent Services department by consumers who have questions or concerns about the billing

4  and payment changes, or whose plans are terminated for premium nonpayment - and the increase

5  in hearings contesting the terminations.

6       159.    MHBE's marketing and outreach efforts will be impacted by the Rule. Marketing

7  and outreach drives enrollment on and off the exchange. MHBE has fixed sums for marketing but

8  will need to redirect funds to explain the Rule's policy changes and to mitigate against consumer

9  confusion and termination of coverage. MHBE's marketing and outreach budget for fiscal year

10  2020 includes $ 3.2 million for full service communications and marketing used to inform

11  Marylanders about the value of insurance and the availability of financial assistance for most

12  Marylanders, encouraging retention of those already enrolled, and to maintain a favorable risk

13  pool. These funds are critically important and necessary for a stable marketplace. As the budget

14  cycle for Maryland runs July 1st through June 30th, most of the FY2020 funds have already been

15  expended on open enrollment and there are little funds left for any new, unplanned initiative.

16  MHBE is assessing how much of the remaining budget will need to be diverted to create and

17  execute a marketing plan to educate consumers about how health insurance premiums, unlike any

18  other insurance premiums, will now be billed and collected. Attaining compliance with HHS's

19  new Rule by June 27, 2020 significantly increases the costs. For example, as of January 2020,

20  41% of MHBE's consumers selected paper mail as their preferred method of communication. As

21  a result, the marketing and outreach that is necessitated by the Rule change will have to be

22  conducted through aggressive mass mailings and on-the-ground campaigns during the middle of

23  the plan year.

24       160.    This Rule is likely to risk MHBE's important annual enrollment gains and put at risk

25  market stabilization efforts made the State. The stability of Maryland's marketplace is also tied

26  to other factors, including renewals and the State's reinsurance program. Renewing enrollees

27  made up 74% of the individual qualified health plan enrollments on the Exchange for 2019 and

28  76% for 2020. New enrollments become harder to acquire each year as the State continues to

48

trim its uninsured rate and the remaining uninsured population increasingly consists of the hardest to reach. Renewals are at risk by the Rule's separate billing, separate payment requirement because MHBE will have to reacquire members who are terminated for nonpayment of premiums. This will significantly increase administrative costs.

161. In 2018, Maryland established the State Reinsurance Program, under a State Innovation Waiver, to increase premium affordability and foster stability in the individual market. Because of the waiver, Maryland has experienced two successive years of double-digit premium decreases, resulting in 2020 premiums that are 23% lower than 2018 premiums. MHBE will need to assess and quantify the additional costs that will be incurred to apply a new actuarial analysis to the State Reinsurance Program based on a projected loss of enrollment due to foreseeable plan terminations. Because the number of enrollees determines federal pass-through dollars allocated under the reinsurance program, insurance premiums, and the amount of state funding needed for the State Reinsurance program, any reduction in enrollment destabilizes Maryland's reinsurance funding and the marketplace as a whole.

162. The Oregon Health Insurance Marketplace is State-Based Exchange on the Federal Platform; the state-based health insurance marketplace is operated by the Oregon Department of Consumer and Business Services (DCBS), but utilizes the federal enrollment platform, Healthcare.gov. The Oregon exchange estimates it will need one additional full time employee to handle the increased call volume resulting from consumer confusion and concern over missed payments. This cost would be in the range of approximately $36,000 - $52,000 per year. Production and updating marketplace consumer education materials would cost approximately $1300, and the cost of distributing those consumer education materials would cost approximately $23,000 per mailing.

163. The Department of Vermont Health Access has performed billing functions in the qualified health plan market along with issuers, but it is in the process of transitioning these functions completely to the issuers for plan year 2021. It would be operationally and financially impossible for the Department of Vermont Health Access to make major changes to its billing procedures at this stage.

164. Moreover, the ACA grants states the option of performing premium collection services for the individual insurance market's sale of qualified health plans. In states that perform all premium billing and collection functions for individual market consumers, the costs of implementing the Rule's changes will be even more significant, and similar to the costs borne by issuers in other exchanges.

165. While HHS reconsidered the "greatly underestimated" cost analysis in the proposed regulation, and determined that the total costs to implement the Rule would reach almost $550 million in 2020 alone, the final Rule remained largely unchanged. 84 Fed. Reg. 71,699. In effect, HHS dismissed a key aspect of the problem relating to the Rule—the excessive costs—and ultimately ignored the many commenters' concerns and *the agency's own accounting* of the unconscionably high costs of implementation.

166. Instead, HHS reminds "states concerned about enforcement and oversight of these requirements that, under section 1321(c), states may elect not to establish and operate an Exchange, thereby deferring those responsibilities to HHS." 84 Fed. Reg. 71,694. In fact, in the preamble, HHS assures state-based exchanges, "the Secretary may step in to enforce the requirement against the non-compliant issuer." 84 Fed. Reg. 71,692.

### 3. The Rule Puts at Risk the State's New Coverage Gains

167. As discussed above, the many problems with the Rule put at risk the healthcare coverage of millions of individuals already enrolled in qualified health plans, and place individuals newly enrolled in a delicate position.

168. First, commenters explained to HHS that insurance bills, as is the case for "auto, homeowners, and liability insurance policies," have inculcated in consumers that only one bill is required for the entire premium for any set time period, and the Rule is therefore contrary to well-established industry practice. (Comments submitted by the District of Columbia's Health Benefit Exchange). This is a key aspect of the insurance industry, where additional invoices are generated "only if there is a late payment or a change to the policy, like adding dependents or new employees." *Id.* But HHS failed to even discuss the radical departure from entire industry practice. 84 Fed. Reg. 71,684.

169.     Second, Covered California, among other exchanges, submitted comments to HHS warning that the Rule would leave consumers confused by the need to pay an additional bill of a nominal amount ($1), and therefore run the risk of losing out on critical health insurance coverage due to inadvertently failing to pay the initial premium payment in full.  Specifically, new policy subscribers who have yet to make their initial "binder" payments would effectively lose their coverage before it even begins.  This is different from risks of coverage termination.

170.     As explained by Access Health CT to HHS, "[w]ithout a binder payment, an enrollment is often not effectuated by a carrier" and exchanges work aggressively "through several channels to ensure consumers understand their responsibility for making the first month's payment, and monthly payments throughout the year thereafter." (Comments to Proposed Rule submitted by Access Health CT).  Similarly discussed in the Attorneys General comment letter, submitted on January 8, 2019, the Rule's separate billing requirements put a significant number of enrollees at risk of termination—or in other words, policy non-initiation.  But the Rule fails to consider that additional costs of updating internal operations, such as binder payment processing, will require exchanges to redirect vital funds from other programs to additional consumer outreach and marketing.  (Comments to Proposed Rule submitted by Covered California).

171.     In California, this has the potential to leave large numbers of new enrollees without coverage and risks hurting California's success in bring down uninsured rate from the historic high discussed above (from 17% in 2013 to 6.8% in 2017).  In addition, in 2018, California experienced a 3% growth in enrollment numbers, gaining 423,484 enrollees who signed up for coverage through Covered California for the first time.[13]  By 2019, Covered California reported more than 1.5 million enrollees had gained coverage on the exchange's individual market.  In addition, in 2020, more than 318,000 consumers have newly signed up for health insurance through Covered California during the current open-enrollment period (which continues through January 31), and that surpassed last year's total of 295,000 enrollees.  This is in part because new

---

[13] News Release, Covered California (Feb. 7, 2018), https://www.coveredca.com/newsroom/news-releases/2018/02/07/Covered-California-Finishes-Fifth-Open-Enrollment-Strong-New-Sign-ups-of-423-484-up-3-Percent-Over-Last-Year/.

1   state law requires Californians to have health insurance in 2020 or face a penalty when they file

2   their taxes with the Franchise Tax Board in 2021.  Under the Rule, all new enrollees would be at

3   risk of policy non-initiation if they failed to make both billing payments on time.  Added to this

4   are the difficulties and confusion of having to re-navigate the process for coverage re-instatement,

5   seek additional coverage, or procure enough time and resources to secure alternative medical

6   services in the face of an emergency.

7       172.    In New York, since opening in 2013, NYSoH has transformed New York's individual

8   insurance market, offering New Yorkers access to affordable health insurance options.  NYSoH

9   assists New Yorkers in determining whether financial assistance through federal subsidies is

10  available.  Through offering affordable health options on its exchange, New York experienced an

11  unprecedented increase in individual health insurance enrollment.  In just seven years — from the

12  opening of NYSoH in 2013 to present — the rate of uninsured New Yorkers has declined from

13  10% to 4.7%.  There are currently 12 plans participating on NYSoH.

14      173.    NYSoH enrolled 253,102 individuals in a QHP (59 percent received financial

15  assistance to lower the cost of their coverage) in January of 2018.[14]  A year later in January of

16  2019, the number of individuals enrolled in a QHP rose to 271,873, with more than half (58%) of

17  those people receiving financial assistance to lower the cost of their coverage.[15]  As of January

18  27, 2020, there were 260,513 people enrolled in a QHP (the deadline to enroll in a QHP does not

19  close until February 7, 2020), with approximately 60 percent receiving financial assistance.

20      174.    The DC's Exchange enrollment experience demonstrates that the Rule will

21  substantially increase payment confusion issues.  In plan years 2018 and 2019, 197 special

22  enrollment period requests requiring manual review were approved due to carrier errors, carrier

23  misinformation, or other carrier issuers that caused plan terminations based on non-payment of

24  premiums.  The DC Exchange anticipates the Rule will result in a 50% increase in wrongful

25  terminations because the separate payments are not paid or applied correctly.  As described

26  _____

27  [14] https://info.nystateofhealth.ny.gov/2018openenrollmentreport - NYSOH 2018 Open
Enrollment Report
[15] https://info.nystateofhealth.ny.gov/2019openenrollmentreport - NYSOH 2019 Open

28  Enrollment Report.

1     above, customers who are unable to initiate their policies would then need to seek re-instatement

2     and re-navigate the enrollment process, all the while being without coverage and experiencing the

3     stress and risk of non-coverage. In the District's experience, a substantial portion of these

4     customers would just forego coverage once terminated.

5          175.     In Maine, the state's total individual market enrollment reached 70,987 in

6     2019. Because the overwhelming majority of individual health plans in Maine are secured

7     through the marketplace, the Rule's separate billing and payment requirements will likely have a

8     significant adverse effect on Maine consumers. In addition, in 2019 there were nearly 14,000

9     new enrollees. Under the Rule, any new gains in enrollment would be at risk of termination, or

10     non-initiation, of their individual health plans if they failed to make both billing payments on

11     time. The confusion created by the Rule's separate billing and separate payment requirements is

12     likely to result in more cancellations of policies, more questions directed to the Bureau of

13     Insurance and requests for administrative hearings, and additional administrative burden and

14     expense.

15          176.     Moreover, in 2018, CMS approved Maine's application for a State Innovation

16     Waiver, for 2019 through 2023, to run a state-based reinsurance program. Maine's reinsurance

17     program is operated by the Maine Guaranteed Access Reinsurance Association (MGARA). As a

18     result of the waiver approval, more consumers in Maine may have coverage, consumers will see

19     lower premiums, and the state will receive pass-through funding to help offset a substantial

20     portion of state costs for MGARA. MGARA is expected to reduce premiums by about 9 percent

21     each year beginning in 2019. Enrollment is expected to increase by about 1.1 percent in 2019, 0.9

22     percent in 2020, and between 0.3 to 0.8 percent after that. Overall, Maine expects enrollment of

23     an additional 300 to 1,100 individual market enrollees annually. MGARA will be funded by

24     multiple sources, including reinsurance premiums paid by issuers and an assessment on all health

25     coverage sold in Maine. Because the number of enrollees determines the amount of federal

26     dollars for MGARA, insurance premiums, and the amount of state dollars needed for MGARA,

27     any reduction in enrollment in the individual market as a result of the Rule's separate billing and

28     separate payment requirements could adversely affect MGARA to the detriment of the state.

177.     Maryland, in 2019, gained more than 40,000 enrollees who signed up for individual coverage through the Maryland Health Benefit Exchange ("MHBE') for the first time—all of whom would be at risk of termination if they failed to make both billing payments on time.[16] This constituted a 2.2% growth in enrollment in 2019, but would now also represent new enrollees who would be at risk of termination, or non-initiation, under the Rule.

178.     In Oregon, the Oregon Health Insurance Marketplace reached a total enrollment of 148,180 for the 2019 plan year, gaining 35,617 new enrollees.  As in other states, new enrollees who fail to make the premium payment in full would risk coverage non-initiation.  As indicated by the numbers of new enrollees for 2019, tens of thousands of new enrollees could potentially be impacted simply because they failed to pay a nominal portion of their insurance coverage.  This is at odds with Oregon's goal of comprehensive, quality health insurance for all its residents.

179.     In Vermont, there are over 25,000 individuals enrolled in qualified health plans in the individual market.  In 2019, there were 3,884 new enrollees who purchased qualified health plans through Vermont Health Connect.  The Rule's separate billing and separate payment requirements will create customer confusion, and are likely to result in unnecessary dis-enrollments or cause new enrollees from effectuating new policies.

### 4.     The Rule Will Increase Consumer Confusion, and Lead to Coverage Termination

180.     The added confusion imposed by the separate billing and separate payment requirements will likely result in more consumers losing healthcare coverage entirely, as the Rule does not prohibit issuers from terminating coverage for failure to pay the separate $1 premium for abortion coverage.

181.     The Rule's resulting confusion is significant because it reveals HHS's lack of due diligence and awareness of most consumers' experience with healthcare insurance.  Often, consumers wary of financial deception may intentionally disregard a second bill suspecting that the bill for a nominal amount is a scam since the consumer may have already paid the first bill.

---

[16] Maryland Health Benefit Exchange, 2019 Annual Report 4, 22, https://tinyurl.com/tdrfkeo.

54

(Comment by Planned Parenthood Federation of America (citing a study reporting consumers described the separate billing process as "a scam," "super confusing," "an unnecessary hassle," "inconvenient," and "frustrating"[17]).  The frustration of failing to make sense of health insurance programs or bills can force some consumers into blindly paying excessive charges, or ignore them and risk losing coverage and incurring more debt in fees.

182.    Any loss of private healthcare coverage will harm the most vulnerable residents (as discussed above in paragraph 118), relegating the uninsured and underinsured and largely low-income communities to public services or emergency care.  Despite comments submitted by Physicians for Reproductive Health raising these facts, the final Rule failed to account for the harms incurred from any inadvertent loss of healthcare coverage, the resulting increased premiums, higher out-of-pocket and uncompensated care costs, and the rise of unintended pregnancies from loss of access to abortion services.

183.    The risk of coverage termination applies to all qualified health plan enrollees.  Under the Rule, while issuers are not required to terminate coverage for failure to pay the separate $1 bill, the Rule does not prohibit issuers from choosing to terminate the entire policy instead of spending additional resources relating to ongoing consumer outreach and debt collection.  In fact, issuers will nonetheless "still be required to collect the premium for the...abortion coverage."  84 Fed. Reg. 71,705.  And while HHS's professed reason for granting issuers the ability to implement opt out mechanisms for policy holders to modify their plans is to mitigate the risk of coverage termination, this non-enforcement policy is discretionary and not mandatory.  *Id.* at 71,706.  Thus, qualified health plans in states without abortion coverage mandates could nevertheless decide not to implement the discretionary policy, and simply choose to terminate the policy holder's coverage for having failed to pay the $1 premium.  This largely leaves the risk of termination unaltered.  Loss of coverage due to a mere billing technicality could be a matter of life or death for consumers dealing with sensitive medical procedures and ongoing treatments.

---

[17] Comment cites Motivate Design, *Usability Study on Nelson Amendment Implementation Report* (2011) (on file with Planned Parenthood Federation of America).

184.    In addition, the Rule will leave consumers—both men and women already beyond their reproductive years—more confused after they receive a separate monthly bill for abortion coverage, a health service they no longer need.  This could prompt policy subscribers, under the Rule's new opt-out discretion now afforded to some issuers, to decline the benefit of abortion coverage, without understanding that this inadvertently triggers the termination of such coverage for any other enrollees under the policy who may still require such services themselves.

### 5.    The Rule Is Contrary to State Policy, Will Increase Uncompensated Costs and Hurt the States' Fiscs

185.    As discussed above, the confusion imposed by the Rule's separate billing and separate payment requirements is likely to result in consumers losing their health coverage entirely.  Ultimately, any lapse or loss of coverage, abortion or otherwise, could result in more unplanned births, an increase in uncompensated care costs, and consumers foregoing preventative care and medically necessary but unaffordable health care.

186.    If residents in need of medically necessary care do not have insurance coverage, they will turn to state-funded public programs, such as welfare or emergency room care.  Yet, HHS wholly failed to consider the full costs and the risks that come from arbitrarily complicating or restricting access to healthcare coverage, which will undeniably costs residents and the States' fiscs.

187.    As an example, HHS's final Rule heightens the risk that women will end up without abortion coverage.  Given the costs of abortions, many of these women will not have the financial means of obtaining one, which increases the likelihood of women falling into cycles of poverty and reliance on public assistance programs.  Women whose healthcare coverage is terminated or non-initiated, and do not have knowledge, time, or resources to obtain or reinstate that coverage, will turn to state-funded programs.

188.    In California, women and individuals in need of healthcare services but left without coverage could turn to the state-funded Family Planning, Access, Care, and Treatment (Family PACT) program, or emergency care for their reproductive healthcare needs.  An increase in unplanned births due to loss of coverage will raise State costs.  In 2010, for example, 64.3% of

1    unplanned births in California were publicly funded.  That year, in California, the federal and

2    state governments spent $1.8 billion on unintended pregnancies; $1.062 billion was paid by the

3    federal government and $689.3 million was paid by the State.  In 2010, Maryland paid for 19,000

4    unplanned births.[18]

5        189.    Importantly, the Rule puts all residents are at risk of such coverage loss, which will

6    likely further increase the hospital and the States' uncompensated care costs.  According to a

7    recent estimate, the loss of insurance coverage and associated uncompensated costs would lead to

8    an exorbitantly high financial loss for the States.[19]

9        190.    In California, between 2010 and 2015, an estimated 3,826,000 people gained

10   coverage.  From 2019 to 2028, a rise in uninsured rates could lead to a loss of federal marketplace

11   spending and Medicaid spending, risking $61.1 and $99.1 billion respectively—a total loss of

12   $160.2 billion.  If California's coverage gains were put at risk, it is estimated that California

13   hospitals could lose $64.1 billion and physicians could lose $24.7 billion.  Uncompensated care

14   costs in California would increase by $140.1 billion over this period.

15       191.    Similarly, since the implementation of the Affordable Care Act the number of

16   uninsured New Yorkers decreased by approximately 1 million.  A rise in uninsured rates due to

17   the Rule could increase the fiscal and human costs of uncompensated care across the state.  New

---

18   [18] https://www.guttmacher.org/sites/default/files/factsheet/md_8_0.pdf

19   [19] Decl. of Henry J. Aaron in Supp. Of Mot. To Intervene, *Texas v. United States*, No.
     4:18-cv-00167-O (N.D. Tex., filed Apr. 9, 2018) at 32-34, 46-48, 52-54, 56-58, 64-66.  *See also*

20   Office of the Assistant Secretary of Planning and Evaluation, Compilation of State Data on the
     Affordable Care Act (Dec. 2016), https://aspe.hhs.gov/compilation-state-data-affordable-care-act.

21   Note that some estimates are not available for all states due to small sample size; Linda J.
     Blumberg et al., *Implications of Partial Repeal of the ACA through Reconciliation*, Urban Inst.

22   (Dec. 2016), https://www.urban.org/sites/default/files/publication/86236/2001013-the-
     implications-of-partial-repeal-of-the-aca-through-reconciliation_1.pdf; Trust for America's

23   Health, *Updated Prevention and Public Health Fund (PPHF) State Funding Data* (FY10-FY17)
     (March 2018), https://www.tfah.org/health-issues/news/updated-prevention-and-public-health-

24   fund-pphf-state-funding-data-fy10-fy17/; Ctrs. for Medicare & Medicaid Serv's, *2017 Effectuated
     Enrollment Snapshot* (June 2017), https://downloads.cms.gov/files/effectuated-enrollment-

25   snapshot-report-06-12-17.pdf; Ctrs. for Medicare & Medicaid Serv's, Nearly 12 Million People
     with Medicare Have Saved over $26 Billion on Prescription Drugs since 2010, Press Release

26   (Jan. 2017), https://www.cms.gov/Newsroom/MediaReleaseDatabase/Press-releases/2017-Press-
     releases-items/2017-01-13.html.

27

28

York hospitals have reported a dramatic decrease in self-pay hospital utilization because patients have gained insurance—a usual source of payment. New York State Institutional Cost Reports show a 23% reduction in self-pay hospital emergency room visits, a 40% reduction in self-pay inpatient services and a 17% reduction in self-pay outpatient visits. Having a usual source of payment for patients reduces the risk of uncompensated care costs.[20]

192. In the District of Columbia between 2010 and 2015, an estimated 25,000 people gained coverage. From 2019 to 2028, a rise in uninsured rates could lead to a loss of federal marketplace spending and Medicaid spending, risking $100 million and $1.7 billion respectively—a total loss of $1.7 billion. If these gains were put at risk, it is estimated that District of Columbia hospitals could lose $700 million and physicians could lose $200 million. Uncompensated care costs in the District of Columbia would increase by $1.7 billion over this period.

193. In Maine, from 2010 to 2018, the rate of uninsured people dropped from 11% to 8%, resulting in 37,000 fewer uninsured people – mostly attributable to the private coverage improvements in the ACA, since the consequences from the MaineCare (Medicaid ) expansion were not fully realized until 2019. Uncompensated care costs in Maine fell by $44 million from 2013 to 2015 alone. The number of people insured through the individual market more than doubled, rising from approximately 32,000 in 2013 to over 70,000 in 2019, according to the Maine Bureau of Insurance. In the 2019 open enrollment period, women comprised 54 percent of people who signed up for individual coverage through HealthCare.gov in Maine.

194. In Maryland, 156,963 residents have obtained private health insurance and more than 1,000,000 are covered by Medicaid as of 2019, cutting the overall rate of the uninsured to just 6%.[21] Uncompensated care costs in the state decreased by an estimated $354 million from 2013

---

[20] Declaration of Dr. Howard A. Zucker ISO Motion to Intervene of State of California, et al., (18-cv-167), April 6, 2018.

[21] Maryland Health Benefit Exchange, 2019 Annual Report 4, 19, https://tinyurl.com/tdrfkeo.

to 2016.[22]  In Maryland, under current agency policy, uncompensated care for all Maryland hospitals is funded by a statewide pooling system in which regulated Maryland hospitals draw funds from the pool if they experience a greater-than-average level of uncompensated care and pay into the pool if they experience a less-than-average level of uncompensated care.  This policy ensures that the cost of uncompensated care is shared equally across all the hospitals within the system.  Thus, when uncompensated care increases, hospital rates increase accordingly, and payers must pay increased rates.

195.    Because Maryland is a payer of hospital rates, Maryland is directly injured by any increase to the uncompensated care rate that will occur if the uninsured population in Maryland increases.  And, any increase in hospital rates will undermine and put at risk Maryland's unique Total Cost of Care Model Agreement with CMS, an Agreement to achieve fixed amounts of savings to Medicare per capita total cost of care during each model year between 2019 and 2023.  The Models financial targets are structured to obtain a total of over $1 billion in Medicare total cost of care savings by the fifth performance year of the Model.

196.    In Oregon, between 2010 and 2015, an estimated 403,000 people gained coverage.  From 2019 to 2028, a rise in uninsured rates could lead to a loss of federal marketplace spending and Medicaid spending, risking $3.3 and $35.1 billion respectively—a total loss of $38.4 billion.  If these gains were put at risk, it is estimated that Oregon hospitals could lose $17.5 billion and physicians could lose $5.7 billion.  Uncompensated care costs in Oregon would increase by $15.2 billion over this period.

197.    In Vermont, between 2010 and 2015, an estimated 26,000 people gained coverage.  From 2019 to 2028, a rise in uninsured rates could lead to a loss of federal marketplace spending and Medicaid spending, risking $1 and $1.9 billion respectively—a total loss of $2.9 billion.  If these gains were put at risk, it is estimated that Vermont hospitals could lose $500 million and

---

[22] Matt Broadus, *ACA Medicaid Expansion Drove Large Drop in Uncompensated Care*, Ctr. on Budget and Policy Priorities (Nov. 9, 2019), https://www.cbpp.org/blog/aca-medicaid-expansion-drove-large-drop-in-uncompensated-care.

physicians could lose $300 million. Uncompensated care costs in Vermont would increase by $2.4 billion over this period.

### 6. The Rule Harms Women and Creates Unreasonable Burdens on Abortion Care

198. Indisputably, the Rule disproportionally impacts the States, which are committed to protecting women's access to the full range of reproduction options and allow or require qualified health plans to include abortion coverage as part of the qualified health plan's benefits.

199. The Rule primarily seeks to create barriers to access to women's healthcare by targeting coverage of a service unique to women—and protected by federal and state laws— abortion care.

200. While the Rule directs issuers to separately bill policy holders without regard to sex, abortion coverage and services are unique to women's reproductive health. 84 Fed. Reg. 71,694. Contrary to nondiscrimination protections provided by the ACA, the Rule has a disparate impact on women because it conditions their access to comprehensive reproductive healthcare on the onerous regulatory burdens requiring separate billing and payments and seeks to eliminate legal abortion coverage entirely in states that do not require it.

201. As discussed in *Subsection F(4)* above, the Rule creates unnecessary confusion, and if separate bills are not paid at the onset of enrollment, women run the risk of being left without any coverage at all. Failing to comply with the Rule impacts women differently than men.

202. The risk of losing coverage of abortion services naturally falls heaviest on women who may require it, potentially resulting in irreversible harm in the form of delayed care, unintended pregnancies, or health complications. Without insurance coverage, a woman must procure the necessary funding to cover the out-of-pocket expenses in time to obtain a needed abortion, placing unreasonable obstacles in her attempt to exercise a legal right.

203. For example, if an issuer terminates a woman's healthcare coverage when she requires abortion services, a time-sensitive matter, she would find herself in the difficult position of having to pay out-of-pocket or endure additional risk while attempting to secure alternative coverage, which may or may not be available. Ultimately, delays in reaching and obtaining care

can push women later into their pregnancies, even up to the point that they might not be able to obtain a wanted abortion, depending on the gestational limits on abortion in their state.[23] Those forced to delay abortion care often experience negative mental health outcomes, and consider ending the pregnancy on their own, either with medications (misoprostol, herbs or home remedies) or by blunt-force physical trauma.[24]

204.    HHS is aware the Rule's risk of coverage loss could leave women to pay higher out-of-pocket costs for abortion care.  84 Fed. Reg. 71,705.  HHS also received many comments expressing "concern that when legal abortion becomes inaccessible, women who seek to end their pregnancy turn to unsafe and illegal methods, risking arrest, serious injury, or even death." *Id.* But HHS simply concludes that "any additional burden these enrollees experience related to understanding" the Rule or inadvertently failing to submit payments in full due to confusion, "is unrelated to whether [enrollees] actually do access coverage" for abortion services.  *Id.* at 71,695. HHS's statement fails to meaningfully consider to the pivotal importance of healthcare coverage that enables women to obtain lawful, necessary healthcare services—and in this case—for women to exercise their constitutionally protected right to abortion.  HHS even disregards commenters who stressed, in their professional opinion, that access to comprehensive reproductive healthcare "is one of the few means of regaining self-esteem and a sense of bodily autonomy" for women experiencing partner abuse, reproductive coercion, and sexual assault.  (Comment submitted by University of California, Irvine, School of Nursing, Assistant Professor Candace W. Burton, RN, PhD on Proposed Rule).

205.    This unnecessary burden applies to no other healthcare service or benefit.  The Rule's sole function is to make it more burdensome and more confusing for women to pay for health plans that include legal abortion services, and frustrate the receipt of such coverage in states that require or allow it.  Further, for many women, access to a health plan that includes abortion

---

[23] Alice Cartwright et al., *Identifying National Availability of Abortion Care and Distance from Major US Cities: Systematic Online Search* (2018), https://www.jmir.org/2018/5/e186/.

[24] Jenna Jerman et al., *Barriers to Abortion Care and Their Consequences for Patients Traveling for Services: Qualitative Findings from Two States*, Perspectives on Sexual and Reproductive Health (2017), https://onlinelibrary.wiley.com/doi/full/10.1363/psrh.12024.

1  coverage is a necessary antecedent to the ability to exercise the legal right to obtain the procedure.

2  Forcing women to adapt to onerous and nonsensical billing practices in order to maintain abortion

3  coverage is discriminatory.

4      206.    The receipt of separate monthly bills, and the costs and labor of having to submit or

5  mail separate payments for abortion coverage is plainly unnecessary, and only serves to remind

6  women that their constitutional right to abortion services is one that is heavily regulated. This can

7  potentially stigmatize abortion and shame women for exercising their constitutional right to

8  choose when and whether to become mothers. Women forced to carry an unwanted pregnancy to

9  term risk postpartum hemorrhage and eclampsia, and report a need to limit physical activity for a

10  period three times longer than women who obtain abortions.[25] Women unable to plan

11  pregnancies and who have pregnancies too close together face an increased health risks, such as

12  premature birth, low birth weight, congenital disorders, and schizophrenia.[26] Carrying an

13  unwanted pregnancy to term can also result in a greater risk of domestic violence.[27]

14      207.    Importantly, communities of color are most harmed when abortion access is

15  undermined. (*See* comments submitted by the Public Health and Insurance Committee of the

16  Connecticut General Assembly, California Latinas for Reproductive Justice (CLRJ), and PPFA

17  on Proposed Rule ). The Rule has failed to consider the disproportionate effect these changes will

18  have on women with limited incomes, women of color, those with limited English proficiency

19  and people in states where abortion is not required.

20      208.    It has been well documented that low-income women who lack insurance coverage

21  for abortion often struggle to pay for the procedure out-of-pocket, and these same financial

22

23  [25] Caitlin Gerdts et al., *Side Effects, Physical Health Consequences, and Mortality
    Associated with Abortion and Birth after an Unwanted Pregnancy*, 26 Women's Health Issues 55,
24  58 (2016), https://www.sciencedirect.com/science/article /pii/S1049386715001589.
    [26] *Family Planning: Get the Facts About Pregnancy Spacing*, Mayo Clinic,
25  https://www.mayoclinic.org/healthy-lifestyle/getting-pregnant/in-depth/family-planning/art-
    20044072.
26  [27] Sarah C.M. Roberts et al., *Risk of Violence from the Man Involved in the Pregnancy
27  after Receiving or Being Denied an Abortion*, 12:144 BMC Medicine at 5 (2014),
    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4182793/.

28

1   hardships drive families further into poverty. Abortion procedures are expensive, costing on

2   average between $500 and $1,500. And most enrollees obtaining advanced premium tax credits

3   or cost-sharing reductions, already have limited incomes—which is often a requirement to meet

4   eligibility thresholds.

5         209.     Lack of access to abortion also results in poorer socioeconomic outcomes, including

6   lower rates of full-time employment and increased reliance on public programs.[28] Conversely,

7   increased availability of abortion results in *increased* women's participation in the workforce,

8   especially for women of color.[29] As the Supreme Court recognized, women's control of their

9   reproductive healthcare ensures that they can participate "equally in the economic and social life

10   of the Nation." *Casey*, 505 U.S. at 856; *see also Priests for Life v. U.S. Dep't of Health and*

11   *Human Services*, 808 F.3d 1, 22-23 (2015) (Kavanaugh, J., dissenting) ("It is commonly accepted

12   that reducing the number of unintended pregnancies would further women's health, advance

13   women's personal and professional opportunities, reduce the number of abortions, and help break

14   a cycle of poverty."). Ultimately, women who want an abortion but are unable to afford one

15   without insurance coverage are more likely to spend years living in poverty than women who are

16   able to receive an abortion.

17         210.     Control over family planning and reproductive healthcare are fundamental to gender

18   equality and women's empowerment, as it is a key driver in reducing poverty. Thus, restrictions

19   that prevent women from obtaining abortion coverage can have negative lifelong consequences,

20   resulting in reductions in full-time employment, limited educational opportunities, and increased

21   incidences of poverty.[30]

22         211.     The potential impacts of the Rule, namely the loss of healthcare coverage and having

23   to carry an unwanted pregnancy to term, accentuate the struggles already present for women

---

[28] Diana Greene Foster et al., *Socioeconomic Outcomes of Women Who Receive and Women Who are Denied Wanted Abortions in the United States*, 103 Am. J. Pub. Health 407, 409 (2018), https://www.ncbi.nlm.nih.gov/pmc/ articles/PMC5803812/.

[29] *See* Anna Bernstein et al., *The Economic Effects of Abortion Access: A Review of the Evidence*, Ctr. for Economics of Reproductive Health, Institute for Women's Policy Research (2019), at v., https://iwpr.org/wp-content/uploads/2019/07/B379_Abortion-Access_rfinal.pdf.

[30] *Supra* Foster et al.

across the Nation, and run contrary to the States' efforts to safeguard women's reproductive freedom.

### FIRST CAUSE OF ACTION

#### (Violation of APA; 5 U.S.C. § 706—Exceeds Statutory Authority)

212.    Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

213.    The APA requires courts to "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

214.    The Rule exceeds Defendants' authority under Section 1303, which prohibits the use of federal subsidies to pay for abortion coverage and services, not the collection of a single payment or the use of a single billing statement.

215.     The Rule creates a significant change in policy that cannot be reconciled with the text and purpose of Section 1303, the authorizing statute.

216.    Defendants illegally attempt to redefine subsections of the statute, expanding the requirement for the collection of separate payments and injecting new notice requirements that are directly contrary to the limitations in Section 1303.

217.    By promulgating this Rule, Defendants have acted in excess of their authority granted to them by the ACA.  In doing so, Defendants have taken action in violation of the APA.  The Rule is therefore invalid.

### SECOND CAUSE OF ACTION

#### (Violation of APA; 5 U.S.C. § 706(2)(A)—Contrary to Law)

218.    Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

219.    The APA requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law."  5 U.S.C. § 706(2)(A).

220.    The Rule conflicts with Section 1554 of the Affordable Care Act, which prohibits the Secretary of HHS from promulgating any regulation that limits access to healthcare services.   42 U.S.C. § 18114.  Among other key provisions, Section 1554 prohibits agency actions that (1)

64

1    unreasonably inhibit access to "appropriate medical care;" (2) prevent "timely" access to care; or

2    (3) would prevent a patient from obtaining treatment "for the full duration of [their] medical

3    needs." *Id.*

4    221.    As addressed previously, the Rule's separate abortion billing and collection

5    requirements leave everyone at risk of coverage termination and will unreasonably inhibit access

6    to appropriate and timely medical care, including abortion, in violation of Section 1554.

7    222.    Additionally, the Rule is also in direct conflict with Section 1557 of the ACA, which

8    provides anti-discrimination protections in health programs based on any ground listed under four

9    different federal civil rights statutes, including Title VI of the Civil Rights Act of 1964 (race,

10   color, national origin, and sex), including sex under Title IX of the Education Amendments of

11   1972. 42 U.S.C. § 18116.

12   223.    Defendants' Rule specifically targets a healthcare service unique to women—

13   abortion. HHS recognizes, as it must, that coverage for abortion services is primarily sought by

14   "women who may ultimately access such services." 84 Fed. Reg. 71,694. The Rule, if

15   implemented, will result in a disparate impact on women's access to comprehensive medical care.

16   224.    The likely impact of this Rule is the loss of insurance coverage, which will lead to

17   increased healthcare costs for consumers that no longer have insurance. This is in complete

18   contravention of the widely recognized core purposes of the ACA, which are to "increase the

19   number of Americans covered by health insurance and decrease the cost of health care". *Nat'l*

20   *Fed'n Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

21   225.    By promulgating this Rule, Defendants have acted contrary to the Affordable Care

22   Act in violation of the APA. The Rule is therefore invalid.

### THIRD CAUSE OF ACTION

### (Violation of APA; 5 U.S.C. § 706—Arbitrary, Capricious, and Abuse of Discretion)

25   226.    Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

26   227.    The APA requires courts to "hold unlawful and set aside" agency action that is

27   "arbitrary, capricious, [or] an abuse of discretion…." 5 U.S.C. § 706(2)(A).

28

228.     In issuing the Rule, Defendants have failed to provide a "satisfactory explanation" and "rational connection between the facts found and the choice made." *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 42 (1983).

229.     Defendants ignored critical impacts of the Rule as a whole that the States and others raised in public comments.  Defendants have offered an explanation for their decision that "runs counter to the evidence before the agency" and is "so implausible that it could not be ascribed to a difference of view or the product of agency expertise." *State Farm Ins.*, at 43.

230.     By promulgating this new Rule, Defendants have acted arbitrarily and capriciously and have abused their discretion in violation of the APA.  The Rule is therefore invalid.

### FOURTH CAUSE OF ACTION

### (Violation of APA; 5 U.S.C. § 553—Procedural Rulemaking Violation)

231.     Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

232.     The APA generally requires agencies to provide the public notice and an opportunity to be heard before promulgating a regulation.  An agency wishing to promulgate a regulation must publish in the Federal Register a notice of proposed rulemaking that includes "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b).  After the notice has issued, "the agency shall give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. § 553(c).

233.     In narrow circumstances, the APA exempts agencies from this notice and comment process where they can show "good cause" that the process would be either "impracticable, unnecessary, or contrary to the public interest." *Id*. § 553(b)(B).  The burden is on the agency to demonstrate good cause, and courts have interpreted the exception narrowly. *See*, *e.g.*, *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 6 (D.C. Cir. 2011).

234. Defendants have not and cannot demonstrate good cause for failing to give notice to the public or allowing for public comment prior to instituting a policy of non-enforcement against issuers that allow consumers to opt-out of the otherwise applicable and substantive requirement to include abortion coverage as a benefit in their qualified health plan.

235. Notice and comment is particularly important in legally and factually complex circumstances like those presented here. Notice and comment allows affected parties—including States—to explain the practical effects of a rule before it is implemented, and ensures that the agency proceeds in a fully informed manner, exploring alternative, less harmful approaches. In the area of women's health care, it is particularly important to have an adequate notice and comment given that women are relying on having plans that contain abortion coverage.

236. Because Defendants failed to follow section 553's notice and comment procedures, promulgating a final rule that was not prefigured nor contemplated by the proposed rule, the public and the States did not have an opportunity to comment upon it, as required by the APA. Therefore, the regulation is invalid.

## FIFTH CAUSE OF ACTION

### (Violation of the Tenth Amendment—Federalism)

237. Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth in full.

238. The Tenth Amendment to the United States Constitution provides, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

239. States have "the power to create and enforce a legal code, both civil and criminal." *Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982); V*irginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253 (4th Cir. 2011). Congress may not infringe on the States' sovereign authority to enforce its own laws. "[W]hen a federal law interferes with a state's exercise of its sovereign 'power to create and enforce a legal code' [ ] it inflict[s] on the state the requisite injury-in-fact." *Cty. of Santa Clara v. Trump*, No. 17-CV-00485-WHO, 2017 WL 1459081, at *17 (N.D. Cal. Apr. 25, 2017), reconsideration denied, No. 17-CV-00485-WHO, 2017 WL 3086064 (N.D. Cal.

July 20, 2017), quoting *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th Cir. 1985).

240. HHS' disregard for the States' laws and policies violates the Tenth Amendment's federalism principles.

241. The Rule penalizes the States for requiring and allowing qualified health plans to provide abortion coverage in its state-based exchanges. The States of California, New York, Maine, and Oregon have all enacted an abortion coverage mandate that requires health plans to provide abortion coverage as part of its essential health benefits, and the State of Vermont, which requires abortion be covered under its state's benchmark plan. The State of Maryland and the District of Columbia allow for the provision of abortion coverage in health plans. This represents the States' policy priorities related to safeguarding women's reproductive freedom by securing abortion coverage to ensure that individuals have access to all the services they may need and have the option of exercising constitutionally protected rights.

242. The ACA authorizes the States' insurance commissioners as the entities primarily responsible for monitoring, overseeing, and enforcing the provisions in Section 1303 related to qualified health plans segregation of funds for abortion services. 42 U.S.C. § 18023(b)(2)(E)(i); 45 C.F.R. § 156.280(e)(5). This in itself demonstrates that the ACA contemplated state-flexibility that state-based exchanges were designed to retain.

243. HHS simply runs past this, instead threatening to step in and enforce these unreasonable changes in the State's place, or worse, short-change the States due HHS federal funding for failing to bend to their regulatory scheme.

244. First, the Rule states that "if HHS determines that a state (or State Exchange) has failed to substantially enforce a federal requirement related to Exchanges and the offering of QHPS through Exchanges, including section 1303 of the PPACA's separate payments requirement (or other requirements), the Secretary may step in to enforce the requirement against the non-compliant issuer." 84 Fed. Reg. at 71,692 (citing 42 U.S.C. § 18041(c)(2)).

245. Second, under 42 U.S.C. § 18033(a)(4) (2018), HHS may conclude that the States' inability to comply, or allow issuers to comply, with the Rule amounts to a "pattern of abuse"

1    regarding compliance with HHS standards related to Title I of the ACA.  If "the Secretary

2    determines that an Exchange has engaged in serious misconduct with respect to compliance with

3    the requirements of, or carrying out of activities required" under the ACA, HHS has the authority

4    to rescind up to one percent (1%) of the federal funding dollars due to a state *under any program*

5    *administered by HHS.*  84 Fed. Reg. 71,678.

6    246.    This is significant, because 1% of annual HHS funds amounts to substantial federal

7    dollars at risk for the States.  Therefore, noncompliance with the Rule risks millions of federal

8    dollars paid to the States for the administration of health programs such as Medicaid.

9    247.    In addition, HHS and CMS recent actions demonstrate the administration's

10   commitment to impeding abortion access and interfering with state sovereignty.  On January 24,

11   2020, the Office of Civil Rights of HHS issued a "Notice of Violation to California for its

12   Abortion Coverage Mandate," which at its core implicates California's police powers over its

13   regulation of healthcare, "notifying California that it cannot impose universal abortion coverage

14   mandates on health insurance plans and issuers in violation of federal conscience laws."[31]  The

15   letter indicates that if California does not receive sufficient assurance that the state will come into

16   compliance with federal law within 30 days, the "action may ultimately result in limitations on

17   continued receipt of certain HHS funds."  This puts California, and the States at large, in a

18   vulnerable position, fearing HHS will seek extreme enforcement actions or penalties merely for

19   choosing to protect their public health interests.

20   248.    The Rule runs parallel with this recent CMS action, and is a powerful use of coercion

21   to induce the States to change their sovereign laws—properly promulgated under its police

22   powers—and accept federally imposed policy changes with respect to access to abortion

23   coverage.  *See Nat'l Fed'n Indep. Bus. v. Sebelius* 567 U.S. 519, 578 ("The Constitution simply

24   does not give Congress the authority to require the States to regulate.").  Complying with the

25   Rule's onerous and excessive changes could in effect cause issuers to leave the States' exchanges,

26

27

28   ────────────────
     [31] *See* https://www.hhs.gov/about/news/2020/01/24/hhs-issues-notice-of-violation-to-california-for-its-abortion-coverage-mandate.html.

putting at risk the viability of a strong insurance market in the jurisdictions that require or allow abortion coverage.

249.    Accepting these changes not only threatens the States' sovereignty but would require the States to incur significant administrative costs to implement efforts that actually increase risks to its public health and their marketplaces.  Compliance with this Rule will undermine our States' police powers over healthcare, and require extensive diversion of resources, interfering with enrollment rates and the insurance risk pool.

250.    The Rule will impermissibly impose burdens on the States' sovereignty.

251.    By promulgating the Rule, Defendants have violated the Tenth Amendment of the U.S. Constitution.  Defendants' violation in itself causes ongoing harm to the States and their residents.  The Rule violates the U.S. Constitution and is therefore invalid.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff States respectfully requests that this Court:

1.    Issue a declaratory judgment that the Rule is an unreasonable interpretation of the law;

2.    Issue a declaratory judgment that the Rule is arbitrary, capricious, an abuse of discretion, not in accordance with law, and contrary to the States' constitutional rights, powers, privileges and immunities, in violation of the Administrative Procedure Act because HHS failed to justify reasons for the change in policy and respond adequately to the public comments it received;

3.    Issue a declaratory judgment that the Rule engaged in improper procedural rulemaking in violation of the Administrative Procedure Act;

4.    Issue a declaratory judgment that the Rule violates the Tenth Amendment;

5.    Postpone the effective date of the Rule, pending judicial review, pursuant to 5 U.S.C. § 705;

6.    Hold unlawful and set aside the Rule, pursuant to 5 U.S.C. § 706(2);

7.    Award the States costs, expenses, and reasonable attorneys' fees;

8.    Award such other relief as the Court deems just and proper.

Dated: January 30, 2020

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
KATHLEEN BOERGERS
Supervising Deputy Attorney General
KETAKEE R. KANE
MICHAEL GOLDSMITH

*/s/ Brenda Ayon Verduzco*

BRENDA AYON VERDUZCO
Deputy Attorneys General
*Attorneys for Plaintiff State of California*

LETITIA JAMES
Attorney General of New York
MATTHEW COLANGELO
Chief Counsel for Federal Initiatives
BRANT CAMPBELL
COLLEEN K. FAHERTY
Assistant Attorneys General

/s/ *Lisa Landau*

LISA LANDAU
Chief, Health Care Bureau
28 Liberty Street
New York, NY 10005
Phone: (212) 416-8542
Lisa.landau@ag.ny.gov
*Attorneys for Plaintiff the State of New York*

71

1

2 KARL A. RACINE
Attorney General for the District of Columbia

3 KATHLEEN KONOPKA
Deputy Attorney General

4 Public Advocacy Division

5 /s/ Alacoque Hinga Nevitt

6 ALACOQUE HINGA NEVITT
Assistant Attorney General

7 441 4th Street, N.W.
Washington, DC 20001

8 Tel (202) 724-6532
Fax (202) 730-1900

9 alacoque.nevitt@dc.gov

10 *Attorneys for Plaintiff District of Columbia*

11 AARON M. FREY
Attorney General of Maine

12

13 /s/ Susan P. Herman

SUSAN P. HERMAN*

14 Chief Deputy Attorney General
6 State House Station

15 Augusta, ME 04333-0006
Telephone: (207) 626-8814

16 susan.herman@maine.gov

17 *Attorneys for Plaintiff State of Maine*
* pro hac vice pending

18

BRIAN E. FROSH

19 Attorney General of Maryland
STEVEN M. SULLIVAN

20 Solicitor General

21 /s/ Kimberly S. Cammarata

22 KIMBERLY S. CAMMARATA
Director, Health Education and Advocacy

23 200 St. Paul Place
Baltimore, MD 21202

24 Telephone: (410) 576-7038
kcammarata@oag.state.md.us

25 *Attorneys for Plaintiff the State of Maryland*

26

27

28

Complaint for Declaratory Relief (Case no.___)

168

ELLEN F. ROSENBLUM
Attorney General of Oregon
MICHAEL C. KRON
Special Counsel
DEANNA J. CHANG

/s/ Nicole DeFever
J. NICOLE DEFEVER
Senior Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
nicole.defever@doj.state.or.us
*Attorneys for Plaintiff the State of Oregon*

THOMAS J. DONOVAN, JR.
Attorney General of Vermont

/s/ Eleanor Spottswood
Eleanor Spottswood*
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-5500
eleanor.spottswood@vermont.gov
*\*pro hac vice pending*

SA2018103397

Complaint for Declaratory Relief (Case no.___)

169

JS 44 (Rev. 09/19)
Case 3:20-cv-00682-WHA Document 1-1 Filed 01/30/20 Page 1 of 1
Case 3:20-cv-00682 Document 1-1 Filed 01/30/20 Page 71 of 189

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| | |
|---|---|
| **I. (a) PLAINTIFFS**<br>STATE OF CALIFORNIA, STATE OF NEW YORK, DISTRICT OF COLUMBIA, STATE OF MAINE, STATE OF MARYLAND, STATE OF OREGON, and the STATE OF VERMONT | **DEFENDANTS**<br>U.S. DEPARTMENT OF HHS; ALEX M. AZAR, II, in his official capacity as Secretary of Health and Human Services; THE CENTERS FOR MEDICARE & MEDICAID SERVICES; et al. |
| **(b)** County of Residence of First Listed Plaintiff    Alameda<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant _____<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>BRENDA AYON VERDUZCO, Deputy Attorneys General<br>1515 Clay Street, 20th Floor, Oakland, CA 94612-0550<br>Telephone: (510) 879-0981 | Attorneys *(If Known)* |

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | **LABOR**<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. § 706; 5 U.S.C. § 553; US Constitution
Brief description of cause:
HHS issued a rule that is contrary to law, exceeds Defendants' authority, and is arbitrary and capricious.

**VII. REQUESTED IN COMPLAINT:**    ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.    DEMAND $ _____    CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE 01/30/2020    SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**170**

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**171**

XAVIER BECERRA
Attorney General of California
KATHLEEN BOERGERS
Supervising Deputy Attorney General
KETAKEE R. KANE
MICHAEL GOLDSMITH
BRENDA AYON VERDUZCO
Deputy Attorneys General
Attorneys for Plaintiff State of California

LETITIA JAMES
Attorney General of New York
MATTHEW COLANGELO
Chief Counsel for Federal Initiatives
BRANT CAMPBELL
COLLEEN K. FAHERTY
Assistant Attorneys General
LISA LANDAU
Chief, Health Care Bureau
28 Liberty Street
New York, NY 10005
Phone: (212) 416-8542
Lisa.landau@ag.ny.gov
Attorneys for Plaintiff the State of New York

KARL A. RACINE
Attorney General for the District of Columbia
KATHLEEN KONOPKA
Deputy Attorney General
Public Advocacy Division
ALACOQUE HINGA NEVITT
Assistant Attorney General
441 4th Street, N.W.
Washington, DC 20001
Tel (202) 724-6532
Fax (202) 730-1900
alacoque.nevitt@dc.gov
Attorneys for Plaintiff District of Columbia

AARON M. FREY
Attorney General of Maine
SUSAN P. HERMAN*
Chief Deputy Attorney General
6 State House Station
Augusta, ME 04333-0006
Telephone: (207) 626-8814

172

susan.herman@maine.gov
Attorneys for Plaintiff State of Maine
* pro hac vice pending

BRIAN E. FROSH
Attorney General of Maryland
STEVEN M. SULLIVAN
Solicitor General

KIMBERLY S. CAMMARATA
Director, Health Education and Advocacy
200 St. Paul Place
Baltimore, MD 21202
Telephone: (410) 576-7038
kcammarata@oag.state.md.us
Attorneys for Plaintiff the State of Maryland

ELLEN F. ROSENBLUM
Attorney General of Oregon
MICHAEL C. KRON
Special Counsel
DEANNA J. CHANG
J. NICOLE DEFEVER
Senior Assistant Attorneys General
100 SW Market Street
Portland, OR 97201
nicole.defever@doj.state.or.us
Attorneys for Plaintiff the State of Oregon

THOMAS J. DONOVAN, JR.
Attorney General of Vermont
Eleanor Spottswood*
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-5500
eleanor.spottswood@vermont.gov
*pro hac vice pending

**173**

1  JEFFREY B. CLARK
   Acting Assistant Attorney General
2  DAVID L. ANDERSON
   United States Attorney
3  ERIC B. BECKENHAUER
   Assistant Branch Director
4  BRADLEY P. HUMPHREYS
   Trial Attorney
5  Federal Programs Branch
6  U.S. Department of Justice, Civil Division
   1100 L Street, NW
7  Washington, DC  20005
   Tel.:  (202) 305-0878
8  Fax:  (202) 616-8460
9  Email:  Bradley.Humphreys@usdoj.gov
   *Counsel for Defendants*
10

11              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
12

13  STATE OF CALIFORNIA, *et al.*,           )   Case No.: 3:20-cv-00682-LB
                                             )
14                   Plaintiffs,             )   **NOTICE OF APPEAL**
                                             )
15           v.                              )
                                             )
16                                           )
    U.S. DEPARTMENT OF HEALTH AND            )
17  HUMAN SERVICES, *et al.*,                )
                                             )
18                   Defendants.             )
19

20          PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of

21  Appeals for the Ninth Circuit from all aspects of the Court's July 20, 2020 order granting

22  Plaintiffs' motion for summary judgment, ECF No. 65, and judgment, ECF No. 66, and all prior

23  orders and decisions that merge into those orders.

24  Dated: September 17, 2020              Respectfully submitted,

25

26                                         JEFFREY B. CLARK
                                           Acting Assistant Attorney General
27

28

**174**

DAVID L. ANDERSON
United States Attorney

ERIC B. BECKENHAUER
Assistant Branch Director

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
(DC Bar No. 988057)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-0878
Fax: (202) 616-8460
Email: Bradley.Humphreys@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2020, I electronically filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF system.

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPRHEYS
(D.C. Bar No. 988057)

# 3:20cv682, State Of California Et Al V. U.S. Dept. Of Health And Human Services Et Al

US District Court Docket

US District Court for the Northern District of California

(San Francisco)

**This case was retrieved on 12/27/2020**

## Header

**Case Number:** 3:20cv682
**Date Filed:** 01/30/2020
**Assigned To:** Magistrate Judge Laurel Beeler
**Nature of Suit:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision (899)
**Cause:** Administrative Procedure Act
**Lead Docket:** None
**Other Docket:** USCA, 20-16802
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Closed
**Closed:** 07/20/2020
**Statute:** 05:551
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutes - Administrative Procedure Act/Review or Appeal of Agency Decision

## Litigants

State of California
**Plaintiff**

## Attorneys

Brenda Ayon Verduzco
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
Department of Justice
Office Of The Attorney General 1515 Clay Street
Oakland, CA 94612-1499
USA
(510) 879-0981     Email:Brenda.Ayonverduzco@doj.Ca.Gov

Kathleen Boergers
ATTORNEY TO BE NOTICED
California Department of Justice
Office Of The Attorney General 1515 Clay Street
Oakland, CA 94612
USA
(510) 879-0011     Email:Kathleen.Boergers@doj.Ca.Gov

Ketakee Rajiv Kane
ATTORNEY TO BE NOTICED
California Department of Justice
1515 Clay St.
Oakland, CA 94612
USA
415-879-1519     Email:Ketakee.Kane@doj.Ca.Gov

Michael Lawrence Goldsmith
ATTORNEY TO BE NOTICED

176

3:20cv682, State Of California Et Al V. U.S. Dept. Of Health And Human Services Et Al

| Litigants | Attorneys |
|---|---|
| | California Department of Justice<br>300 S. Spring Street, Suite 1702<br>Los Angeles, CA 90013<br>USA<br>213-269-6441    Email:Michael.Goldsmith@doj.Ca.Gov |
| **State of New York**<br>**Plaintiff** | Brenda Ayon Verduzco<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Department of Justice<br>Office Of The Attorney General 1515 Clay Street<br>Oakland, CA 94612-1499<br>USA<br>(510) 879-0981    Email:Brenda.Ayonverduzco@doj.Ca.Gov |
| | Lisa Landau<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Chief, Halth Care Bureau<br>28 Liberty Street<br>New York, NY 10005<br>USA<br>(212) 416-8542    Email:Lisa.Landau@ag.Ny.Gov |
| | Colleen Kelly Faherty<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>New York State Office of the Attorney General<br>28 Liberty Street<br>New York, NY 10005<br>USA<br>212-416-6046    Fax: 212-416-6009<br>Email:Colleen.Faherty@ag.Ny.Gov |
| | Matthew Colangelo<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Chief Counsel for Federal Initiatives<br>Office Of The New York State Attorney General 28 Liberty Street<br>New York, NY 10005<br>USA<br>212-416-6057    Email:Matthew.Colangelo@ag.Ny.Gov |
| **District of Columbia**<br>**Plaintiff** | Alacoque Hinga Nevitt<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Office of the Attorney General for the District of Columbia<br>400 6th Street Nw<br>Washington, DC 20001<br>USA<br>202-717-1368    Email:Alacoque.Nevitt@dc.Gov |
| | Brenda Ayon Verduzco<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Department of Justice<br>Office Of The Attorney General 1515 Clay Street<br>Oakland, CA 94612-1499<br>USA<br>(510) 879-0981    Email:Brenda.Ayonverduzco@doj.Ca.Gov |
| **State of Maine**<br>**Plaintiff** | Brenda Ayon Verduzco<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Department of Justice<br>Office Of The Attorney General 1515 Clay Street<br>Oakland, CA 94612-1499<br>USA |

3:20cv682, State Of California Et Al V. U.S. Dept. Of Health And Human Services Et Al

| Litigants | Attorneys |
|---|---|
| | (510) 879-0981    Email:Brenda.Ayonverduzco@doj.Ca.Gov |
| | Susan P. Herman<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Office of the Attorney General<br>Litigation Division    6 State House Station<br>Augusta, ME 04333-0006<br>USA<br>207-626-8814    Fax: 207-287-3145<br>Email:Susan.Herman@maine.Gov |
| | Thomas C. Sturtevant<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Office of the Maine Attorney General<br>6 State House Station<br>Augusta, ME 04333<br>USA<br>207-626-8413    Fax: 207-287-3145<br>Email:Thomas.C.Sturtevant@maine.Gov |
| State of Maryland<br>**Plaintiff** | Brenda Ayon Verduzco<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Department of Justice<br>Office Of The Attorney General 1515 Clay Street<br>Oakland, CA 94612-1499<br>USA<br>(510) 879-0981    Email:Brenda.Ayonverduzco@doj.Ca.Gov |
| | Kimberly S. Cammarata<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Maryland Office of the Attorney General<br>200 St Paul Place 16th Floor<br>Baltimore, MD 21202<br>USA<br>410-576-7038    Fax: 410-576-6571<br>Email:Kcammarata@oag.State.Md.Us |
| State of Oregon<br>**Plaintiff** | Brenda Ayon Verduzco<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Department of Justice<br>Office Of The Attorney General 1515 Clay Street<br>Oakland, CA 94612-1499<br>USA<br>(510) 879-0981    Email:Brenda.Ayonverduzco@doj.Ca.Gov |
| | Jeanne Nicole DeFever<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Oregon Dept of Justice<br>Trial Division 100 Sw Market Street<br>Portland, OR 97201<br>USA<br>971-673-1880    Fax: 971-673-5000<br>Email:Nicole.Defever@doj.State.Or.Us |
| State of Vermont<br>**Plaintiff** | Brenda Ayon Verduzco<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Department of Justice<br>Office Of The Attorney General 1515 Clay Street<br>Oakland, CA 94612-1499<br>USA |

3:20cv682, State Of California Et Al V. U.S. Dept. Of Health And Human Services Et Al

## Litigants

## Attorneys

(510) 879-0981   Email:Brenda.Ayonverduzco@doj.Ca.Gov

Eleanor Spottswood
LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE
NOTICED
Vermont Attorney General's Office
109 State St
Montpelier, VT 05609
USA
802-828-3178   Email:Eleanor.Spottswood@vermont.Gov

**State of Colorado**
**Plaintiff**

Abby Lynn Chestnut
PRO HAC VICE;ATTORNEY TO BE NOTICED
Colorado Department of Law
Ralph L. Carr Judicial Center 1300 Broadway, 8th Floor
Denver, CO 80203
USA
720-508-6353   Email:Abby.Chestnut@coag.Gov

Brenda Ayon Verduzco
ATTORNEY TO BE NOTICED
Department of Justice
Office Of The Attorney General 1515 Clay Street
Oakland, CA 94612-1499
USA
(510) 879-0981   Email:Brenda.Ayonverduzco@doj.Ca.Gov

**U.S. Dept. of Health and Human Services**
**Defendant**

Bradley Philip Humphreys
ATTORNEY TO BE NOTICED
U.S. Department of Justice
Civil Division, Federal Programs Branch 1100 L Street, Nw
Washington, DC 20005
USA
202-305-0878   Email:Bradley.Humphreys@usdoj.Gov

**Alex M. Azar**
in his official capacity as Secretary of Health and Human
Services |
**Defendant**

Bradley Philip Humphreys
ATTORNEY TO BE NOTICED
U.S. Department of Justice
Civil Division, Federal Programs Branch 1100 L Street, Nw
Washington, DC 20005
USA
202-305-0878   Email:Bradley.Humphreys@usdoj.Gov

Cormac A Early
ATTORNEY TO BE NOTICED
U.S. Department of Justice
Civil Division, Federal Programs Branch     1100 L St. Nw
Washington, DC 20005
USA
(202) 616 7420   Email:Cormac.A.Early@usdoj.Gov

**Centers for Medicare and Medicaid Services**
**Defendant**

Bradley Philip Humphreys
ATTORNEY TO BE NOTICED
U.S. Department of Justice
Civil Division, Federal Programs Branch 1100 L Street, Nw
Washington, DC 20005
USA
202-305-0878   Email:Bradley.Humphreys@usdoj.Gov

Cormac A Early
ATTORNEY TO BE NOTICED
U.S. Department of Justice
Civil Division, Federal Programs Branch     1100 L St. Nw

3:20cv682, State Of California Et Al V. U.S. Dept. Of Health And Human Services Et Al

| Litigants | Attorneys |
|---|---|
| | Washington, DC 20005 |
| | USA |
| | (202) 616 7420    Email:Cormac.A.Early@usdoj.Gov |
| SEEMA VERMA | Bradley Philip Humphreys |
| in her official capacity as Administrator of Centers for | ATTORNEY TO BE NOTICED |
| Medicare and Medicaid Services \| | U.S. Department of Justice |
| **Defendant** | Civil Division, Federal Programs Branch 1100 L Street, Nw |
| | Washington, DC 20005 |
| | USA |
| | 202-305-0878    Email:Bradley.Humphreys@usdoj.Gov |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 01/30/2020 | COMPLAINT For Declaratory Relief against Alex M. Azar, Centers for Medicare and Medicaid Services, U.S. Dept. of Health and Human Services, Seema Verma. Filed by District of Columbia, State of California, State of Maine, State of Maryland, State of New York, State of Oregon, State of Vermont. (Attachments: # 1 Civil Cover Sheet)(Ayon Verduzco, Brenda) (Filed on 1/30/2020) Modified on 1/31/2020 (slhS, COURT STAFF). (Entered: 01/30/2020) | |
| 2 | 01/30/2020 | FEE PAID (Filing fee$400,receipt number 0971-14123180). (Ayon Verduzco, Brenda) (Filed on 1/30/2020) (Entered: 01/30/2020) | |
| | 01/30/2020 | Electronic filing error. Incorrect Revision of Civil Cover Sheet used [err201].Current Revision is JS-CAND 44 (Rev. 07/19). Please complete correct Civil Cover Shee t and e-file an an Amended Civil Cover Sheet only. Event is located at: Other Filings > Other Documents > Civil Cover Sheet. (ajsS, COURT STAFF) (Filed on 1/30/2020) (Entered: 01/30/2020) | |
| 3 | 01/30/2020 | Case assigned to Magistrate Judge Laurel Beeler. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit E-Filing A New Civil Case at http://cand.uscourts.gov/ecf/caseopening.Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5-1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 2/13/2020. (ajsS, COURT STAFF) (Filed on 1/30/2020) (Entered: 01/30/2020) | |
| 4 | 01/30/2020 | Civil Cover Sheet by State of California (Amended). (Ayon Verduzco, Brenda) (Filed on 1/30/2020) (Entered: 01/30/2020) | |
| 5 | 01/31/2020 | Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 4/23/2020. Initial Case Management Conference set for 4/30/2020 11:00 AM in San Francisco, Courtroom B, 15th Floor. (slhS, COURT STAFF) (Filed on 1/31/2020) (Entered: 01/31/2020) | |
| 6 | 01/31/2020 | Proposed Summons. (Ayon Verduzco, Brenda) (Filed on 1/31/2020) (Entered: 01/31/2020) | |

3:20cv682, State Of California Et Al V. U.S. Dept. Of Health And Human Services Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 7 | 02/03/2020 | Summons Issued as to Alex M. Azar, Centers for Medicare and Medicaid Services, U.S. Dept. of Health and Human Services, Seema Verma. (slhS, COURT STAFF) (Filed on 2/3/2020) (Entered: 02/03/2020) | |
| 8 | 02/06/2020 | NOTICE of Appearance by Alacoque Hinga Nevitt  (Nevitt, Alacoque) (Filed on 2/6/2020) (Entered: 02/06/2020) | |
| 9 | 02/07/2020 | CLERK'S NOTICE Re: Consent or Declination: Plaintiff District of Columbia shall file a consent or declination to proceed before a magistrate judge. Note that any party is free to withhold consent to proceed before a magistrate judge without adverse substantive consequences. The forms are available at: http://cand.uscourts.gov/civilforms. Consent/Declination due by 2/13/2020. (ejkS, COURT STAFF) (Filed on 2/7/2020) (Entered: 02/07/2020) | |
| 10 | 02/10/2020 | MOTION for leave to appear in Pro Hac Vice  ( Filing fee $ 310, receipt number 0971-14158883.) filed by State of Vermont. (Attachments: # 1 Exhibit Certificate of Good Standing)(Spottswood, Eleanor) (Filed on 2/10/2020) (Entered: 02/10/2020) | |
| 11 | 02/10/2020 | Order by Magistrate Judge Laurel Beeler granting 10 Motion for Pro Hac Vice. Attorney Eleanor Spottswood representing Plaintiff State of Vermont. (ejkS, COURT STAFF) (Filed on 2/10/2020) (Entered: 02/10/2020) | |
| 12 | 02/10/2020 | CLERK'S NOTICE Re: Consent or Declination: Plaintiff State of Vermont shall file a consent or declination to proceed before a magistrate judge. Note that any party is free to withhold consent to proceed before a magistrate judge without adverse substantive consequences. The forms are available at: http://cand.uscourts.gov/civilforms. Consent/Declination due by 2/24/2020. (ejkS, COURT STAFF) (Filed on 2/10/2020) (Entered: 02/10/2020) | |
| 13 | 02/10/2020 | MOTION for leave to appear in Pro Hac Vice  ( Filing fee $ 310, receipt number 0971-14159781.) filed by State of New York. (Attachments: # 1 Exhibit Certificate of Good Standing)(Faherty, Colleen) (Filed on 2/10/2020) (Entered: 02/10/2020) | |
| 14 | 02/10/2020 | Order by Magistrate Judge Laurel Beeler granting 13 Motion for Pro Hac Vice. Attorney Colleen K. Faherty representing Plaintiff State of New York. (ejkS, COURT STAFF) (Filed on 2/10/2020) (Entered: 02/10/2020) | |
| 15 | 02/11/2020 | MOTION for leave to appear in Pro Hac Vice  ( Filing fee $ 310, receipt number 0971-14164988.) filed by State of Maine. (Attachments: # 1 Exhibit Certificate of Good Standing)(Herman, Susan) (Filed on 2/11/2020) (Entered: 02/11/2020) | |
| 16 | 02/11/2020 | Order by Magistrate Judge Laurel Beeler granting 15 Motion for Pro Hac Vice. Attorney Susan P. Herman representing Plaintiff State of Maine. (ejkS, COURT STAFF) (Filed on 2/11/2020) (Entered: 02/11/2020) | |
| 17 | 02/12/2020 | MOTION for leave to appear in Pro Hac Vice  ( Filing fee $ 310, receipt number 0971-14169776.) filed by State of New York. (Attachments: # 1 Exhibit Certificate of Good Standing)(Colangelo, Matthew) (Filed on 2/12/2020) (Entered: 02/12/2020) | |
| 18 | 02/12/2020 | Order by Magistrate Judge Laurel Beeler granting 17 Motion for Pro Hac Vice. Attorney Matthew Colangelo representing Plaintiff State of New York. (ejkS, COURT STAFF) (Filed on 2/12/2020) (Entered: 02/12/2020) | |
| 19 | 02/12/2020 | CERTIFICATE OF SERVICE by State of California re 1 Complaint, 4 Civil Cover Sheet, 3 Case Assigned by Intake,,, 7 Summons Issued  (Ayon Verduzco, Brenda) (Filed on 2/12/2020) (Entered: 02/12/2020) | |

3:20cv682, State Of California Et Al V. U.S. Dept. Of Health And Human Services Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 20 | 02/13/2020 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by District of Columbia, State of California, State of Maine, State of Maryland, State of New York, State of Oregon, State of Vermont.. (Ayon Verduzco, Brenda) (Filed on 2/13/2020) (Entered:. 02/13/2020) | |
| 21 | 02/25/2020 | NOTICE of Appearance by Bradley Philip Humphreys (Humphreys, Bradley) (Filed on 2/25/2020) Entered: 02/25/2020) | |
| 22 | 02/26/2020 | CLERK'S NOTICE Re: Consent or Declination: Defendants shall file a consent or declination to proceed before a magistrate judge. Note that any party is free to withhold consent to proceed before a magistrate judge without adverse substantive consequences. The forms are available at: http://cand.uscourts.gov/civilforms. Consent/Declination due by 3/11/2020. (ejkS, COURT STAFF) (Filed on 2/26/2020) (Entered: 02/26/2020) | |
| 23 | 02/26/2020 | MOTION for leave to appear in Pro Hac Vice  ( Filing fee $ 310, receipt number 0971-14220585.) filed by State of Maryland. (Cammarata, Kimberly) (Filed on 2/26/2020) (Entered: 02/26/2020) | |
| 24 | 02/26/2020 | Order by Magistrate Judge Laurel Beeler granting 23 Motion for Pro Hac Vice. Attorney Kimberly S. Cammarata representing Plaintiff State of Maryland. (ejkS, COURT STAFF) (Filed on 2/26/2020) Modified on 2/27/2020 (ejkS, COURT STAFF). (Entered: 02/26/2020) | |
| 25 | 02/26/2020 | AMENDED COMPLAINT for Declaratory and Injunctive Relief against Alex M. Azar, Centers for Medicare and Medicaid Services, U.S. Dept. of Health and Human Services, Seema Verma . Filed byState of Oregon, State of Maryland, State of New York, District of Columbia, State of California, State of Maine, State of Vermont, State of Colorado. (Ayon Verduzco, Brenda) (Filed on 2/26/2020) Modified on 2/27/2020 (slhS, COURT STAFF). (Entered: 02/26/2020) | |
| 26 | 02/27/2020 | MOTION for leave to appear in Pro Hac Vice  ( Filing fee $ 310, receipt number 0971-14223776.) filed by State of Colorado. (Attachments: # 1 Exhibit Chestnut_Colorado Certificate of Good Standing)(Chestnut, Abby) (Filed on 2/27/2020) (Entered: 02/27/2020) | |
| 27 | 02/27/2020 | Order by Magistrate Judge Laurel Beeler granting 26 Motion for Pro Hac Vice. Attorney Abby Chestnut representing Plaintiff State of Colorado. (ejkS, COURT STAFF) (Filed on 2/27/2020) (Entered: 02/27/2020) | |
| 28 | 02/27/2020 | NOTICE of Appearance by Ketakee Rajiv Kane  (Kane, Ketakee) (Filed on 2/27/2020) (Entered: 02/27/2020) | |
| 29 | 03/04/2020 | NOTICE of Appearance by Kimberly S. Cammarata  (Cammarata, Kimberly) (Filed on 3/4/2020) (Entered: 03/04/2020) | |
| 30 | 03/05/2020 | CLERK'S NOTICE RESETTING CASE MANAGEMENT CONFERENCE TIME: Initial Case Management Conference set for 4/30/2020 at 11:00 AM is reset to 9:30 AM in San Francisco, Courtroom B, 15th Floor.  (This is a text-only entry generated by the court. There is no document associated with this entry.) (ejkS, COURT STAFF) (Filed on 3/5/2020) (Entered: 03/05/2020) | |
| 31 | 03/11/2020 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Alex M. Azar, Centers for Medicare and Medicaid Services, U.S. Dept. of Health and Human Services, Seema Verma.. (Humphreys, Bradley) (Filed on 3/11/2020) (Entered: 03/11/2020) | |
| 32 | 03/18/2020 | CLERK'S NOTICE RE: CASE MANAGEMENT CONFERENCE / MOTION HEARING: Through at least May 1, 2020, the court (under the new General Orders 72 and 73, available at https://cand.uscourts.gov/notices/information-regarding-covid-19) | |

3:20cv682, State Of California Et Al V. U.S. Dept. Of Health And Human Services Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | will not have any in-person civil case-management conferences or civil-motions hearings and instead will have telephonic appearances or decide the matters on the papers. For now, the court is converting all appearances to telephone appearances but may on a case-by-case basis take things off calendar. For motions hearings, the court is open to hearings by Skype for Business or Google Hangouts (and may be able to use Zoom eventually). Telephonic appearances generally are by CourtCall, but the court also circulates the following conference number, which can accommodate up to 200 people and allow the equivalent of a public hearing by telephone: Dial In: 877-336-1839Access Code: 8191201#Security Code: 200430#  (This is a text-only entry generated by the court. There is no document associated with this entry.) (ejkS, COURT STAFF) (Filed on 3/18/2020) (Entered: 03/18/2020) | |
| 33 | 03/19/2020 | CLERK'S NOTICE RE: UPDATED CALL-IN INFORMATION FOR CMC/MOTION HEARING: The court circulates the following conference number to allow the equivalent of a public hearing by telephone:Dial In: 877-336-1839Access Code: 8191201#  (This is a text-only entry generated by the court. There is no document associated with this entry.) (ejkS, COURT STAFF) (Filed on 3/19/2020) (Entered: 03/19/2020) | |
| 34 | 03/25/2020 | STIPULATION WITH PROPOSED ORDER re: Request for Expedited Briefing Schedule filed by State of California. (Attachments: # 1 Proposed Order Granting Stipulated Request)(Ayon Verduzco, Brenda) (Filed on 3/25/2020) (Entered: 03/25/2020) | |
| 35 | 03/25/2020 | Order by Magistrate Judge Laurel Beeler granting 34 Stipulation for Expedited Briefing Schedule re Cross Motions for Summary Judgment. The court also is available to hear the case on June 4, 2020, but the briefing schedule must be complete two weeks before the any hearing. The court approves the briefing schedule, and when the plaintiffs file their motion on March 30, 2020, they must notice the motion for a hearing on June 11, 2020 at 9:30 unless the parties have stipulated to a slightly faster briefing schedule, in which case, they may notice it for June 4, 2020 at 9:30 a.m. The court does not set the hearing date now because it gets set automatically when the plaintiffs notice the motion.Plaintiffs to file a motion for summary judgment (not to exceed 40 pages): 3/30/2020.Amicus briefs filed in support of Plaintiffs motion: 4/6/2020. Defendants to file in lieu of an answer, a combined response to Plaintiffs motion for summary judgment and a cross-motion for summary judgment (not to exceed 50 pages): 4/20/2020. Amicus briefs filed in support of Defendants motion: 4/27/2020. Plaintiffs to file a combined response to Defendants cross-motion for summary judgment and reply in support of Plaintiffs motion for summary judgment (not to exceed 30 pages): 5/4/2020. Defendants to file a reply in support of their cross-motion for summary judgment (not to exceed 20 pages): 5/26/2020. Hearing on the cross-motions for summary judgment: 6/11/2020 at 11:00 AM in San Francisco, Courtroom B, 15th Floor. (ejkS, COURT STAFF) (Filed on 3/25/2020) (Entered: 03/25/2020) | |
| 36 | 03/30/2020 | MOTION for Summary Judgment , with Memorandum of Points and Authorities filed by State of California. Motion Hearing set for 6/11/2020 09:30 AM in San Francisco, Courtroom B, 15th Floor before Magistrate Judge Laurel Beeler. Responses due by 4/13/2020. Replies due by 4/20/2020. (Attachments: # 1 Declaration, # 2 Declaration, # 3 Declaration, # 4 Declaration, # 5 Declaration, # 6 Declaration, # 7 Declaration, # 8 Declaration, # 9 Declaration, # 10 Declaration, # 11 Declaration, # 12 Declaration, | |

3:20cv682, State Of California Et Al V. U.S. Dept. Of Health And Human Services Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | # 13 Declaration, # 14 Declaration, # 15 Declaration, # 16 Declaration)(Ayon Verduzco, Brenda) (Filed on 3/30/2020) Modified on 3/31/2020 (slhS, COURT STAFF). (Entered: 03/30/2020) | |
| 37 | 03/30/2020 | Declaration of Brenda Ayon Verduzco in Support of 36 MOTION for Summary Judgment filed by State of California. (Attachments: # 1 Proposed Order)(Related document(s) 36 ) (Ayon Verduzco, Brenda) (Filed on 3/30/2020) Modified on 3/31/2020 (slhS, COURT STAFF). (Entered: 03/30/2020) | |
| 38 | 03/30/2020 | Appendix of Evidence in Support re 37 Declaration in Support, 36 MOTION for Summary Judgment filed by State of California. (Attachments: # 1 Exhibits 1 through 5, # 2 Exhibits 6 through 10, # 3 Exhibits 11 through 114, # 4 Exhibits 15 through 18, # 5 Exhibits 19 through 23, # 6 Exhibits 24 through 28, # 7 Exhibits 29 through 39, # 8 Certificate/Proof of Service)(Related document(s) 37 , 36 ) (Ayon Verduzco, Brenda) (Filed on 3/30/2020) Modified on 3/31/2020 (slhS, COURT STAFF). (Entered: 03/30/2020) | |
| 39 | 04/01/2020 | Correction of Opposition/Response or Reply Deadlines pertaining to 36 MOTION for Summary Judgment (Reason: Correcting an error) According to 35 ORDER granting 34 Stipulation for Expedited Briefing Schedule filed byState of California. Responses due by 4/20/2020. Replies due by 5/4/2020. (Ayon Verduzco, Brenda) (Filed on 4/1/2020) (Entered: 04/01/2020) | |
| 40 | 04/10/2020 | CLERK'S NOTICE RESETTING CASE MANAGMENT CONFERENCE: In light of the Motion Hearing set for 6/11/2020, the court resets the Initial Case Management Conference previously set for 4/30/2020 to 6/25/2020 at 11:00 AM in San Francisco, Courtroom B, 15th Floor. Case Management Statement due by 6/18/2020. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ejkS, COURT STAFF) (Filed on 4/10/2020) (Entered: 04/10/2020) | |
| 41 | 04/10/2020 | STATEMENT OF RECENT DECISION pursuant to Civil Local Rule 7-3.d filed byState of California. (Attachments: # 1 Order Granting Partial Summary Judgment)(Ayon Verduzco, Brenda) (Filed on 4/10/2020) (Entered: 04/10/2020) | |
| 42 | 04/20/2020 | NOTICE of Appearance by Cormac A Early (Early, Cormac) (Filed on 4/20/2020) (Entered: 04/20/2020) | |
| 43 | 04/20/2020 | OPPOSITION to Plaintiffs' 36 Motion for Summary Judgment and Cross-MOTION for Summary Judgment , with Memorandum of Points and Authorities filed by Alex M. Azar, Centers for Medicare and Medicaid Services, U.S. Dept. of Health and Human Services, Seema Verma. Motion Hearing set for 6/11/2020 09:30 AM in San Francisco, Courtroom B, 15th Floor before Magistrate Judge Laurel Beeler. Responses due by 5/4/2020. Replies due by 5/26/2020. (Attachments: # 1 Proposed Order)(Humphreys, Bradley) (Filed on 4/20/2020) Modified on 4/21/2020 (slhS, COURT STAFF). Modified on 4/21/2020 (slhS, COURT STAFF). (Entered: 04/20/2020) | |
| 44 | 05/04/2020 | OPPOSITIION (re 43 Cross- MOTION for Summary Judgment); REPLY in Support (re 36 MOTION for Summary Judgment) filed by State of California. (Attachments: # 1 Certificate/Proof of Service)(Ayon Verduzco, Brenda) (Filed on 5/4/2020) Modified on 5/5/2020 (slhS, COURT STAFF). (Entered: 05/04/2020) | |
| 45 | 05/11/2020 | CLERK'S NOTICE RESETTING FURTHER CASE MANAGEMENT CONFERENCE TIME: Further Case Management Conference set for 6/11/2020 at 11:00 AM is reset to 9:30 AM. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ejkS, COURT STAFF) (Filed on 5/11/2020) (Entered: 05/11/2020) | |

184

3:20cv682, State Of California Et Al V. U.S. Dept. Of Health And Human Services Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 46 | 05/11/2020 | CLERK'S NOTICE RESETTING INITIAL CASE MANAGEMENT CONFERENCE TIME: Initial Case Management Conference set for 6/25/2020 at 11:00 AM is reset to 9:30 AM. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ejkS, COURT STAFF) (Filed on 5/11/2020) (Entered: 05/11/2020) | |
| 47 | 05/21/2020 | MOTION for Extension of Time to File Response/Reply as to 44 Reply to Opposition/Response, filed by Alex M. Azar, Centers for Medicare and Medicaid Services, U.S. Dept. of Health and Human Services, Seema Verma. (Attachments: # 1 Declaration, # 2 Proposed Order)(Humphreys, Bradley) (Filed on 5/21/2020) (Entered: 05/21/2020) | |
| 48 | 05/21/2020 | MOTION to Shorten Time filed by Alex M. Azar, Centers for Medicare and Medicaid Services, U.S. Dept. of Health and Human Services, Seema Verma. (Attachments: # 1 Declaration, # 2 Proposed Order)(Humphreys, Bradley) (Filed on 5/21/2020) (Entered: 05/21/2020) | |
| 49 | 05/21/2020 | ORDER.Ordinarily an administrative motion requires a response within four days under the Local Rules. That is not possible given the timing issues. The court asks the plaintiffs to weigh in by 3:30 p.m. today. For various reasons, including the fact that the urgency of the June date is ameliorated by the new timing, the court's own ability to work on the motion might be improved by hearing the case somewhat later. (The court is on criminal duty in June. Thanks to quarantine issues, in-custody defendants appear one at a time, by telephone, and a calendar that used to take 30 minutes can now stretch hours.) The court is willing to try to hear the case a week later, but the extra time to work on the already filed briefs will be useful. (This is a text-only entry generated by the court. There is no document associated with this entry.) (Beeler, Laurel) (Filed on 5/21/2020) (Entered: 05/21/2020) | |
| 50 | 05/21/2020 | OPPOSITION/RESPONSE (re 47 MOTION for Extension of Time to File Response/Reply as to 44 Reply to Opposition/Response, ) filed byState of California. (Ayon Verduzco, Brenda) (Filed on 5/21/2020) (Entered: 05/21/2020) | |
| 51 | 05/22/2020 | CLERK'S NOTICE Continuing Motion Hearing. Motion Hearing 36 MOTION for Summary Judgment and 43 Cross- MOTION for Summary Judgment previously set for 6/11/2020 is reset to 6/18/2020 at 9:30 AM. Replies due by 6/2/2020. (This is a text-only entry generated by the court. There is no document associated with this entry.) (Related documents(s) 43 , 36 )(ejkS, COURT STAFF) (Filed on 5/22/2020) (Entered: 05/22/2020) | |
| 52 | 06/02/2020 | REPLY in Support (re 43 Cross- MOTION for Summary Judgment ) filed by Alex M. Azar, Centers for Medicare and Medicaid Services, U.S. Dept. of Health and Human Services, Seema Verma. (Humphreys, Bradley) (Filed on 6/2/2020) (Entered: 06/02/2020) | |
| 53 | 06/05/2020 | ADR Clerks Notice re: Non-Compliance with Court Order. The parties have failed to file an ADR Certification as required by the Initial Case Management Scheduling Order. Counsel shall comply promptly with the requirements of ADR L.R. 3-5(b) and shall file the ADR Certification. (This is a text-only entry generated by the court. There is no document associated with this entry.)(cmf, COURT STAFF) (Filed on 6/5/2020) (Entered: 06/05/2020) | |
| 54 | 06/08/2020 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Ayon Verduzco, Brenda) (Filed on 6/8/2020) (Entered: 06/08/2020) | |
| 55 | 06/09/2020 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Humphreys, Bradley) (Filed on 6/9/2020) (Entered: 06/09/2020) | |

3:20cv682, State Of California Et Al V. U.S. Dept. Of Health And Human Services Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 56 | 06/11/2020 | CLERKS NOTICE SETTING ZOOM HEARING FOR MOTION HEARING SET FOR 6/18/2020. For Zoom connection, see: https://apps.cand.uscourts.gov/telhrg/ This proceeding will be a Zoom video conferencing webinar. Pre-registration by counsel with the clerk in advance of the hearing must be done by sending a list of names of participating counsel to lbcrd@cand.uscourts.gov no later than noon on Wednesday, June 17, 2020.  All counsel, members of the public and press please click the link or use the information below to join the webinar:https://cand-uscourts.zoomgov.com/webinar/register/WN_hpuezoSLTeOFLIIFo9yOJA Or an H.323/SIP room system: H.323: 161.199.138.10 (US West) or 161.199.136.10 (US East) Meeting ID: 161 696 8400 Password: 334043SIP: 1616968400@sip.zoomgov.com Password: 334043Dial by your location+1 929 205 6099 US (New York)+1 253 215 8782 US+1 301 715 8592 US+1 312 626 6799 US (Chicago)+1 346 248 7799 US (Houston)+1 669 900 6833 US (San Jose)Find your local number: https://zoom.us/u/ac4JkPfcjo For important information and guidance on technical preparation, please see https://www.cand.uscourts.gov/zoom/. (Related documents(s) 43 , 36 ) (This is a text-only entry generated by the court. There is no document associated with this entry.) (ejkS, COURT STAFF) (Filed on 6/11/2020) (Entered: 06/11/2020) | |
| 57 | 06/15/2020 | CLERK'S NOTICE Continuing Motion Hearing. Motion Hearing 36 MOTION for Summary Judgment and 43 Cross- MOTION for Summary Judgment previously set for 6/18/2020 is reset to 6/25/2020 at 9:30 AM before Magistrate Judge Laurel Beeler. (This is a text-only entry generated by the court. There is no document associated with this entry.) (Related documents(s) 43 , 36 )(ejkS, COURT STAFF) (Filed on 6/15/2020) (Entered: 06/15/2020) | |
| 58 | 06/18/2020 | JOINT CASE MANAGEMENT STATEMENT  filed by State of California. (Ayon Verduzco, Brenda) (Filed on 6/18/2020) (Entered: 06/18/2020) | |
| 59 | 06/19/2020 | CLERKS NOTICE SETTING ZOOM HEARING. Motions Hearing / Initial Case Management Conference set for 6/25/2020 at 9:30 AM before Magistrate Judge Laurel Beeler. For Zoom connection, see: https://apps.cand.uscourts.gov/telhrg/This proceeding will be a Zoom video conferencing webinar.  PLEASE NOTE: Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. See General Order 58 at Paragraph III.Case participants may also receive an email invitation from the court with different information which should be followed.All counsel, members of the public and press please click the link or use the information below to join the webinar: https://cand-uscourts.zoomgov.com/j/1619029010?pwd=eVQ4WGN6VmtzSVMwT3crUml6bTRaQT09Meeting ID: 161 902 9010Password: 400462Dial by your location+1 929 205 6099 US (New York)+1 253 215 8782 US+1 301 715 8592 US+1 312 626 6799 US (Chicago)+1 346 248 7799 US (Houston)+1 669 900 6833 US (San Jose)Find your local number: https://zoom.us/u/ac4JkPfcjoFor important information and guidance on technical preparation, please see https://www.cand.uscourts.gov/zoom/.  (This is a text-only entry generated by the court. Th ere is no document associated with this entry.) (ejkS, COURT STAFF) (Filed on 6/19/2020) (Entered: 06/19/2020) | |

3:20cv682, State Of California Et Al V. U.S. Dept. Of Health And Human Services Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 60 | 06/25/2020 | Minute Entry for proceedings held before Magistrate Judge Laurel Beeler: Motion Hearing and Initial Case Management Conference held via Zoom on 6/25/2020. Matter is argued, submitted and taken under submission. Court to issue order. Total Time in Court: 36 minutes. Court Reporter: Ana Dub. Plaintiffs' Attorneys: Brenda Verduzco and Kathleen Boergers. Defendants' Attorney: Bradley Humphreys. (This is a text-only entry generated by the court. There is no document associated with this entry.) (ejkS, COURT STAFF) (Date Filed: 6/25/2020) (Entered: 06/25/2020) | |
| 61 | 06/26/2020 | TRANSCRIPT ORDER for proceedings held on 06/25/2020 before Magistrate Judge Laurel Beeler by State of California, for Court Reporter Ana Dub. (Kane, Ketakee) (Filed on 6/26/2020) (Entered: 06/26/2020) | |
| 62 | 06/29/2020 | TRANSCRIPT ORDER for proceedings held on 06/25/2020 before Magistrate Judge Laurel Beeler by Alex M. Azar, Centers for Medicare and Medicaid Services, U.S. Dept. of Health and Human Services, Seema Verma, for Court Reporter Ana Dub. (Humphreys, Bradley) (Filed on 6/29/2020) (Entered: 06/29/2020) | |
| 63 | 07/03/2020 | Transcript of Proceedings held on 6/25/2020, before Judge Laurel Beeler. Court Reporter Ana M. Dub, CSR 7445, RDR, CRR, telephone number 415-290-1651; ana_dub@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date, it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 61 Transcript Order ) Release of Transcript Restriction set for 10/1/2020. (Related documents(s) 61 ) (amdS, COURT STAFF) (Filed on 7/3/2020) (Entered: 07/03/2020) | |
| 64 | 07/10/2020 | STATEMENT OF RECENT DECISION pursuant to Civil Local Rule 7-3.d filed byState of California. (Attachments: # 1 Memorandum Opinion, # 2 Order Granting Summary Judgment)(Ayon Verduzco, Brenda) (Filed on 7/10/2020) (Entered: 07/10/2020) | |
| 65 | 07/20/2020 | In the attached order, the court grants the plaintiffs' motion for summary-judgment, and denies the defendants' cross-motion for summary-judgment, on the ground that the rule is arbitrary and capricious. (lblc3S, COURT STAFF) (Filed on 7/20/2020) (Entered: 07/20/2020) | |
| 66 | 07/20/2020 | JUDGMENT. Signed by Judge Laurel Beeler on 07/20/2020. (lblc3S, COURT STAFF) (Filed on 7/20/2020) (Entered: 07/20/2020) | |
| 67 | 09/17/2020 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Alex M. Azar, Centers for Medicare and Medicaid Services, U.S. Dept. of Health and Human Services, Seema Verma. Appeal of Judgment 66 , Order on Motion for Summary Judgment 65 (Appeal fee: WAIVED) (Humphreys, Bradley) (Filed on 9/17/2020) (USCA Case No. 20-16802) (Entered: 09/17/2020) | |
| 68 | 09/17/2020 | USCA Case Number 20-16802 for 67 Notice of Appeal filed by U.S. Dept. of Health and Human Services, Centers for Medicare and Medicaid Services, Alex M. Azar, Seema Verma. (slhS, COURT STAFF) (Filed on 9/17/2020) (Entered: 09/17/2020) | |
| 69 | 12/22/2020 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number 0971-15353347.) filed by State of Maine. (Attachments: # 1 Certificate of Good Standing)(Sturtevant, Thomas) (Filed on 12/22/2020) (Entered: 12/22/2020) | |
| 70 | 12/22/2020 | Order by Magistrate Judge Laurel Beeler granting 69 Motion for | |

3:20cv682, State Of California Et Al V. U.S. Dept. Of Health And Human Services Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Pro Hac Vice as to Thomas Sturtevant Jr.(tmiS, COURT STAFF) (Filed on 12/22/2020) (Entered: 12/22/2020) | |
| 71 | 12/23/2020 | MOTION to Withdraw as Attorney filed by State of Maine. Responses due by 1/6/2021. Replies due by 1/13/2021. (Attachments: # 1 Proposed Order)(Herman, Susan) (Filed on 12/23/2020) (Entered: 12/23/2020) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

188

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Amanda L. Mundell*
Amanda L. Mundell